UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No.: 05-21772-CIV-MARTINEZ/BANDSTRA

QANTUM COMMUNICATIONS
CORPORATION, a Delaware corporation,

    Plaintiff,

v.

STAR BROADCASTING, INC., a Florida
corporation, and RONALD E. HALE, SR.,

    Defendants.

_____/



FILED by _____ D.C.

NOV - 7 2005

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

### AMENDED COMPLAINT

Pursuant to Rule 15 of the Federal Rules of Civil Procedure, Plaintiff Qantum Communications Corporation ("Qantum") hereby files this Amended Complaint against Defendants, Star Broadcasting, Inc. ("Star Broadcasting") and Ronald E. Hale, Sr. ("Hale"), and states as follows:

### INTRODUCTION

1.    This is an action against Star Broadcasting and Hale for declaratory relief, injunctive relief, specific performance and breach of contract. Qantum's claims arise from Star Broadcasting and Hale's repeated breaches of, and willful refusal to perform under, an Asset Purchase Agreement ("the WTKE Purchase Agreement") in which they agreed to sell the assets of Ft. Walton Beach radio station WTKE (FM) (the "WTKE Assets") to Qantum. The WTKE Purchase Agreement is attached hereto as "Exhibit A."

2.    On April 14, 2005, Star Broadcasting and Hale sent a notice to Qantum purporting to terminate the WTKE Purchase Agreement. Section 17.1(g), the provision



Case No.: 05-21772-CIV-MARTINEZ/BANDSTRA

of the WTKE Purchase Agreement relied upon by Star Broadcasting and Hale, permits termination only where the party seeking to terminate "is not then in breach."

3.      Star Broadcasting and Hale were unquestionably in breach on April 14, 2005 (and remain so today), both by virtue of a host of contractual violations identified in a January 12, 2005 notice of breach from Qantum, and by virtue of their pre-April 14, 2005 solicitation and negotiations with Cumulus Media, Inc. ("Cumulus"). Qantum's primary competitor in the relevant market. Section 8.9 of the WTKE Purchase Agreement (the "No Shop Provision") expressly states that "[a]s long as this Agreement is in effect," neither Star Broadcasting nor Hale "shall directly or indirectly solicit, entertain, negotiate, with any person or entity (other than a party hereto) or accept any proposal to acquire" the WTKE Assets.

4.      At the August 3, 2005 hearing on Qantum's Motion for Preliminary Injunction, Star Broadcasting and Hale conceded, through counsel, that they had breached the No-Shop Provision by negotiating to sell the WTKE Assets prior to the WTKE Purchase Agreement's termination date.    Star Broadcasting and Hale's concession came in the face of deposition testimony by Cumulus's CEO, Lewis Dickey ("Dickey"), that Star Broadcasting and Hale solicited and negotiated with Cumulus as early as October 2004.   Dickey's testimony, as well as a host of e-mails and other documents produced by Cumulus, directly contradicted Hale's deposition testimony that neither he nor Star Broadcasting approached or discussed the sale of WTKE to Cumulus prior to March 5, 2005.

5.      Because Star Broadcasting and Hale were unquestionably in breach when they issued the termination notice, and because they have no right to terminate while *in*

breach, their purported termination was invalid and Qantum is in the same position it occupied before the purported termination, with all of its rights under the WTKE Purchase Agreement.

6.     Star Broadcasting and Hale's violation of the No-Shop Provision was deliberate and done in bad faith. Hale simply did not want to lose the deal with Qantum without finding out whether there was a better offer available. If Hale had waited until after the WTKE Purchase Agreement was properly terminated to commence negotiations with Cumulus, he would have faced a significant risk that those negotiations would produce no deal whatsoever, leaving him with no means of profiting from the sale of the WTKE Assets.

7.     Notwithstanding Star Broadcasting and Hale's numerous ongoing breaches of the WTKE Purchase Agreement and their wrongful attempt to terminate, Qantum is ready, willing and able to acquire the WTKE Assets from Star Broadcasting and Hale and has demanded, as is its right under the agreement, that Star Broadcasting and Hale move expeditiously to close the deal.

8.     The Court already has granted Qantum a preliminary injunction precluding Star Broadcasting and Hale from selling or transferring the WTKE Assets to any third parties, including Cumulus, while the WTKE Purchase Agreement is in effect. Relatedly, Qantum is entitled to a declaration that Star Broadcasting and Hale's purported termination notice was invalid. Moreover, Qantum is entitled to an order requiring Star Broadcasting and Hale to specifically perform their obligation to convey all of the WTKE Assets to Qantum in accordance with the terms of the WTKE Purchase Agreement. Qantum is entitled to compensation placing it in the position it would have occupied had

Star Broadcasting and Hale timely performed the WTKE Purchase Agreement, including but not limited to any special damages such as lost profits or lost rents. Qantum is also entitled to damages for breach of contract arising out of Star Broadcasting and Hale's sale to a third party of the radio tower from which WTKE presently transmits ("the Tower").

## PARTIES

9.      Qantum is organized under the laws of Delaware, with its principal place of business at 3 Stamford Landing, Suite 210, 46 Southfield Avenue, Stamford, CT 06902. Qantum owns and operates radio stations in small-to-medium sized markets throughout the United States. Although a relatively new player in the radio industry, Qantum has a seasoned management team that has allowed it to pursue a successful strategy of well-planned growth.

10.     Star Broadcasting is organized under the laws of Florida, with its principal place of business at 21 Miracle Strip Parkway, Ft. Walton Beach, FL 32548. On information and belief, Star Broadcasting owns and operates radio stations and related assets in and around Florida.

11.     Hale is a resident of the State of Florida. At all relevant times Hale acted as an agent and/or officer and director of Star Broadcasting.

## JURISDICTION AND VENUE

12.     This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332. The amount in controversy, exclusive of interests and costs, exceeds the sum of $75,000.

13.     Venue in this action is proper in the Southern District of Florida because the parties have expressly agreed to venue in this Court, have waived any objection to

venue here, and have further agreed not to assert that this action is being brought in an

inconvenient or improper forum.  Section 18.7 of the WTKE Purchase Agreement states:

> [Star Broadcasting] and [Qantum] hereby submit to the nonexclusive
> jurisdiction of the courts of the State of Florida and the federal courts of
> the United States of America located in such state . . . and hereby waive,
> and agree not to assert, as a defense in any action, suit or proceeding for
> the interpretation or the enforcement hereof . . . that they are not subject
> thereto or that such action, suit or proceeding may not be brought or is not
> maintainable in said courts or that this Agreement or any such documents
> may not be enforced in or by said courts, that the suit, action or proceeding
> is brought in an inconvenient forum, or that the venue of the suit, action or
> proceeding is improper.

14.    On August 4, 2005, the Court issued an Order holding that Star

Broadcasting and Hale waived any objection to venue.

## FACTUAL BACKGROUND

15.    The WTKE Purchase Agreement was one part – the more important part –

of a two-station deal pursuant to which Hale and companies owned by his family entered

into separate agreements on September 5, 2003 to sell Qantum the assets of radio stations

WMMK and WTKE.  It was strategically important to Qantum to acquire both stations

due to economies of scale in operations and advertising sales advantages in owning

multiple stations in a single market.  And by adding WMMK and WTKE to the two

stations Qantum already owned in the market, Qantum would for the first time be in a

position to compete on near-equal footing with the station group owned by Cumulus, the

dominant player in the market with a 70 percent share of total advertising revenue.

16.    Qantum originally contemplated a single agreement covering both stations

but the deal was ultimately signed as two agreements, in part because the stations were

owned by different corporations (WMMK was owned by Gulf Breeze Media, Inc. ("Gulf

Breeze")).  However, Hale and/or members of his family owned both companies and Hale himself negotiated the deals for both stations.

17.   As it turns out, the signing of these two agreements began what has become a nearly two-year ordeal during which the Hale parties have done virtually everything in their power to frustrate and prevent the consummation of the contracts they signed.

**WTKE and the Relevant Provisions of the WTKE Purchase Agreement**

18.   WTKE is licensed in Holt, Florida, and transmits throughout the Ft. Walton Beach market.  The WTKE Purchase Agreement (Exhibit A) is a complete and binding contract that accurately reflects the intent of each party.  The parties (all represented by counsel) negotiated the terms of the WTKE Purchase Agreement and exchanged preliminary drafts for approximately six months before executing the final version.

19.   The purchase price for the WTKE Assets as stated in the WTKE Purchase Agreement is $3 million.  Pursuant to Section 3.2 of the agreement, on September 5, 2003, Qantum made a $150,000 cash deposit in escrow, which remains committed to the transaction as of the filing of this Amended Complaint.

20.   WTKE is a unique property due to its relative position in the local and national markets, its location, its licensing and frequency, its assets, and its strategic importance in Qantum's overall business plan.  Section 17.4 of the WTKE Purchase Agreement states:

> [Star Broadcasting] and [Hale] each agrees that [WTKE] is unique and cannot be readily obtained on the open market and that [Qantum] will be irreparably injured if this Agreement is not specifically enforced. Therefore, in the event that [Qantum] institutes any action specifically to

Case No.: 05-21772-CIV-MARTINEZ/BANDSTRA

enforce [Star Broadcasting] and [Hale's] performance under this Agreement, [Star Broadcasting] and [Hale] each agrees to waive the defense that [Qantum] has an adequate remedy at law and to interpose no opposition, legal or otherwise, as to the propriety of specific performance as a remedy.

21.     As previously described, Section 8.9 of the WTKE Purchase Agreement (the No-Shop Provision) precludes Star Broadcasting and Hale from soliciting, entertaining, or negotiating with entities other than Qantum regarding the WTKE Assets while the WTKE Purchase Agreement is in effect.  The No-Shop Provision states as follows:

As long as this Agreement is in effect and except as otherwise provided in this Agreement, neither [Hale], [Star Broadcasting] nor any of its principals shall directly or indirectly solicit, entertain, negotiate with any person or entity (other than a party hereto) or accept any proposal to acquire [Star Broadcasting], [WTKE] or any of [WTKE] Assets in whole or in part, including without limitation an acquisition of all or substantially all of the assets of [Star Broadcasting], any equity in [Star Broadcasting] or any rights to program [WTKE].

22.     In Section 8.1(a)(ix) of the WTKE Purchase Agreement, Star Broadcasting and Hale covenant that "pending closing" they shall not "lease, sell, convey, transfer, assign, license, encumber, mortgage, pledge, or subject to a Lien, claim, or encumbrance (other than Permitted Liens) any of the [WTKE] Assets or sell or transfer any of the [WTKE] Assets without replacing such [WTKE] Assets with assets of substantially the same value and utility."

23.     In Section 8.1(e) of the WTKE Purchase Agreement, Star Broadcasting and Hale covenant that, "pending closing," they shall not "take any action which is inconsistent with [their] obligations under this Agreement."

24.     Section 17.1(g) provides that the WTKE Purchase Agreement may be terminated:

7

by written notice of either party to the other if the Closing shall not have been consummated on or before the date eighteen (18) months after the date of this Agreement [i.e., on or before March 5, 2005], and the party seeking to terminate this Agreement is not then in breach of this Agreement.

(emphasis added).

25.    The ultimate closing on the WTKE Purchase Agreement is dependent, in part, on Federal Communications Commission ("FCC") approval, including FCC approval of a station swap through which Star Broadcasting and Hale are to acquire the WTKE Assets from affiliates of Clear Channel Communications, Inc. ("Clear Channel"). The FCC has long since approved Star Broadcasting and Hale's acquisition of the WTKE Assets from Clear Channel and Qantum's acquisition of the WTKE Assets from Star Broadcasting and Hale. FCC approval of Clear Channel's acquisition of the station it is to receive from Star Broadcasting and Hale in the station swap was granted on May 26, 2005.

26.    There is nothing in the deal between Star Broadcasting and Clear Channel to prevent the parties thereto from immediately executing the station swap and putting WTKE in defendants' hands. Section 1.8 of the Cumulus Agreement between them states that "[t]he consummation of the exchange provided for in this Agreement (the 'Closing') shall take place at a date and time designated by Clear Channel after the FCC Consents (as defined in Section 1.9) are granted pursuant to the FCC's initial order, but in no event later than 10 business days after the date of the FCC Consents (as defined in Section 1.9) become Final . . . .[i.e. within 10 business days of July 5, 2005]" (emphasis added).

Case No.:  05-21772-CIV-MARTINEZ/BANDSTRA

**Efforts by the Hale Parties to Frustrate and Prevent Qantum's Acquisition
of the Ft. Walton Beach Stations (WTKE and WMMK)**

27.    On September 5, 2003, the same day Qantum, Star Broadcasting and Hale
executed the WTKE Purchase Agreement, Qantum and Gulf Breeze entered into a
separate Asset Purchase Agreement whereby Gulf Breeze was to convey WMMK (FM)
(n/k/a WFFY (FM)) to Qantum ("the Gulf Breeze Agreement").[1]  At the time, Hale's
spouse, Jennifer Hale, was the sole shareholder in Gulf Breeze.

28.    The Hale parties' intent to frustrate and prevent Qantum from closing on
the agreements signed on September 5, 2003 and thereby acquiring the Ft. Walton Beach
stations first surfaced in connection with the WMMK deal.  The parties eventually closed
on the Gulf Breeze deal, but only after Hale appeared to do all he could to renege,
including putting Gulf Breeze into bankruptcy in an effort to cancel the Gulf Breeze
Agreement.

29.    As noted above, Qantum's arrangement with the Hale parties was a
package deal to acquire two Ft. Walton Beach radio stations.  The two agreements signed
on September 5, 2003 were intended to confer upon Qantum the economic benefits of
two additional stations in the Ft. Walton Beach market and also to enhance the value of
Qantum's existing stations in that market.  Qantum was willing to cooperate with the
Hale parties on the allocation between the two agreements of the total purchase price and
the respective rights and obligations of the parties, but only because it secured binding
commitments from the Hale parties on all matters in the two agreements.

---

[1] The station formerly known as WMMK (FM) changed its call sign to WWRK (FM) on
July 13, 2004.  WWRK subsequently changed its call sign to WFFY (FM) on March 1,
2005.

30.     Because the parties contemplated (a) that the WMMK deal might close before the WTKE Purchase Agreement; (b) that certain of the benefits of the combined deal would be available once the WMMK deal closed; and (c) that certain of the benefits of the two agreements would inure to Qantum immediately and irrespective of closing dates, Star Broadcasting and Hale were required to perform several of their obligations under the WTKE Purchase Agreement before closing on a sale of the WTKE Assets.

31.     Star Broadcasting and Hale's obligations included affirmative pre-closing duties to lease and/or convey options to lease or buy rights held by Star Broadcasting and Hale on certain radio transmission towers, and the right for Qantum to control programming on WTKE once it had closed on the WMMK deal with the Hale parties.

**Star Broadcasting and Hale Have Repeatedly Breached and Failed to Cure Pre-Closing Obligations Under the WTKE Purchase Agreement**

32.     Qantum is now halfway into its acquisition strategy in the Ft. Walton Beach market and, once again, the Hale parties are attempting to avoid closing on a deal they signed. As is its right, Qantum has demanded that Star Broadcasting and Hale comply with all of their obligations under the WTKE Purchase Agreement, including obligations that required them to perform in advance of closing. Unfortunately, as with the WMMK deal, Star Broadcasting and Hale have failed or refused to perform numerous affirmative obligations.

33.     Star Broadcasting and Hale's ongoing breaches of the WTKE Purchase Agreement have previously been detailed in a January 12, 2005 notice-of-breach letter from Qantum to Star Broadcasting and Hale. Those breaches include at least the following:

Case No.:  05-21772-CIV-MARTINEZ/BANDSTRA

(a)    Section 4.2:  Local Marketing Agreement.  Section 4.2 provides

that the parties will enter into a Local Marketing Agreement ("the LMA")

whereby Qantum will be permitted to broadcast programming over WTKE:

> [Star Broadcasting] and [Hale] acknowledge that [Qantum] is
> concurrently entering into a purchase agreement whereby
> [Qantum] has agreed to purchase substantially all of the assets of
> WMMK (FM), Destin, Florida. . . . [Hale] agrees that, in the event
> that the parties have not closed on the transactions contemplated
> by this Agreement by the date that [Qantum] or its permitted
> assign closes on the purchase of substantially all of the assets of
> WMMK, [Hale] shall permit [Qantum], effective on the WMMK
> Closing Date, to broadcast programming over [WTKE] during all
> broadcast time made available to [Hale] pursuant to the Clear
> Channel [Local Marketing Agreement].  In return for [Hale]'s
> granting the [Qantum] the right to provide substantially all of the
> programming aired on [WTKE], [Qantum] shall reimburse [Hale]
> for those expenses required to be paid by [Hale] under the Clear
> Channel [Local Marketing Agreement] commencing with the
> WMMK Closing Date and continuing for as long as [Qantum]
> provides such programming over [WTKE] pursuant to this Section
> 4.2. . . .  The rights and obligations of the parties under this Section
> 4.2 shall be reduced to writing in an agreement to be entered into
> by the parties no later than the date that is ten (10) business days
> prior to the WMMK closing date.

Hale breached Section 4.2 by failing to enter into the LMA, and by

preventing Qantum from broadcasting over WTKE.   Section 4.2 expressly

requires Hale to permit Qantum to commence programming on WTKE upon

Qantum's closing on its purchase of WMMK (FM) (the "WMMK closing").  It

further requires the parties to draft and execute the LMA to reflect their

arrangement "no later than" ten (10) business days prior to the WMMK closing

date.  Although the WMMK closing took place on December 30, 2004, Hale has

yet to execute the LMA, and has yet to allow Qantum to broadcast on WTKE, all

despite repeated demands to perform from Qantum.

Sole responsibility for the parties' failure to execute the LMA lies with Hale. On March 5, 2004, in anticipation of the expected WMMK closing, Qantum sent Hale's counsel a draft of the LMA under Section 4.2. Again in December, Qantum sent Hale's counsel a draft of the LMA under Section 4.2. In response to Hale's comments on the December draft, Qantum subsequently revised the LMA and forwarded the new version to Hale's counsel on December 24, 2004. Later, on December 28, 2004, and again on January 5, 2005, Qantum requested any final comments from Hale regarding the draft LMA. To date, Hale has not provided Qantum with his proposed revisions or an executed copy of the LMA.

Instead, Hale has done everything he can to prevent the LMA from going into effect. In a December 16, 2004 email to Cumulus' general counsel, Hale even considered converting Gulf Breeze's Chapter 11 bankruptcy filing into a Chapter 7 filing to blow up the Gulf Breeze Agreement and prevent the WTKE Purchase Agreement's LMA from being triggered:

> [W]e've been looking at several sections of the Qantum/Star contract that bother us . . . . Section 4.1, 4.2 and 17.1 Termination says that we would need to give them an LMA or be in breach if they buy WWRK (WMMK) so what can we do to not LMA it or have you come up for a way for [Cumulus] to slide into our position . . . . so how can we get around that . . . . I wonder if we need to blow up the WWRK deal by putting it into Chapter 7 . . . .

As a result, Qantum has been unable to broadcast programming over WTKE despite the fact that more than ten months have elapsed since the WMMK closing. Moreover, based on revenue statements that Star Broadcasting has submitted to Qantum, it is clear that Star Broadcasting itself has assumed the role of programmer for WTKE. Star is thus directly responsible for Qantum's

inability to broadcast programming over WTKE, as contemplated by the WTKE Purchase Agreement.

     (b)     <u>Section 8.10: Qantum's option to lease space on the Tower</u>.  Star Broadcasting is also in breach of Section 8.10 of the WTKE Purchase Agreement. Section 8.10 requires Star Broadcasting to enter an agreement whereby Qantum will hold an option to place the antenna for WWAV (FM) on the Tower at a height specified by Qantum:

> [Star Broadcasting], its principals or its affiliates (including, but not limited to, Star Tower, LLC as applicable shall enter into an agreement with [Qantum] whereby [Qantum] will hold an option to lease space at the transmitter site to be constructed at the Ft. Walton Beach Site ("Option"). The Option shall allow [Qantum] to place the transmission facilities of WWAV (FM) at the Ft. Walton Beach Site and to locate the antenna for WWAV (FM) on the tower at a height to be specified by [Qantum]. . . . [Qantum] shall have the option to extend the lease for two additional terms of five years each.

Star Broadcasting breached Section 8.10 by preventing Qantum from locating the WWAV antenna on the Tower at a height specified by Qantum. During negotiations between the parties in March 2004, Star suggested that Qantum could place the antenna on the top-most location of the Tower. Yet, when the parties resumed discussions at the end of 2004, Star informed Qantum that the only available space was below the top-most location, because Star had conferred that location to Clear Channel. Although Qantum attempted to negotiate a compromise whereby it could share space with Clear Channel, Star refused to compromise, and insisted that Qantum place the antenna beneath the top-most location – at a height that Qantum had neither wanted nor specified.

(c)    Section 1.3: Qantum's option to purchase the Tower. Related to Star Broadcasting's breach of Section 8.10 of the WTKE Purchase Agreement is its breach of Section 1.3, which requires Star to negotiate in good faith an agreement whereby Qantum will hold an option to purchase the Tower from Star Tower, LLC: "[Qantum] and [Star Broadcasting] shall negotiate in good faith an agreement whereby [Qantum] will hold an option to purchase from Star Tower, LLC, the Ft. Walton Beach Tower." Star Broadcasting holds a one-half (50%) interest in Star Tower, LLC.

Star Broadcasting has breached Section 1.3 in several ways. First, while required to negotiate Qantum's option "in good faith," on April 1, 2005 – some two weeks before purportedly terminating the WTKE Purchase Agreement – Ronald E. Hale, Jr., another principal of Star Broadcasting, executed an agreement to sell all of Star Broadcasting's interest in the Tower to Phillips Properties, Inc. The agreement with Phillips states that, as of April 1, 2005, Phillips had paid Star Broadcasting $100,000 in connection with the transaction wherein Star Broadcasting has purportedly disposed of its interest in the Tower. Star Broadcasting could not have negotiated an option with Qantum "in good faith" while at the same time accepting money from a third party.

Second, the purchase price of $2.15 million advanced by Star Broadcasting in the draft option purchase agreement being negotiated between the parties violated Star's obligation to negotiate good faith. As of March 18, 2005 the total monthly rental payments by the Tower's tenants was just $4,600. On the basis of that total, there is no generally accepted cash-flow multiple in the Tower

industry that would produce a purchase price that even approaches $2.15 million. This is true even if, as Star Broadcasting has previously represented to Qantum, another tenant is willing to pay an additional $3,000 per month at the Tower, thereby bringing the total monthly rental payments to $7,600.

Further evidence of Star Broadcasting's bad faith in quoting the $2.15 million purchase price is found in its agreement to sell the Tower to Phillips Properties, Inc. In that agreement, in addition to the aforementioned $100,000 payment, Phillips agreed to convey to Star Broadcasting its ownership interest in Yesterday's Radio Network, LLC, a Florida limited liability company that owns the license and assets of station WBAU (AM). However, comparable sales of AM radio stations in the relevant market demonstrate that the value of WBAU (AM) is a mere fraction of the $2.15 million purchase price Star Broadcasting quoted to Qantum for the Tower.

Third, the draft option purchase agreement that Star Broadcasting presented to Qantum was not in the name of Star Towers, LLC, but rather "Star Towers of Florida, LLC." Star Towers of Florida, LLC came into existence approximately two (2) months after the parties entered into the WTKE Purchase Agreement. Thus, it appears that even before the wrongful agreement to sell the Tower to Phillips, Star Broadcasting's principals conveyed the Tower to Star Towers of Florida, LLC, in violation of Section 1.3.

Fourth, Star Broadcasting has never provided copies of the Tower leases to Qantum, despite a request by Qantum and a March 18, 2005 promise by Star's counsel to do so. Qantum has thus been unable to assess the actual value of the

15

Tower; without the leases Qantum cannot verify the accuracy of the monthly rental figures provided by Star Broadcasting, or determine whether the leases are long-term or month-to-month arrangements that can be terminated on short notice.

Finally, sometime prior to March 18, 2005, Star Broadcasting apparently entered into an option agreement with a third-party to lease space on the Tower without obtaining Qantum's prior consent, further encumbering the asset in violation of Section 1.3.

(d)     Sections 6.1(c) and 8.1(c): Star Broadcasting and Hale's Financials. Section 6.1(c) required Star Broadcasting and Hale to provide Qantum with unaudited balance sheets and the related income statements and statements of cash flow as of June 30, 2003 ("financial statements"):

> Within ten (10) days after the date of this agreement, each of [Star Broadcasting] and [Hale] shall provide [Qantum] with unaudited balance sheets as of June 30, 2003, and the related income statements and statements of cash flow for such periods (such financial statements collectively being referred to as the "Financial Statements"). The Financial Statements are appended hereto as Schedule 6.1(c). Except as set forth on Schedule 6.1(c), the Financial Statements have been prepared in accordance with GAAP applied on a consistent basis and accurately present the financial position and the results of operations for [WTKE] for the period covered. Except as disclosed in Schedule 6.1(c), there has not been any material adverse change in the working capital, financial condition, business, results of operations, assets or liabilities of [Star Broadcasting], [Hale] or [WTKE] between December 31, 2002, and the date of this Agreement.

Furthermore, Section 8.1(c) requires Star Broadcasting and Hale to provide Qantum with monthly financial statements from 2002 to the present ("monthly statements"):

Within fifteen (15) days of the date of this Agreement, [Star Broadcasting] and [Hale] shall provide [Qantum] with monthly financial statements, in a form reasonably acceptable to [Qantum], for 2002 and for each month of 2003 through the month immediately preceding the date of this Agreement. During the period from the date of this Agreement through the Closing Date, each calendar month or part thereof, [Star Broadcasting] and [Hale] shall prepare and promptly deliver (in any event no more than 30 days following the end of the relevant calendar month) to [Qantum] financial statements, in a form reasonably acceptable to [Qantum], relating to [WTKE's] business and operations. The monthly financial statements provided pursuant to this Section 8.1(c) shall fairly and accurately present the financial position and results of the business and operations of [WTKE] as of the dates and for the periods indicated;

Star Broadcasting and Hale breached both of the foregoing provisions. They breached Section 6.1(c) by failing to provide financial statements within ten days of executing the WTKE Purchase Agreement – i.e., by September 15, 2003. They breached Section 8.1(c) by failing to provide monthly statements within fifteen days of executing the WTKE Purchase Agreement – i.e., by September 20, 2003. All of the financial and monthly statements were to have been prepared in accordance with GAAP applied on a consistent basis, or they were to explain how they deviated from that standard. In either case, the statements were to accurately present the finances of WTKE.

Rather than providing Qantum with the statements required by Sections 6.1(c) and 8.1(c), Star Broadcasting and Hale provided quarterly income statements for 2003 that combined the operations of WWRK and WTKE. Those income statements, moreover, were not prepared in accordance with GAAP; nor did they explain how they deviated from GAAP.

Case No.: 05-21772-CIV-MARTINEZ/BANDSTRA

Although Star Broadcasting provided Qantum with a limited number of so-called "revised" statements on February 7, 2005, those statements also failed to conform to GAAP or explain their deviation. Moreover, Star Broadcasting and Hale have not provided Qantum with any statements since that date. The failure to provide Qantum with all of the statements required by Sections 6.1(c) and 8.1(c) constitutes a breach of their covenants under the WTKE Purchase Agreement.

(e)     Section 8.1(e): No inconsistent action. Finally, in Section 8.1(e) of the WTKE Purchase Agreement, Star Broadcasting and Hale agreed not to take any action "which is inconsistent with this Agreement." The actions by Star Broadcasting and Hale, as described above, if not breaches of the WTKE Purchase Agreement in and of themselves (and they are), are "inconsistent" with the letter and the spirit of Star Broadcasting and Hale's obligations under the WTKE Purchase Agreement, and constitute separate and independent breaches of Section 8.1(e).

34.     In sum, beginning as early as 2004, and continuing through the date of this Complaint, Star Broadcasting and Hale have remained in breach of the WTKE Purchase Agreement, and have failed to cure those breaches despite repeated demands by Qantum. Nevertheless, Qantum is operating under a business plan that depends in important part on the acquisition of the WTKE Assets (especially after having consummated the associated acquisition in the same market of WMMK), and has therefore refrained from canceling the WTKE Purchase Agreement.

**Star Broadcasting and Hale Negotiated and Signed an Agreement to Sell the WTKE Assets to Cumulus in Violation of the WTKE Purchase Agreement**

35.   On April 18, 2005, Star Broadcasting and Cumulus entered into an agreement in which Star Broadcasting agreed to convey the WTKE Assets to Cumulus in exchange for, among other things, an assignment from Cumulus of assets in WYZB (FM), a loan in the amount of $850,000 and $1.5 million cash (the "Cumulus Agreement"). Cumulus is a competitor of Qantum that already holds approximately 70 percent of the relevant advertising revenue market.

36.   On the same day that Star Broadcasting and Cumulus entered into the Cumulus Agreement, the parties executed a separate agreement whereby Cumulus agreed to swap WNCV (FM) for Star Broadcasting's interest in WPGG (FM). As part of that arrangement, Cumulus also agreed to lend $1.5 million to Star Broadcasting by directly paying that sum to a third party.

37.   The total consideration to be received by the Hale parties in the deals for which they wrongfully abandoned the WTKE Purchase Agreement involves as much as $6.25 million.

38.   As conceded by Star Broadcasting and Hale through their counsel, they breached the No-Shop Provision by soliciting and negotiating with Cumulus as early as October 2004.

39.   Despite the fact that Star Broadcasting and Hale remained obligated to convey the WTKE Assets to Qantum under the WTKE Purchase Agreement, Star Broadcasting and Hale failed to inform Qantum about Star Broadcasting's decision to negotiate and contract with Cumulus to dispose of the very same assets. Qantum only

learned about the Cumulus Agreement when one of its principals, Michael Mangan, read about the agreement in a trade publication on May 5, 2005.

40. Star Broadcasting and Hale's violation of the No-Shop Provision was deliberate and done in bad faith. Star Broadcasting and Hale simply did not want to lose their deal with Qantum without finding out whether there was a better offer available. If Hale had waited until after the WTKE Purchase Agreement was properly terminated to commence negotiations with Cumulus, he would have faced a significant risk that those negotiations would produce no deal whatsoever, leaving him with no means of profiting from the sale of the WTKE Assets.

41. Absent this Court's preliminary injunction, the Cumulus Agreement poses a direct, imminent threat to Qantum's ability to acquire the WTKE Assets under the WTKE Purchase Agreement. On June 6, 2005, Qantum filed a petition to deny the applications to assign WTKE and WPGG to Cumulus. Cumulus filed an opposition to the petition on June 21. Although the petition is currently pending before the FCC, under the applicable rules the FCC could deny the petition at any time after the conclusion of the pleading cycle, which ends on July 1, 2005.

42. Star Broadcasting's act of soliciting, entertaining, and negotiating the Cumulus Agreement also breached the following provisions of the WTKE Purchase Agreement: (a) Section 8.1(a)(ix), in which Star Broadcasting and Hale covenanted upon signing that "pending closing" they will not "lease, sell, convey, transfer …. or subject to a Lien, claim or encumbrance (other than Permitted Liens) any of the [WTKE] Assets or sell or transfer any of the [WTKE] Assets without replacing such [WTKE] Assets with assets of substantially the same value and utility"; and (b) Section 8.1(e), in which Star

Broadcasting and Hale covenanted upon signing that "pending closing" they shall not "take any action which is inconsistent with [Star Broadcasting and Hale's] obligation sunder this Agreement."

43.     These breaches, as well as the numerous pre-closing breaches detailed above, render Star Broadcasting and Hale's April 14, 2005 purported termination notice invalid and of no force and effect.

44.     Notwithstanding Star Broadcasting and Hale's ongoing breaches of the WTKE Purchase Agreement and their wrongful attempt to terminate the agreement, Qantum is presently ready, willing, and able to close on its purchase of the WTKE Assets and has sent Star Broadcasting and Hale notice to that effect in accordance with the provisions of the WTKE Purchase Agreement.

## COUNT I
## SPECIFIC PERFORMANCE

45.     Qantum incorporates by reference the allegations in paragraphs 1 through 44 in their entirety.

46.     Section 17.4 of the WTKE Purchase Agreement states:

[Star Broadcasting] and [Hale] agree, that [WTKE] is unique and cannot be readily obtained on the open market and that [Qantum] will be irreparably injured if this Agreement is not specifically enforced ... in the event that [Qantum] institutes any action specifically to enforce    [Star Broadcasting] and [Hale's] performance under this Agreement, [Star Broadcasting] and [Hale] each agrees to waive the defense that [Qantum] has an adequate remedy at law and to interpose no opposition, legal or otherwise, as to the propriety of specific performance as a remedy.

47.     Star Broadcasting and Hale are in breach of their obligation to expeditiously close on the WTKE Purchase Agreement and their obligation to proceed in

good faith in satisfying all of their remaining obligations to take steps necessary to meet Qantum's demand for a prompt closing.

48.     Qantum is entitled to an order requiring Star Broadcasting and Hale to specifically perform these and all of their remaining obligations under the WTKE Purchase Agreement and to proceed promptly to closing.

49.     The Order should also provide Qantum monetary compensation to place Qantum in the position it would have occupied had Star Broadcasting and Hale timely performed the WTKE Purchase Agreement, including but not limited to any special damages such as lost profits or lost rents.

## COUNT II
## BREACH OF CONTRACT

50.     Qantum incorporates by reference the allegations in paragraphs 1 through 44 in their entirety.

51.     Section 1.3 of the WTKE Purchase Agreement requires Star Broadcasting to negotiate in good faith an agreement whereby Qantum will hold an option to purchase the Tower from Star Tower, LLC: "[Qantum] and [Star Broadcasting] shall negotiate in good faith an agreement whereby [Qantum] will hold an option to purchase from Star Tower, LLC, the Ft. Walton Beach Tower."

52.     As described in paragraph 33(c) above, Star Broadcasting has breached Section 1.3 in numerous ways, not the least of which was selling the Tower to a third party, making specific performance of paragraph 1.3 impossible.

53.     As a result of the breaches of Section 1.3 by Star Broadcasting and Hale, Qantum has been damaged.

Case No.: 05-21772-CIV-MARTINEZ/BANDSTRA

## COUNT III
## DECLARATORY RELIEF

54.     Qantum incorporates by reference the allegations in paragraphs 1 through 44 in their entirety.

55.     As described in paragraph 33 above, Star Broadcasting and Hale have breached numerous affirmative pre-closing obligations under the WTKE Purchase Agreement and have failed to cure those breaches, despite notice and an opportunity to cure.

56.     Star Broadcasting and Hale have also breached Section 8.9 (the No Shop Provision) of the WTKE Purchase Agreement by negotiating for the sale of the WTKE Assets with Cumulus while the WTKE Purchase Agreement was still "in effect," and breached numerous other provisions of the WTKE Purchase Agreement by encumbering the WTKE Assets through execution of the Cumulus Agreement. Star Broadcasting and Hale have failed to cure these breaches, despite notice and an opportunity to cure.

57.     Because Section 17.1(g) permits Star Broadcasting and Hale to terminate the WTKE Purchase Agreement only if they are "not then in breach," Star Broadcasting and Hale's April 14, 2005 purported termination notice is invalid and the WTKE Purchase Agreement remains in full force and effect.

58.     Because Star Broadcasting and Hale have refused to acknowledge the invalidity of the April 14, 2005 purported termination notice, Qantum is in doubt as to its rights and obligations under the WTKE Purchase Agreement, and a genuine dispute exists between the parties.

## COUNT IV
## INJUNCTIVE RELIEF

59. Qantum incorporates by reference the allegations in paragraphs 1 through 44 in their entirety.

60. As detailed above, the April 14, 2005 purported termination is invalid because Star Broadcasting and Hale were in breach of the WTKE Purchase Agreement when they issued the notice (and continue to be in breach as of the filing of this Amended Complaint). The WTKE Purchase Agreement therefore remains in full force and effect and Qantum is likely to succeed on the merits of its claim for a declaration to that effect.

61. The parties to the WTKE Purchase Agreement have expressly agreed in Section 17.4 of the WTKE Purchase Agreement that the WTKE Assets are unique and that Qantum will be irreparably injured if Qantum is wrongfully prevented from acquiring those assets.

62. In the absence of an injunction, Star Broadcasting and Hale's efforts to market the WTKE Assets to parties other than Qantum, including Star Broadcasting and Hale's purported agreement to sell those assets to Cumulus, pose an imminent threat to Qantum's rights to acquire those assets, which threat is likely to come to fruition if Star Broadcasting and Hale are not permanently enjoined from selling or transferring the WTKE Assets which they are contractually bound to convey to Qantum.

### PRAYER

WHEREFORE, Qantum requests judgment in its favor and against Defendants as follows:

Case No.: 05-21772-CIV-MARTINEZ/BANDSTRA

1.  That this Court issue an order requiring Star Broadcasting and Hale to specifically perform all of their remaining obligations under the WTKE Purchase Agreement and to proceed promptly to closing.

2.  That the order granting specific performance provide Qantum monetary compensation to place Qantum in the position it would have occupied had Star Broadcasting and Hale timely performed the WTKE Purchase Agreement, including but not limited to any special damages such as lost profits or lost rents.

3.  That this Court issue an order declaring Star Broadcasting and Hale's purported April 14, 2005 termination of the WTKE Purchase Agreement invalid, and further declaring that the WTKE Purchase Agreement remains in effect and fully enforceable according to its terms.

4.  That this Court permanently enjoin, for such time as the WTKE Purchase Agreement remains in effect, Star Broadcasting, Hale, and each of their agents, employees, including without limitation, Ronald E. Hale, Jr. and Jennifer F. Hale, and all persons acting in concert or in conspiracy with them or under their control or on their behalf, from directly or indirectly:

    (a)  soliciting, entertaining, or negotiating with entities other than Qantum with regard to the transfer or sale of the WTKE Assets;

    (b)  consummating the transaction contemplated in the Cumulus Agreement or otherwise conveying the WTKE Assets to Cumulus;

    (c)  soliciting, entertaining, or negotiating with entities other than Qantum with regard to the transfer or sale of the Tower;

Case No.: 05-21772-CIV-MARTINEZ/BANDSTRA

(d)    consummating the transaction contemplated in Star Broadcasting's purported agreement to convey Star's interest in the Tower to Phillips Properties, Inc., or otherwise conveying Star's interest in the Tower to Phillips Properties, Inc.; and

(e)    engaging in further violations of the No-Shop Provision in the WTKE Purchase Agreement.

5.    That this Court award Qantum its damages arising from Star Broadcasting's breach of Section 1.3 of the WTKE Purchase Agreement regarding the option to purchase the Tower.

6.    And that this Court grant Qantum such other relief as the Court deems just and proper under the circumstances.

Dated: November 1, 2005

Respectfully submitted,

**AKERMAN SENTERFITT**

By: _____
John F. O'Sullivan, Esq.
Florida Bar No. 143154
john.osullivan@akerman.com
Jason Kellogg, Esq.
Florida Bar No. 0578401
jason.kellogg@akerman.com

One Southeast Third Avenue
Miami, Florida 33131-1714
Telephone: (305) 374-5600
Facsimile: (305) 374-5095

Case No.: 05-21772-CIV-MARTINEZ/BANDSTRA

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served

**via email and U.S. Mail** to Ronald B. Ravikoff, Zuckerman Spaeder LLP, 201 South

Biscayne Boulevard, Suite 900, Miami, Florida 33139, this 1st day of November, 2005.

A courtesy copy has also been sent via U.S. Mail to the Honorable Ted E. Bandstra,

United States Magistrate Judge.

Attorney

# SEE

# DE#84

# FOR

# EXHIBITS