UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

Case No. 05-21772 CIV – MARTINEZ/BANDSTRA

QANTUM COMMUNICATIONS
CORPORATION, a Delaware
corporation,

     Plaintiff,

v.

STAR BROADCASTING, INC., a
Florida corporation, and RONALD E.
HALE, SR.,

     Defendants.

_____/

## PLAINTIFF'S MOTION FOR SANCTIONS, INCLUDING THE ENTRY OF A DEFAULT JUDGMENT AND AN AWARD OF ATTORNEY'S FEES, AND REQUEST FOR HEARING

Plaintiff, Qantum Communications, Inc. ("Qantum"), moves this Court to enter a default judgment in Qantum's favor against Defendants, Star Broadcasting, Inc. ("Star") and Ronald E. Hale Sr. ("Hale"), and to order Defendants to pay Qantum the attorney's fees and costs it has incurred in this action. Qantum also requests a hearing on its motion, and states:

### INTRODUCTION

From the outset of this litigation, Defendants tried to undermine the judicial process by interfering with this Court's ability to adjudicate the key issues in the case. Defendants lied under oath and failed to produce smoking-gun documents. Defendants then put Star into bankruptcy in a bad-faith attempt to avoid this

Court's preliminary injunction ruling.   Defendants' misconduct should not be countenanced by the Court.

As a long line of caselaw indicates, this Court has the inherent power to protect its integrity by imposing "ultimate sanctions" such as the striking of pleadings and the entry of a default judgment.   The Court also has the inherent power to protect Qantum by awarding the attorneys fees Qantum has expended in dealing with Defendants' vexatious, unconscionable and dilatory conduct.   Under the facts of this case, no lesser sanctions would suffice.

## FACTUAL BACKGROUND

**A.** **The Parties Entered Into the WTKE Purchase Agreement**

On September 5, 2003, Qantum and Star executed an Asset Purchase Agreement (the "WTKE Purchase Agreement," attached hereto without attachments as **Ex. 1**) in which Star agreed to sell the assets of Ft. Walton Beach radio station WTKE (the "WTKE Assets") to Qantum.[1]

The WTKE Purchase Agreement includes a non-solicitation or no-shop provision (the "No-Shop Provision") that precludes Star and Hale from soliciting,

---

[1]        On the same day, Qantum entered into a similar agreement to purchase the assets of radio station WMMK (the "WMMK Asset Purchase Agreement") from another entity controlled by Hale, Gulf Breeze Media, Inc. ("Gulf Breeze").   In a precursor to Defendants' bad faith actions in the WTKE deal, Qantum was forced to file a lawsuit against Hale and Gulf Breeze seeking specific performance of the WMMK Asset Purchase Agreement. In response, Hale sent Gulf Breeze into bankruptcy and sought to avoid the WMMK Asset Purchase Agreement, first in favor of an insider deal with another Hale company and then through an allegedly better offer from a third party.   Qantum objected to both transactions. The WMMK assets were ultimately sold to Qantum in accordance with the WMMK Asset Purchase Agreement — nearly a year and a half after the deal had been signed.

:::..M1 - 26335/0001 - 92917 v2

HOGAN & HARTSON L.L.P., 1111 BRICKELL AVENUE, SUITE 1900 • MIAMI, FL 33131 • TEL. (305) 459-6500 • FAX (305) 459-6550

entertaining, or negotiating with entities other than Qantum regarding the WTKE assets while the WTKE Purchase Agreement is in effect. (*See* WTKE Purchase Agreement § 8.9). The Agreement also contains a provision allowing written notice of termination after 18 months, <u>but only if "the party seeking to terminate . . . is not then in breach of [the] Agreement."</u> (*Id.* § 17.1(g)) (emphasis added).

On April 14, 2005, Defendants sent Qantum a purported notice of termination. Then, just two business days later, Defendants entered into a complex, single-spaced, 30-page agreement to sell WTKE to Qantum's main competitor in the relevant market, Cumulus Media, Inc. ("Cumulus"). Knowing that Star and Cumulus could not possibly have negotiated the deal in two days, and that Star and Hale therefore must have breached the No-Shop Provision, Qantum filed suit against Star and Hale on July 1, 2005 (the "District Court Action").

On July 5, 2005, this Court entered a temporary restraining order prohibiting Defendants from soliciting, entertaining or negotiating with a third party and from consummating the Cumulus deal. (D.E. 10). A full hearing on Qantum's injunction motion was set for August 3, 2005. In the interim, the parties conducted expedited discovery. In response to a Qantum subpoena, Defendants produced hundreds of documents. Suspiciously, none of them predated March 2, 2005.

3

HOGAN & HARTSON L.L.P., IIII BRICKELL AVENUE, SUITE 1900 • MIAMI, FL 33131 • TEL. (305) 459-6500 • FAX (305) 459-6550

**B.    Hale Lied Under Oath Regarding the Key Issue in the Case**

At his July 21, 2005 deposition, Hale testified that Defendants interpreted the WTKE Asset Purchase Agreement to expire by its own terms on March 5, 2005.[2] (Hale Depo. Tr. at 114:10-11 (D.E. 39), excerpts attached as **Ex. 2**). Hale repeatedly testified that neither he nor anyone else at Star had approached Cumulus with the WTKE deal until <u>after</u> March 7, 2005:

| | |
|---|---|
| [PLAINTIFF'S COUNSEL]: | Starting with the moment you signed the Qantum/TKE deal . . . and moving all the way forward to early March, when was the first moment that you convey[ed], either directly or through your attorneys, to Cumulus that you would be interested in selling TKE to them? |
| [HALE]: | March 7th. |
| [PLAINTIFF'S COUNSEL]: | Okay.  Is that your sworn testimony? |
| [HALE]: | <u>That is my sworn testimony</u>. |
| [PLAINTIFF'S COUNSEL]: | All right. |
| [HALE]: | That is the best recollection I have. |

(Hale Depo. Tr. at 54:25-55:11 (emphasis added); *see also id.* at 79:5-79:13; 24:22-25:8 ("Any discussions with Cumulus [prior to March 3, 2005] were simply that we needed funds to close it with Clear Channel.")).  Hale also testified that the earliest he spoke with Cumulus was in January 2005, and only regarding the sale of WPPG. (*Id.* at 59:16-60:1).

---

[2]    Qantum maintains that the WTKE Asset Purchase Agreement did not expire on its own terms on March 5, 2005, but required a written notice of termination pursuant to Section 17.1.  Nevertheless, Qantum acknowledges Defendants' position for the purposes of this Motion for Sanctions only.

Shortly after Hale's deposition, Qantum subpoenaed hundreds of documents from Cumulus. These documents directly contradicted Hale's deposition testimony and proved that Hale, Star and Cumulus began negotiating the sale of WTKE in October 2004. The deposition testimony of Cumulus' CEO, Lew Dickey ("Dickey"), confirmed this fact. (*See* Dickey Depo. Tr. at 118, excerpts attached as **Ex. 3**). The documents also showed that Defendants purposely tried to conceal from Qantum the timing of its negotiations with Cumulus:

> The FCC is not interested in when various discussions took place. Qantum is very interested. They know that logically we had to be discussing the transactions before we entered into the agreements, but they have no idea when those discussions took place or whether they were before or after March 5th. We do not want to tell them that, as having that fact might increase the chance they will file some action against Star and/or Cumulus.

(*See* Ex. 127 (June 20, 2005 email from Star's FCC counsel, Timothy K. Brady, to Cumulus' FCC Counsel, Lew Paper), attached as **Ex. 4**).

## C.   Defendants Failed to Produce Key Documents

In addition, Defendants withheld pivotal documents responsive to Qantum's subpoena. As mentioned above, Defendants failed to produce any documents predating March 2, 2005. In contrast, Cumulus produced dozens of such documents in the form of emails that were either sent from or received by Hale or Star's attorney Brady. (*See, e.g.*, Dickey Depo. Exs. 56-61, 63, attached as **Comp. Ex. 5**). Key among these documents were term sheets exchanged between Defendants and Cumulus prior to March 5 that reflected initial terms of a deal involving WTKE. (*See, e.g.*, Dickey Depo. Ex. 86 ("Overview of the Star/Cumulus Deal" sent by Hale to Cumulus on Feb 15, 2005), attached as **Ex. 6**; Ex. 98 ("outline" of the Star/Cumulus

\\\MI - 26335/0001 - 92917 v2

HOGAN & HARTSON L.L.P., 1111 BRICKELL AVENUE, SUITE 1900 • MIAMI, FL 33131 • TEL. (305) 459-6500 • FAX (305) 459-6550

deal sent to Cumulus by Brady on March 2, 2005), attached as **Ex. 7**; and Ex. 105 (draft by Cumulus prior to March 5, 2005), attached as **Ex. 8**).  Defendants produced the cover email to one of these term sheets but not the attached outline of terms.  (*See id.* Dickey Depo. Ex. 98).  When questioned at his deposition about the contents of the missing attachment, Hale stated that it did not relate to WTKE. (*See* Hale Depo. Tr. at 42:13-43:2).  Shortly thereafter, however, Cumulus produced the missing attachment.   In direct contradiction to Hale's testimony, the attachment outlined the terms of a deal between Defendants and Cumulus for the sale of WTKE — further proving that Star, Hale and Cumulus negotiated well before March 5.  (*See* Dickey Depo. Ex. 98).

At the August 3, 2005 preliminary injunction hearing, Defendants' counsel, faced with the overwhelming evidence of Hale's lies, finally conceded the fact that Defendants negotiated with Cumulus prior to March 5, stating that "For purposes of this argument, I am conceding that we are in violation of the no solicitation clause. . . . I do not want to dispute those facts."  (Inj. H'rg Tr. at 13, attached as **Ex. 9**) (D.E. 48).  In response, the Court reminded Defendants' counsel that "[The facts] have been disputed for some time, and apparently under oath."  (*Id.*).[3]

---

[3]     It is worth noting that before Cumulus produced the smoking-gun documents revealing Defendants' breach, Defendants also injected their scheme into their court filings.  In their July 27, 2005 Motion in Opposition to the Preliminary Injunction, Defendants argued that "Qantum has not even made a showing that the negotiations with Cumulus regarding WTKE occurred prior to March 5, 2005, much less a showing of likelihood of success in proving it."  (Opp. Mot. at 15) (D.E. 26).

Case No. 05-21772 CIV – MARTINEZ/BANDSTRA

**D.      Defendants Filed a Bad-Faith Bankruptcy Petition
to Avoid This Court's Injunction**

On August 9, 2005, the Court entered an Order granting in part Qantum's Motion for Preliminary Injunction.[4]   (D.E. 43).   The Order prohibits Defendants from soliciting, entertaining or negotiating with a third party and from consummating the Cumulus deal.   On October 31, 2005, Defendants' counsel Zuckerman Spaeder withdrew its representation of Defendants in both this case and in Defendants' appeal of the preliminary injunction before the Eleventh Circuit.[5]   This Court gave Star until November 11, 2005 to find replacement counsel.   Rather than face a default, Star filed for bankruptcy in the Bankruptcy Court for the Northern District of Florida (the "Bankruptcy Court"), staying Qantum's pursuit of its claims in the District Court Action.[6]

Qantum promptly filed a motion to dismiss Star's bankruptcy petition or lift the automatic stay.   On January 3, 2006, the Bankruptcy Court held an all-day evidentiary hearing on Qantum's motions, at which Hale and Brady gave live testimony.   On January 20, 2006, the Bankruptcy Court issued an order (the "Bankruptcy Court Order") lifting the automatic stay and holding that Star's bankruptcy was nothing more than a "litigation tactic" employed by Hale to avoid

---

[4]      The Court issued a Corrected Order on August 16, 2005.   (D.E. 46).

[5]      According to Star's bankruptcy filings, Zuckerman Spaeder is owed more than $275,000 in unpaid attorney's fees and costs.

[6]      By filing for bankruptcy, Defendants also avoided the dismissal of its appeal in the Eleventh Circuit.   At the time it filed for bankruptcy on November 10, 2005, Star had not filed the Initial Brief that was due November 4, 2005.

\\\MI - 26335/0001 - 92917 v2

HOGAN & HARTSON L.L.P., 1111 BRICKELL AVENUE, SUITE 1900 • MIAMI, FL 33131 • TEL. (305) 459-6500 • FAX (305) 459-6550

the District Court Action, reject the WTKE Purchase Agreement and sell the WTKE

Assets to Cumulus:

> The Debtor's strategy in this case was simple.  The Debtor
> would file its motion to reject the [WTKE Purchase Agreement], halt
> the district court litigation and the Eleventh Circuit appeal by virtue of
> the automatic stay and seek to have the bankruptcy court ultimately
> approve this through a plan of reorganization.  At the first meeting of
> creditors the Debtor clearly stated that the sole reason for filing a
> Chapter 11 was to avoid the [WTKE Purchase Agreement]. . . .  The
> Court concludes that based on the timing of the filing of the petition,
> the Debtor's own schedules showing an equity position of over $5
> million in assets over liabilities, the attempt to circumvent pending
> litigation and the attempt to reject what the Debtor perceived as an
> unprofitable contract constitutes bad faith in this case and that "cause"
> exists under §362(d)(1) to lift the automatic stay.

(Bankruptcy Court Order at 9, 12, attached as **Ex. 10**).

In addition, the Bankruptcy Court found that Hale's testimony at the

evidentiary hearing was less than forthright: "This Court has observed Hale as a

witness and his demeanor on the stand and concludes that his responses to certain

questions have been evasive, contradictory and not credible." (Bankruptcy Order at

10-11).   The court found that the testimony of Star's communications counsel,

Brady, who admitted reviewing the WTKE Purchase Agreement but not the No-

Shop Provision, also strained credibility.  (*Id.* at 11).

With the stay lifted, the case returns to this Court.  A new trial date has not

yet been scheduled.  Defendants have filed an Answer and Affirmative Defenses to

Qantum's Amended Complaint.  (D.E. 115).  Qantum has filed a Motion for Partial

Summary Judgment as to Liability along with this Motion for Sanctions.

\\\M1 - 26335/0001 - 92917 v2

HOGAN & HARTSON L.L.P., 1111 BRICKELL AVENUE, SUITE 1900 • MIAMI, FL 33131 • TEL. (305) 459-6500 • FAX (305) 459-6550

## ARGUMENT

### 1.   THIS COURT HAS THE INHERENT POWER TO STRIKE DEFENDANTS' ANSWER, ENTER A DEFAULT AND AWARD ATTORNEY'S FEES

Federal courts possess the inherent power to sanction parties and attorneys who conduct litigation in bad faith or who perpetrate a fraud on the court. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-51 (1991); *Vargas v. Peltz*, 901 F. Supp. 1572, 1581-82 (S.D. Fla. 1995) (Ryskamp, J.).

"The key to unlocking a court's inherent power is a finding of bad faith." *Allapattah Servs., Inc. v. Exxon Corp.*, 372 F. Supp. 2d 1344, 1373 (S.D. Fla. 2005) (Gold, J.) (striking defendant's affirmative defenses through inherent powers doctrine) (citing *Byrne v. Nezhat*, 261 F.3d 1075, 1106 (11th Cir. 2001) (sanctioning attorney who filed a frivolous lawsuit in bad faith for the purpose of extorting a settlement)). Bad faith exists where a party or its counsel "[defiles the] very temple of justice" by committing a fraud on the court, or "knowingly or recklessly raises a frivolous argument, delays or disrupts the litigation, or hampers the enforcement of a court order." *Id.* (citing *Chambers*, 501 U.S. at 46).

The imposition of sanctions under the inherent powers doctrine serves the dual role of "vindicating judicial authority" and providing redress for the litigants who bear the brunt of a party's bad faith acts. *See Chambers*, 501 U.S. at 46. Although the courts' inherent powers should be exercised with restraint, the courts have complete discretion to fashion appropriate sanctions for conduct that abuses

9

the judicial process.[7]   *Id.* at 44-45.   As a result, a robust body of caselaw has developed in which federal courts have employed various means to sanction parties and their counsel for assorted bad faith acts and unconscionable schemes.

*Chambers* involved the bad faith acts of a television station owner who reneged on a contract to sell the station. *Id.* at 35-36. The buyer, NASCO, sued for specific performance, only to become the victim of a litany of tactics designed to frustrate its claim. *Id.* at 35. For example, to avoid NASCO's motion for a preliminary injunction, the defendant and his lawyer conducted a simulated sale of the station's assets to the defendant's sister. *Id.* at 36-37. When that scheme failed, the defendant filed a series of meritless motions and, in derogation of the injunction, petitioned the FCC to transfer the station's license. *Id.* at 38-39. After the district court entered a judgment for NASCO on the merits of its specific performance claim, NASCO moved for $996,644.65 in attorney's fees as sanctions for the actions of the defendant and his attorneys. *Id.* at 40. The district court awarded NASCO's fees, and the Fifth Circuit affirmed. *Id.* at 40-42. The U.S. Supreme Court also affirmed, holding that sanctions such as "outright dismissal" and attorney's fees are within the courts' inherent power where a party's conduct evidences bad faith and an attempt to perpetrate a fraud on the court. *Id.* at 44-45.

---

[7]   There are other sanctioning schemes outlined by the Federal Rules of Civil Procedure and the United States Code that can be applied with, but that do not displace, the courts' inherent powers to sanction. *Chambers*, 501 U.S. at 46-47. In this case none of these other pertinent rules or statutes apply. For example, Rule 11 sanctions frivolous <u>pleadings</u>; Rule 37 requires a party's derogation of a <u>court order</u>; and 28 U.S.C. § 1927 applies only to <u>attorneys</u> who purposely cause unnecessary delays in litigation.

\\\MI - 26335/0001 - 92917 v2

HOGAN & HARTSON L.L.P., IIII BRICKELL AVENUE, SUITE I900 • MIAMI, FL 33131 • TEL. (305) 459-6500 • FAX (305) 459-6550

Although *Chambers* involved a particularly egregious set of facts, the inherent powers doctrine is most often invoked where, like here, a party commits perjury or destroys or doctors evidence. For example, *Vargas* involved a sexual harassment suit in which it eventually was revealed that the plaintiff had fabricated evidence and lied at deposition.  901 F. Supp. at 1574-76.  Judge Ryskamp dismissed the plaintiff's claims, finding that they were part of an "unconscionable scheme" to defraud the court:

> Dismissal is appropriate where[ ] a party has sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense.

*Id.* at 1579 (citing *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1118 (1st Cir. 1989)). The *Vargas* court held that the need for sanctions is heightened when, as here, the scheme goes to the pivotal or "lynchpin" issue in the case.  *Id.* at 1582; *see also Nichols v. Klein Tools, Inc.*, 949 F.2d 1047, 1049 (8th Cir. 1991) (dismissing plaintiff's claims after he repeatedly and pointedly lied under oath regarding the case's pivotal issue).

Similarly, in *McDowell v. Seaboard Farms of Athens, Inc.*, 1996 WL 684140, at *8 (M.D. Fla. Nov. 4, 1996), the Middle District of Florida found the plaintiff had submitted a fabricated diary as evidence and lied at deposition regarding the diary's authenticity. The court held that the plaintiff's "unconscionable scheme" warranted the complete dismissal of his claims.  *Id. at* **2, 10.  In another case, the Seventh Circuit affirmed the district court's dismissal of a plaintiff's claim where the plaintiff lied on his application for leave to proceed in forma pauperis.  *Thomas v.*

\\\MI - 26335/0001 - 92917 v2

HOGAN & HARTSON L.L.P., 1111 BRICKELL AVENUE, SUITE 1900 • MIAMI, FL 33131 • TEL. (305) 459-6500 • FAX (305) 459-6550

Case No. 05-21772 CIV – MARTINEZ/BANDSTRA

*Gen. Motors Acceptance Corp.*, 288 F.3d 305, 308 (7th Cir. 2002) (Posner, J.). And in 1999, Judge Moore dismissed the claims of a particularly litigious and abusive plaintiff who "mistakenly" appeared for hearing in Miami despite the fact that the hearing had been set in Key West. *Corneal v. Niemic*, 1999 WL 737884, at *3 (S.D. Fla. June 24, 1999).

In addition to dismissing a plaintiff's claims, courts often invoke the inherent powers doctrine to strike defendants' answers and enter default judgments.[8]  In *Chemtall, Inc. v. Citi-Chem, Inc.*, 992 F. Supp. 1390, 1410 (S.D. Ga. 1998), the defendant repeatedly lied under oath at deposition and produced misleading documents in an effort to hinder plaintiff's efforts to collect a debt.  To prove the defendant's deception, the plaintiff conducted third-party discovery and confronted the defendant with documents that contradicted his previous testimony.  *Id.* at 1409.  The court "unsheathed the [proverbial] 'samurai sword'" and entered a default judgment against the defendant, finding by clear and convincing evidence that he had engaged in abusive behavior, and finding that a lesser sanction would not suffice given the defendant's actions.  *Id.* at 1407-08, 1410; *see also Telectron*,

---

[8]      Courts have discretion under the inherent powers doctrine "to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers*, 501 U.S. at 44-45.  Thus, the universe of possible sanctions that this Court may impose on Star and Hale is boundless.  *See, e.g., Barnes v. Dalton*, 158 F.3d 1212, 1214-15 (11th Cir. 1998) (fining plaintiff's counsel $10,000); *Allapattah Services, Inc.*, 372 F. Supp. 2d at 1376 (requiring Special Master to make findings in each of more than 5,000 claims against Exxon as to whether Exxon defended each claim in bad faith and, if so, to award attorney's fees).  Additional or alternative sanctions against Defendants and their counsel may include, among other things, the imposition of fines, the striking of Defendants' affirmative defenses or a determination of one or more disputed facts in Qantum's favor.

\\\MI - 26335/0001 - 92917 v2

*Inc. v. Overhead Door Corp.*, 116 F.R.D. 107, 126-27 (S.D. Fla. 1987) (Marcus, J.) (entering default judgment against defendant that purposely destroyed documents).

In *Televideo Systems, Inc. v. Heidenthal*, 826 F.2d 915, 916 (9th Cir. 1987), the defendant testified at deposition that he diverted $700,000 from the corporate plaintiff at the behest of the corporation's president. Later, the defendant filed a written declaration recanting his prior testimony and admitting that he lost the money gambling. *Id.* The district court struck the defendant's answer, entered a default judgment and awarded the plaintiff its attorney's fees. *Id.* The Ninth Circuit affirmed on appeal, holding that the defendant's "elaborate scheme involving perjury clearly qualifies as a willful deceit of the court" and "interfered egregiously with the court's administration of justice." *Id.* at 917.

## 2. DEFENDANTS' BAD FAITH ACTS WARRANT THE ULTIMATE SANCTIONS

### A. Defendants Lied Under Oath and Buried Key Documents

Much like the sanctioned parties in the cases cited above, Defendants attempted to enhance their case through perjurious testimony and the burying of key documents. Defendants' scheme was calculated to serve one purpose: to improperly influence and defraud this Court regarding the key issue in the case — whether Defendants breached the No-Shop Provision by negotiating with Cumulus prior to March 5, 2005. Only after facing the Cumulus emails and Dickey's testimony did Defendants concede to breaching the No-Shop Provision. (Inj. H'rg Tr. at 13, attached as **Ex. 9**). Prior to that, Defendants did everything they could to conceal from Qantum the timing of their negotiations with Cumulus. (*See Brady*

13

Depo. Ex. 127 (June 20, 2005 email from Brady to Paper), attached as **Ex. 4**). Toward that end, Hale lied repeatedly under oath at his deposition, testifying that Defendants never spoke with Cumulus about WTKE until after March 5, 2005. (*See* Hale Depo. Tr. at 24-25, 54-55, 59-60, 79, attached as **Ex. 2**).

However, the documents produced by Cumulus — consisting of emails to and from Hale and Brady — not only proved that Hale lied under oath, they proved that Defendants withheld from Qantum the key documents in this case. <u>Defendants did not produce a single email predating March 2, 2005</u>.  And in at least one instance, Defendants removed a smoking-gun email attachment and lied about its contents. The attachment was later discovered to be the terms of Defendants' agreement with Cumulus. (*Compare* Dickey Depo. Ex. 98, attached as **Ex. 7**, *with* Hale Depo. Tr. at 42-43).  In contrast, Cumulus produced dozens of pre-March 2 emails — most of which were either written by or directed to Hale and/or Star's FCC counsel, Brady. (*See, e.g.*, **Comp. Ex. 5** and **Exs. 6-8** attached hereto).  The emails conclusively showed that Defendants were dealing with Cumulus prior to March 5, 2005.

### B. In a Bad-Faith Effort to Avoid the District Court Litigation, Reject the WTKE Purchase Agreement and Sell WTKE to Cumulus, Hale Sank Star Into Bankruptcy

It is well-settled that when considering sanctions, a district court may consider all of the circumstances surrounding the alleged violation, including a party's misconduct in related cases. *Atkins v. Fischer*, 232 F.R.D. 116, 129-31 (D.C. Cir. 2005) (citing *Link v. Wabash R.R. Co.*, 370 U.S. 626, 635 (1962)); *Travelers Ins. Co. v. St. Jude Hosp. of Kenner, La., Inc.*, 38 F.3d 1414, 1417-18 (5th Cir. 1994) (affirming sanctions where the district court mentioned collateral bankruptcy

proceedings in its sanctions order); *see also Johnson v. Comm'r of Internal Revenue,* 289 F.3d 452, 456-57 (7th Cir. 2002) (Posner, J.) (holding that Tax Court would be remiss not to consider attorney's bad conduct in other cases).

Here, the Bankruptcy Court found that Star's bankruptcy petition, filed on the eve of default for failure to hire new counsel, was nothing more than a "litigation tactic" by Star to avoid the District Court Action, reject the WTKE Purchase Agreement and confirm a reorganization plan to sell WTKE to Cumulus. (Bankruptcy Court Order at 12, attached as **Ex. 10**).  Moreover, Hale's "evasive, contradictory and not credible" testimony at the bankruptcy hearing showed that even after being admonished by this Court at the August 3, 2005 preliminary injunction hearing, Hale still has little respect for courts and the judicial process.[9] (*See id.* at 10-11; Inj. H'rg Tr. at 13-14).

## CONCLUSION

"Those who lie, evade and fail to tell the *whole* truth obviously enjoy an advantage over honest litigants." *Chemtall,* 992 F. Supp. at 1409.  Taken alone, Defendants' failure to produce key documents warrants sanctions under the inherent powers doctrine.  Taken together with Hale's perjurious testimony regarding the pivotal issue in this case, Defendants' bad faith actions warrant the

---

[9]    Defendants' misconduct toward Qantum over the last two-and-a-half years has come full-circle. Defendants' actions in the Bankruptcy Court Action follow the pattern of Hale's previous attempt to avoid the WMMK Purchase Agreement in the Gulf Breeze Bankruptcy, (see *infra* note 1), and his December 16, 2004 email to Richard Denning of Cumulus proposing to "blow up" that bankruptcy to avoid a provision in the WTKE Asset Purchase Agreement requiring Star to provide Qantum with access to WTKE prior to closing. (*See* Dickey Depo. Ex. 71, attached as **Ex. 11**).

MI - 26335/0001 - 92917 v2

HOGAN & HARTSON L.L.P., 1111 BRICKELL AVENUE, SUITE 1900 • MIAMI, FL 33131 • TEL. (305) 459-6500 • FAX (305) 459-6550

"ultimate" sanctions. This conclusion finds even further support in Star's bad-faith bankruptcy petition and Hale's evasive testimony before the Bankruptcy Court.

Thus, for the foregoing reasons, Plaintiff, Qantum Communications Corporation, respectfully requests that this Court enter a Default Judgment in Qantum's favor against Defendants, Star Broadcasting, Inc. and Ronald E. Hale Sr., and award Qantum the attorney's fees and costs it has incurred in this case,[10] or impose any other sanction it deems proper.

## REQUEST FOR HEARING

Pursuant to S.D. Fla. L.R. 7.1.B, Qantum requests a hearing. Due process requires that the party against whom sanctions are sought "must be given an opportunity to respond, orally or in writing, to the invocation of such sanctions and to justify his actions." *In re Mroz*, 65 F.3d 1567, 1575-76 (11th Cir. 1995).

                              Respectfully submitted,

Dated: April 5, 2006          Hogan & Hartson LLP

                              John F. O'Sullivan, Esq.
                              Florida Bar No. 143154
                              john.osullivan@akerman.com
                              Jason Kellogg, Esq.
                              Florida Bar No. 0578401
                              jason.kellogg@akerman.com

---

[10]   Qantum is entitled to its attorney's fees under Section 16.2 of the WTKE Purchase Agreement.

16

Case No. 05-21772 CIV – MARTINEZ/BANDSTRA

Mellon Financial Center – 19th Floor
1111 Brickell Avenue
Miami, Florida 33131
Telephone:   (305) 459-6500
Facsimile:   (305) 459-6550

*Attorneys for Plaintiff Qantum
Communications Corporation*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 5th, 2006, I served a true and correct copy

of the foregoing by U.S. mail on Jeffrey P. Shapiro, Esq., Shapiro Ramos, SunTrust

International Center, One S.E. Third Avenue, Suite 1450, Miami, Florida  33131.

By: _____

\\MI - 26335/0001 - 92917 v2

# Exhibit 1

EX. 3

RECEIVED AS EXHIBIT NO.
Bank. Case No. 05-35012-WSS
For ID. __1__ In Evidence
Debtor Star Broadcasting, Inc.
This 3rd day of January, 2006
WILLIAM S. SHULMAN, BANKRUPTCY JUDGE

# ASSET PURCHASE AGREEMENT

## DATED AS OF SEPTEMBER 5, 2003

## BY AND AMONG

## STAR BROADCASTING, INC.,

## RONALD E. HALE, SR.

## AND

## QANTUM COMMUNICATIONS CORPORATION

# TABLE OF CONTENTS

Page

ARTICLE 1 SALE OF ASSETS ............................................................................. 1

   1.1.   Station Assets ................................................................................... 1

   1.2.   Excluded Assets .............................................................................. 3

   1.3.   Option to Purchase Tower ............................................................... 4

ARTICLE 2 ASSUMPTION OF OBLIGATIONS .................................................... 4

   2.1.   Assumed Obligations ....................................................................... 4

   2.2.   Retained Obligations ....................................................................... 4

ARTICLE 3 PURCHASE PRICE ............................................................................ 4

   3.1.   Purchase Price ................................................................................ 4

   3.2.   Deposit ........................................................................................... 4

   3.3.   Payment of Purchase Price ............................................................. 5

   3.4.   Prorations and Adjustments ............................................................ 5

   3.5.   Allocation ....................................................................................... 6

ARTICLE 4 CLOSING; LOCAL MARKETING AGREEMENT ............................... 6

   4.1.   The Closing .................................................................................... 6

   4.2.   Local Marketing Agreement ............................................................ 7

ARTICLE 5 GOVERNMENTAL CONSENTS ........................................................ 7

   5.1.   Consents ........................................................................................ 7

   5.2.   FCC ............................................................................................... 7

   5.3.   General .......................................................................................... 8

ARTICLE 6 REPRESENTATIONS AND WARRANTIES OF SELLER AND PROGRAMMER ................................................................................................. 8

   6.1.   Representations and Warranties of Seller and Programmer .............. 8

   6.2.   No other Representations or Warranties by Seller or Programmer .... 17

ARTICLE 7 REPRESENTATIONS AND WARRANTIES OF BUYER .................... 17

   7.1.   Representations and Warranties of Buyer ....................................... 17

   7.2.   No other Representations or Warranties by Buyer ........................... 18

ARTICLE 8 COVENANTS OF SELLER AND PROGRAMMER ........................... 18

   8.1.   Seller's and Programmers' Covenants ............................................ 18

| 8.2. | Updating of Schedules | 20 |
| 8.3. | Enforcement of Agreements | 20 |
| 8.4. | FCC Filings | 20 |
| 8.5. | Notification | 21 |
| 8.6. | Post-Closing Access | 21 |
| 8.7. | Taxes | 21 |
| 8.8. | Continuity | 21 |
| 8.9. | Non-Solicitation | 21 |
| 8.10. | Option for Ft. Walton Beach Site | 21 |
| ARTICLE 9 | COVENANTS OF BUYER | 22 |
| 9.1. | Buyer Covenants | 22 |
| 9.2. | Post-Closing Access | 22 |
| 9.3. | Other Consents | 22 |
| ARTICLE 10 | JOINT COVENANTS | 22 |
| 10.1. | Joint Covenants | 22 |
| 10.2. | Control of Station | 23 |
| 10.3. | Bulk Sales Laws | 23 |
| 10.4. | Public Announcements | 23 |
| 10.5. | Employee Matters | 24 |
| 10.6. | Payroll Tax | 24 |
| 10.7. | Buyer's Audit | 24 |
| ARTICLE 11 | CONDITIONS OF CLOSING BY BUYER | 25 |
| 11.1. | Obligations of Buyer | 25 |
| ARTICLE 12 | CONDITIONS OF CLOSING BY SELLER | 26 |
| 12.1. | Obligations of Seller | 26 |
| ARTICLE 13 | DOCUMENTS TO BE DELIVERED AT THE CLOSING | 27 |
| 13.1. | Documents to be Delivered by Seller | 27 |
| 13.2. | Documents to be Delivered by Buyer | 28 |
| ARTICLE 14 | TRANSFER TAXES; FEES AND EXPENSES | 28 |
| 14.1. | Expenses | 28 |
| 14.2. | Transfer Taxes and Similar Charges | 28 |
| 14.3. | Governmental Filing or Grant Fees | 29 |

ARTICLE 15 ACCOUNTS RECEIVABLE.................................................................. 29

    15.1.  Accounts Receivable.................................................................................... 29

ARTICLE 16 SURVIVAL; INDEMNIFICATION ................................................... 29

    16.1.  Survival ........................................................................................................ 29

    16.2.  Indemnification............................................................................................ 29

    16.3.  Procedures ................................................................................................... 30

ARTICLE 17 TERMINATION ................................................................................... 31

    17.1.  Termination .................................................................................................. 31

    17.2.  Interruption of Broadcast Transmission...................................................... 32

    17.3.  Liquidated Damages .................................................................................... 32

    17.4.  Specific Performance ................................................................................... 32

ARTICLE 18 MISCELLANEOUS PROVISIONS ..................................................... 33

    18.1.  Casualty Loss ............................................................................................... 33

    18.2.  Risk of Loss ................................................................................................. 33

    18.3.  Further Assurances ....................................................................................... 33

    18.4.  Assignment ................................................................................................... 33

    18.5.  Amendments ................................................................................................. 34

    18.6.  Headings ....................................................................................................... 34

    18.7.  Governing Law and Venue ........................................................................... 34

    18.8.  Notices .......................................................................................................... 34

    18.9.  Counterparts ................................................................................................. 35

    18.10.  No Third Party Beneficiaries ...................................................................... 35

    18.11.  Severability ................................................................................................. 35

    18.12.  Entire Agreement ....................................................................................... 35

    18.13.  Interpretation .............................................................................................. 35

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (the "Agreement") is made and entered into as of this 5th day of September 2003, by and among Star Broadcasting, Inc., a Florida corporation ("Seller"), Ronald E. Hale. Sr. ("Programmer"), and Qantum Communications Corporation, a Delaware corporation ("Buyer").

### RECITALS:

WHEREAS, Seller is a party to that certain "Asset Exchange Agreement" dated as of December 9, 2002, whereby, upon the consummation of the transactions contemplated therein (the "Exchange Closing"), it will hold the FCC licensee of FM Broadcast Station WTKE(FM), 98.1 MHz, Holt, Florida  (the "Station") and substantially all of the assets used or useful in the operation of the Station;

WHEREAS, Programmer, who is one of Seller's principals and who will substantially benefit from the transactions contemplated by this Agreement, provides substantially all of the programming to the Station pursuant to a Local Programming and Marketing Agreement dated February 5, 2003 (the "Clear Channel LMA");

WHEREAS, Seller desires to assign to Buyer the licenses and other authorizations issued by the Federal Communications Commission (the "Commission" or "FCC") for the purpose of operating the Station and Buyer desires to accept assignment of the Station licenses;

WHEREAS, Seller desires to sell to Buyer, and Buyer desires to purchase, the assets used or useful in the operation of the Station; and

WHEREAS, the parties recognize that the Station licenses may not be assigned to Buyer without the prior consent of the Commission.

NOW, THEREFORE, in consideration of the mutual promises and covenants set forth below, the parties, intending to be legally bound, agree as follows:

### ARTICLE 1
### SALE OF ASSETS

1.1.          Station Assets.  On the terms and subject to the conditions set forth in this Agreement, on the Closing Date (as defined in Section 4.1), Seller shall assign, transfer, convey and deliver to Buyer, and Buyer shall acquire from Seller, all of the right, title and interest of Seller in and to all of the assets, properties, interests and rights of whatsoever kind and nature, real and personal, tangible and intangible, or mixed held by Seller and used or useful in the operation of the Station (the "Station Assets").  Except as otherwise provided in Section 1.2, the Station Assets shall include, without limitation, the following:

(a)    all licenses, permits and other authorizations issued by the FCC with respect to the Station (the "Station Licenses"), including those described on Schedule 1.1(a), including any renewals, extensions or modifications thereof and additions thereto made between the date hereof and the Closing Date;

(b)    all equipment, electrical devices, antennas, towers, cables, tools, hardware, office furniture and fixtures, computer equipment and printers, office materials and supplies, inventory, motor vehicles, spare parts and other tangible personal property of every kind and description which are used or useful in the operation of the Station, including, without limitation, those listed or described on Schedule 1.1(b), except any retirements or dispositions thereof made between the date hereof and the Closing Date in the ordinary course of business and consistent with past practices of Seller or with the written consent of Buyer (the "Tangible Personal Property");

(c)    (i) all agreements for the sale of advertising time on the Station for cash in the ordinary course of business ("Time Sales Agreements"), including, without limitation, those listed on Schedule 1.1(c)(i); (ii) all agreements for the sale of advertising time on the Station for non-cash consideration listed on Schedule 1.1(c)(ii) ("Trade Agreements"); (iii) all leases of real property pertaining to any and all Leased Real Property (as defined in Section 6.1(h)(ii)) listed in Schedule 1.1(c) (iii), subject as noted therein, however, to Buyer's option; and (iv) all other contracts, agreements and leases that are used or useful in the operation of the Station and listed on Schedule 1.1(c)(iv), together with all contracts, agreements and leases entered into by Seller between the date hereof and the Closing Date that are either (x) entered into with the written consent of Buyer or (y) are consistent with past practices of Seller, are entered into in the ordinary course of business of the Station, and would impose upon Buyer an obligation of Ten Thousand Dollars ($10,000.00) or less for each such contract, agreement or lease and would impose upon Buyer an obligation of no more than Twenty-Five Thousand Dollars ($25,000.00) in the aggregate for all such contracts, agreements and leases (such contracts being referred to herein as the "Station Contracts"). Any deposits paid by Seller with respect to any Station Contracts shall become the property of Buyer, but the amount of any such deposit shall be added to the amounts to be paid to Seller by Buyer pursuant to Section 3.4 of this Agreement. [Among the assets to be assigned to Buyer will be a lease of no less than ten (10) years' duration for the transmitter site in Ft. Walton Beach located at 30° 24' 38" N Latitude; 86° 37' 22" W Longitude (NAD27) to which the Station has been authorized to move by the FCC in response to Application File No. BMPH-20011206AAE (the "Ft. Walton Beach Tower")];

(d)    all of Seller's rights in and to the Station's call letters and rights in and to the trademarks, trade names, service marks, franchises, copyrights, computer software, telephone numbers, programs and programming material, jingles, slogans, logos and other intangible property which are used or useful in the operation of the Station, including, without limitation, as listed on Schedule 1.1(d) (the "Intellectual Property");

(e)    all of Seller's and Programmer's rights in and to all the files, documents, records and books of account (or copies thereof) relating to the operation of the Station, including (if such exist) the Station's local public files, programming information and studies, blueprints, technical information and engineering data, advertising studies, marketing and demographic data, sales correspondence, lists of advertisers, credit and sales reports and logs, but

excluding accounts payable, payroll, payroll taxes, general ledger and records relating exclusively to the Excluded Assets (as defined in Section 1.2);

(f)     all claims and rights against third parties if and to the extent that they relate to Station Assets including, without limitation, all rights under manufacturers' and vendors' warranties;

(g)     all of Seller's goodwill in, and going concern value of, the Station;

(h)     all interests of Seller in all of the real property and buildings, transmitters, antennae, fixtures and improvements thereon, owned by the Seller and used or held for use in the business and operations of the Station including, without limitation, those listed and described on Schedule 1.1(h) attached hereto and any additions and improvements thereto between the date of this Agreement and the Closing Date (collectively, the "Owned Real Property" and with the "Leased Real Property," the "Real Property"); and

(i)     Seller's and Programmer's list of customers and subscriptions.

Except as set forth on Schedule 1.1 (Liens), the Station Assets shall be assigned to Buyer free and clear of all liens, pledges, claims, orders, security interests, writs, judgments, restrictions, mortgages (real or personal), tenancies and other possessory interests, conditional sale or other title retention agreements, assessments, easements, rights of way, covenants, restrictions, rights of first refusal, defects in title, encroachments and other burdens, options or encumbrances of any kind ("Liens") except for (i) Assumed Obligations (as defined in Section 2.1), (ii) liens for taxes not yet due and payable and (iii) such liens, easements, rights of way, building and use restrictions, exceptions, reservations and limitations that do not in any material respect detract from the value of the property subject thereto or impair the use thereof in the ordinary course of the business of the Station  ("Permitted Liens").

1.2.     Excluded Assets.  Notwithstanding anything to the contrary contained in this Agreement, the Station Assets shall not include the following assets along with all right, title and interest therein (the "Excluded Assets"):

(a)     all cash and cash equivalents of Seller, including without limitation certificates of deposit, commercial paper, treasury bills, marketable securities, asset or money market accounts and all such similar accounts or investments as of the close of business on the business day prior to the Closing Date;

(b)     all accounts receivable or notes receivable arising in the operation of the Station prior to the Closing Date as of the close of business on the business day prior to the Closing Date;

(c)     all tangible and intangible personal property disposed of or consumed in the ordinary course of business consistent with the past practices of Seller between the date of this Agreement and the Closing Date;

(d)     all Station Contracts that terminate or expire prior to the Closing Date in the ordinary course of business;

(e)     Seller's corporate name, corporate minute books, charter documents, corporate stock record books and such other books and records as pertain to the organization, existence or share capitalization of Seller;

(f)     any contracts of insurance of Seller relating to the Station, and all insurance proceeds or claims made thereunder;

(g)     all Seller Plans and the trusts, assets and liabilities thereof. Buyer is assuming no rights or obligations with respect to Seller Plans; and

(h)     all rights, properties and assets described on Schedule 1.2(h).

1.3.       Option to Purchase Tower.  Buyer and Seller shall negotiate in good faith an agreement whereby Buyer will hold an option to purchase from Star Tower, LLC, the Ft. Walton Beach Tower.

# ARTICLE 2
## ASSUMPTION OF OBLIGATIONS

2.1.       Assumed Obligations.  On the Closing Date, Buyer shall assume any obligations of Seller (the "Assumed Obligations") arising after the Closing under the Station Contracts.

2.2.       Retained Obligations.  Other than the Assumed Obligations Buyer does not assume or agree to discharge or perform and will not be deemed by reason of the execution and delivery of this Agreement or any agreement, instrument or document delivered pursuant to or in connection with this Agreement or otherwise by reason of the consummation of the transactions contemplated hereby, to have assumed or to have agreed to discharge or perform, any liabilities, obligations or commitments of Seller or Programmer of any nature whatsoever whether accrued, absolute, contingent or otherwise and whether or not disclosed to Buyer (the "Retained Obligations").

# ARTICLE 3
## PURCHASE PRICE

3.1.       Purchase Price.  The aggregate purchase price to be paid by Buyer to Seller as full consideration to Seller and Programmer for the promises and covenants by them as set forth in this Agreement shall be Three Million Dollars ($3,000,000) (the "Purchase Price").

3.2.       Deposit.  Simultaneously with the execution of this Agreement, Buyer shall deposit the sum of One Hundred Fifty Thousand Dollars ($150,000) (the "Deposit") with, or deliver an irrevocable letter of credit (the "Letter of Credit") in such amount to, Garvey Schubert Barer (the "Pre-Closing Escrow Agent") pursuant to the Pre-Closing Escrow Agreement attached hereto as Exhibit A, dated as of the date of this Agreement (the "Pre-Closing Escrow Agreement"), by and among Buyer, Seller and Pre-Closing Escrow Agent. If Buyer deposits a Letter of Credit with Pre-Closing Escrow Agent pursuant to the preceding sentence and if Buyer fails to renew or replace such Letter of Credit at least ten (10) days prior to the

expiration date of the Letter of Credit, the Pre-Closing Escrow Agent shall draw down on the Letter of Credit in full and the proceeds of the Letter of Credit in the amount of One Hundred Fifty Thousand Dollars ($150,000) shall be deemed to be the Deposit, which amount shall be invested by the Pre-Closing Escrow Agent in accordance with the terms of the Pre-Closing Escrow Agreement. At the Closing, the Pre-Closing Escrow Agent shall either (a) return the Letter of Credit, if such is being held by the Pre-Closing Escrow Agent, to Buyer or (b) disburse the Deposit to the Seller for application of the Deposit against the Purchase Price as set forth in Section 3.3 hereof and disburse any interest accrued on the Deposit or interest on such interest (the "Interest") to Buyer. If this Agreement is terminated by Seller in accordance with Section 17.1(b) of this Agreement due to Buyer's failure to consummate the Closing on the Closing Date, the Pre-Closing Escrow Agent shall either (x) draw down on the Letter of Credit in full, if such is being held by the Pre-Closing Escrow Agent, and disburse the proceeds of One Hundred Fifty Thousand Dollars ($150,000) to Seller or (y) disburse the Deposit to Seller, in either event such disbursement serving as an agreed estimate of liquidated damages under Section 17.3. In the event that the Deposit is disbursed to Seller pursuant to the previous sentence, the Pre-Closing Escrow Agent shall disburse any Interest to Buyer. In the event that this Agreement is terminated other than in accordance with Section 17.1(b) of this Agreement due to Buyer's failure to consummate the Closing on the Closing Date, the Pre-Closing Escrow Agent shall disburse either the Letter of Credit or the Deposit, plus Interest, as applicable, to Buyer.

3.3.     Payment of Purchase Price. If, as of the Closing, Pre-Closing Escrow Agent holds the Letter of Credit pursuant to Section 3.2, above, Pre-Closing Escrow Agent will return the Letter of Credit to Buyer and  Buyer will pay the sum of Two Million, Eight Hundred Fifty Thousand Dollars ($2,850,000) by wire transfer of immediately available funds to accounts specified by Seller at least two business days prior to the Closing Date. If, as of the Closing, Pre-Closing Escrow Agent holds the Deposit in lieu of the Letter of Credit, Pre-Closing Escrow Agent shall disburse the Deposit to Seller as prescribed in Section 3.2, above, and Buyer will pay Two Million, Seven Hundred Thousand Dollars ($2,700,000) by wire transfer of immediately available funds to accounts specified by Seller at least two business days prior to the Closing Date. In either event, the sum of One Hundred Fifty Thousand Dollars ($150,000) (the "Post-Closing Escrow Deposit") shall be paid to Stan Raymond & Associates, Inc., or such other escrow agent as the Parties may jointly designate ("Post-Closing Escrow Agent"), who shall hold the Post-Closing Escrow Deposit, pursuant to the terms of the Post-Closing Escrow Agreement attached hereto as Exhibit B, for one year to secure Seller's indemnification obligations under this Agreement.

3.4.     Prorations and Adjustments.  All revenues and expenses arising from the operation of the Station shall be prorated between Seller and Buyer in accordance with the principle that, except as expressly otherwise set forth in this Agreement, (a) Seller shall receive all revenues, and shall be responsible for all expenses, relating to the business and operations of the Station for the period ending at 11:59 p.m. on the day prior to the Closing Date, and (b) Buyer shall receive all revenues, and be responsible for all expenses, relating to the business and operations of the Station thereafter. In implementation of this general principle, the parties agree that, except as otherwise provided in this Agreement, all deposits and deferred income and expenses arising from the conduct of the business and operations of the Station shall be prorated in accordance with generally accepted accounting principles ("GAAP") as of 11:59 p.m. on the date immediately preceding the Closing Date.  Such prorations shall include, without limitation,

all ad valorem and other property taxes and assessments, business and license fees, FCC regulatory fees, music and other license fees (including any retroactive adjustments thereof), utility expenses, amounts due or to become due under contracts, rents, lease payments, accrued vacation leave and sick leave for any employees of Seller that become employees of Buyer (which shall be paid by Seller with respect to such period prior to the Closing Date) and similar deferred items. Real estate taxes shall be apportioned on the basis of taxes assessed for the preceding year, with a reapportionment, if any, as soon as the new tax rate and valuation can be ascertained. FCC regulatory fees shall be apportioned on the basis of the fees charged by the FCC for payment in September 2003. Except as otherwise provided herein, the prorations and adjustments contemplated by this Section 3.4, to the extent practicable, shall be made on the Closing Date. As to those prorations and adjustments not capable of being ascertained on the Closing Date, unless otherwise stipulated in this Section 3.4, an adjustment and proration shall be made within ninety (90) calendar days of the Closing Date. In the event of any disputes between the parties as to such prorations and adjustments, the amounts not in dispute shall nonetheless be paid at the time provided herein and such disputes shall be determined by an independent certified public accountant mutually acceptable to the parties, and the fees and expenses of such accountant shall be paid one-half by Buyer and one-half by Seller. With respect to Trade Agreements, if there exists on the Closing Date an aggregate negative trade balance in excess of Ten Thousand Dollars ($10,000) determined in accordance with GAAP, then such excess will be treated as prepaid time sales and adjusted as a proration in Buyer's favor, but there shall be no adjustment for any positive trade balance existing on the Closing Date.

      3.5.      <u>Allocation</u>. The Purchase Price shall be allocated among the Station Assets in a manner to be determined by Buyer based on the advice or recommendation of a nationally recognized appraisal firm. Seller and Buyer agree to use the allocations determined pursuant to this Section 3.5 for all tax purposes, including without limitation, those matters subject to Section 1060 of the Internal Revenue Code of 1986, as amended.

**ARTICLE 4**
**CLOSING; LOCAL MARKETING AGREEMENT**

      4.1.      <u>The Closing</u>. The consummation of the transactions contemplated in this Agreement (the "Closing") shall occur (a) within ten (10) business days after the FCC Consent (as defined in Section 5.1) to the assignment of the Station Licenses has become a Final Order (as defined below), unless Buyer waives the requirement that the FCC Consent shall have become a Final Order in which case the Closing shall occur on such date chosen by Buyer that is subsequent to the grant of the FCC Consent but no later than the date that is ten (10) business days after the FCC Consent has become a Final Order, or (b) at such later date that all other terms and conditions as set forth in Articles 11 and 12 have been satisfied, or (c) such other date as may be mutually agreed to by the parties (the "Closing Date"). Notwithstanding the foregoing, if the FCC renewal application for the Station is pending on the date that is ten (10) business days after the FCC Consent has become a Final Order and if the FCC Consent does not permit the parties to consummate the transactions during the pendency of such renewal application, the Closing Date with respect to the Station, in the absence of the agreement of the parties to the contrary, shall be the date that is fifteen (15) business days after the date on which such renewal application is granted. For purposes of this Agreement "Final Order" shall mean action by the FCC granting the FCC Application which is not reversed, stayed, enjoined, set aside, annulled or suspended,

- 6 -

and with respect to which action no timely request for stay, petition for rehearing or reconsideration, application for review or appeal is pending, and as to which the time for filing any such request, petition or appeal or reconsideration by the FCC on its own motion has expired. The Closing shall be held at Buyer's offices at 3 Stamford Landing, Suite 210, Stamford, CT, or at such place as the parties hereto may agree.

      4.2.         <u>Local Marketing Agreement</u>. Seller and Programmer acknowledge that Buyer is concurrently entering into a purchase agreement whereby Buyer has agreed to purchase substantially all of the assets of WMMK(FM), Destin, Florida. The licensee of WMMK(FM) is Gulf Breeze Media, Inc., an entity that is affiliated with Seller through familial relationships and a common officer. In addition, the officers, directors and shareholders of Gulf Breeze Media, Inc., are members of Programmer's family. Programmer agrees that, in the event that the parties have not closed on the transactions contemplated by this Agreement by the date that Buyer or its permitted assign closes on the purchase of substantially all of the assets of WMMK(FM) (the "WMMK Closing Date"), Programmer shall permit Buyer, effective on the WMMK Closing Date, to broadcast programming over the Station during all broadcast time made available to Programmer pursuant to the Clear Channel LMA. In return for Programmer's granting to Buyer the right to provide substantially all of the programming aired on the Station, Buyer shall reimburse Programmer for those expenses required to be paid by Programmer under the Clear Channel LMA commencing with the WMMK Closing Date and continuing for as long as Buyer provides such programming over the Station pursuant to this Section 4.2. In addition, Buyer shall pay to Programmer at Closing if the Closing takes place fifty percent (50%) of Buyer's broadcast cash flow, if any, directly attributable to the Station during the period that Buyer was programming the Station pursuant to this Section 4.2. The rights and obligations of the parties under this Section 4.2 shall be reduced to writing in an agreement to be entered into by the parties no later than the date that is ten (10) business days prior to the WMMK Closing Date. For purposes of this Agreement, "Broadcast Cash Flow" means the total of the net revenues (after agency commissions and excluding barter transactions) of the Station, less all operating expenses (excluding barter transactions) of the Station as adjusted to reflect the add back of all non-operating expenses including interest, depreciation, amortization, taxes and corporate allocation.

## ARTICLE 5
## GOVERNMENTAL CONSENTS

      5.1.         <u>Consents</u>. The occurrence of the Closing is subject to and conditioned upon prior FCC consent (the "FCC Consent") to the assignment of the Station Licenses to Buyer.

      5.2.         <u>FCC</u>. Seller and Buyer shall file an application with the FCC (the "FCC Application") requesting the FCC Consent within five (5) business days following the date of execution of this Agreement if there is no freeze on such applications imposed by the FCC which is in effect on the date of execution, or, if such freeze been imposed by the FCC, then within five (5) business days of the day on which such freeze is lifted. Buyer and Seller shall diligently prosecute the FCC Application and otherwise use their best efforts to obtain the FCC Consent as soon as possible.

5.3.       General. Seller and Buyer shall notify each other of all documents filed with or received from any governmental agency with respect to this Agreement or the transactions contemplated hereby. Seller and Buyer shall furnish each other with information and assistance as the other may reasonably request in connection with their preparation of any governmental filing hereunder.

## ARTICLE 6
## REPRESENTATIONS AND WARRANTIES OF SELLER AND PROGRAMMER

6.1.       Representations and Warranties of Seller and Programmer. Seller and Programmer hereby make the following representations and warranties to Buyer. Each of the following representations and warranties is true and correct as of the date hereof except for those representations and warranties made as of the Exchange Closing, which shall be true and correct as of such Exchange Closing. Each of the following representations and warranties, regardless of whether it is deemed to be true as of the date hereof or as of the Exchange Closing, shall be true and correct as of the Closing Date, and shall be unaffected by any investigation heretofore or hereafter made by Buyer.

(a)       Organization.

(i)       Seller is validly existing and in good standing under the laws of the State of Florida and has all requisite corporate power and authority to own, lease, operate or otherwise hold the Station Assets to be owned, leased or otherwise held by it and to carry on the business and operations of the Station as now being conducted and is duly qualified to do business in each jurisdiction in which its operation of the Station or its ownership or leasing of property makes such qualification necessary. Appended hereto as Schedule 6.1(a) is a true and correct list of Seller's officers, directors and shareholders accurately specifying the office held, the voting interest held and the equity interest held by each such person.

(ii)       Seller has all requisite corporate power and authority to enter into this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement by Seller and the consummation of the transactions contemplated hereby have been duly authorized by all necessary corporate action on the part of Seller, its officers, directors, and shareholders. This Agreement has been duly executed and delivered by Seller and Programmer and, assuming the due execution and delivery of this Agreement by Buyer, constitutes the legal, valid and binding obligation of Seller and Programmer, enforceable against Seller and Programmer in accordance with its terms.

(b)       Authority. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby shall not (a) violate, conflict with or result in any breach or default of any provision of the organizational documents of Seller, (b) violate, conflict with or result in a violation or breach of, or constitute a default (with or without due notice, lapse of time, right to cure, or all of the foregoing) under, or permit the suspension or termination of, or result in the acceleration of, or entitle any party to accelerate (whether as a result of the sale of the Station Assets or otherwise) any material obligation, covenant, term, or condition, or result in the loss of any material benefit, or give rise to the creation of any material Lien, charge, security interest, judgment, claim or encumbrance upon any of the properties or

assets of Seller or Programmer or any of its or his subsidiaries or affiliates, as applicable, under any of the terms, conditions or provisions of any loan or credit agreement, note, bond, mortgage, indenture or deed of trust, promissory note, security agreement, chattel mortgage, debt, or any material license, lease, agreement or other material instrument or obligation to which Seller or Programmer is a party or by which it or he or any of its or his properties or assets may be bound or affected, or (c) violate any order, writ, judgment, injunction, decree, statute, rule, ordinance or regulation of any court, administrative agency or commission or other governmental authority or instrumentality (a "Governmental Entity") applicable to Seller or Programmer or any of their respective properties or assets.  To Seller's and Programmer's knowledge, no consent, approval, order or authorization of, or registration, declaration or filing with, any Governmental Entity is required by or with respect to Seller or Programmer in connection with the execution and delivery of this Agreement by Seller or Programmer or the consummation by Seller or Programmer of the transactions contemplated hereby, except for FCC Consents.

(c)     Financial Statements.  Within ten (10) days after the date of this agreement, each of Seller and Programmer shall provide Buyer with unaudited balance sheets as of June 30, 2003, and the related income statements and statements of cash flow for such periods (such financial statements collectively being referred to as the "Financial Statements").  The Financial Statements are appended hereto as Schedule 6.1(c). Except as set forth on Schedule 6.1(c), the Financial Statements have been prepared in accordance with GAAP applied on a consistent basis and accurately present the financial position and the results of operations for the Station for the period covered. Except as disclosed in Schedule 6.1(c), there has not been any material adverse change in the working capital, financial condition, business, results of operations, assets or liabilities of Seller, Programmer or the Station between December 31, 2002, and the date of this Agreement.

(d)     Compliance with Applicable Laws; FCC Matters.

(i)     Except as permitted or contemplated in this Agreement, the business and operations of the Station have been, and are being, conducted in material compliance with the Station Licenses and with each law, ordinance, regulation, judgment, decree, injunction, rule or order (collectively, "Laws") of the FCC or any other Governmental Entity having jurisdiction over Seller, Programmer or the Station.  No investigation or review by any Governmental Entity with respect to Seller, Programmer or the Station is pending or, to the knowledge of Seller or Programmer, threatened.  Without limiting the generality of the foregoing and with respect to the Station, the Station and the operations of the Station comply in all material respects with the Communications Act of 1934, as amended (the "Communications Act"), and all rules, regulations and written policies of the FCC thereunder. In addition, Seller represents that the licensee of the Station has duly and timely filed, or caused to be filed, with the appropriate Governmental Entities all applications, reports, statements, fees, documents, registrations, filings or submissions with respect to the business or operations of the Station and the ownership thereof, including, without limitation, applications for renewal of authority required to be filed by applicable law.  All such filings complied in all material respects with applicable laws when made, and no material deficiencies have been asserted with respect to any such filings.

(ii)     Schedule 1.1(a) lists (i) all licenses, permits and other authorizations (including all broadcast auxiliary licenses, construction permits and all grants of Special Temporary Authority) issued by the FCC relating to the Station as of the date of this Agreement and (ii) all licenses, permits or authorizations issued by any other Governmental Entities which are material to the business or operations of the Station. Such licenses, permits and authorizations, and all applications for modification, extension or renewal thereof or for new licenses, permits, permissions or authorizations that would be material to the business or operations of the Station are collectively referred to herein as the Station Licenses (as defined in Section 1.1). Each Station License is in full force and effect. The Station has been operated in all material respects in accordance with the terms of the Station Licenses. To Seller's knowledge, all towers and other structures used in the operation of the Station or the Station Assets or located on the Real Property are constructed and operated in accordance with the rules and regulations of the FAA, the FCC and other governmental entities (including, without limitation, all rules regulating hazards to air navigation, registration of radio towers, and exposure of humans to non-ionizing radio frequency radiation). Except for proceedings affecting the radio broadcast industry generally, there are no proceedings pending or, to Seller's or Programmer's knowledge, threatened with respect to the ownership or operation of the Station which could result in the revocation, material adverse modification, non-renewal or suspension of any of the Station Licenses, the denial of any pending applications for Station Licenses, the issuance against Seller, Programmer or the present licensee of the Station of any cease and desist order, or the imposition of any administrative actions by the FCC or any other Governmental Entity against Seller, Programmer or the present licensee of the Station with respect to the Station Licenses, or which could adversely affect the Station's ability to operate as currently operated or the Buyer's ability to obtain assignment of the Station Licenses.

(e)     Litigation.  Except as stated in Schedule 6.1(e), there is no action, suit, litigation, inquiry, judicial or administrative proceeding, or arbitration pending or, to the knowledge of Seller or Programmer, threatened against Seller, Programmer, the Station, the Station Assets or any of Seller's or Programmer's properties or assets. Set forth on Schedule 6.1(e) is a listing of all pending or resolved complaints that have been filed during the present FCC license term of the Station before any Governmental Authority that allege unlawful discrimination in the employment practices of the Seller, the Programmer or the present licensee of the Station.

(f)     Insurance.  Schedule 6.1(f) accurately lists all fire, liability and other forms or policies of insurance and all fidelity bonds held by or applicable to the Station setting forth in respect of each such policy the policy name, policy number, carrier, term, type of coverage and annual premium, each of which is in full force and effect on the date hereof, is valid and enforceable in accordance with its terms and is in an amount consistent with past practices of the Seller and Programmer. No event or claim has occurred, including, without limitation, the failure by Seller or Programmer to give any notice or information, or the delivery of any inaccurate or erroneous notice or information, or any reservation of rights, which limits or impairs, or could limit or impair, the rights of the insured parties under any such insurance policies. Seller and Programmer shall cause comparable policies of insurance to remain in effect for acts, omissions and events occurring on or prior to the Closing Date. Copies of the policies of insurance and bonds listed in Schedule 6.1(f) have been provided to Buyer by Seller and Programmer and such copies are complete and correct.

(g)   Assets.  Other than with respect to assets with a value of no more than Ten Thousand Dollars ($10,000) that are not used in the operation of the Station, Seller owns no assets and, as of the Exchange Closing, will own no assets except for assets with a value of no more than Ten Thousand Dollars ($10,000), other than the Station Assets and the Excluded Assets set forth on Schedule 1.2(h).

(h)   Real Property.

(i)   Schedule 1.1(h) accurately lists and describes all of the Owned Real Property used in conjunction with the operation of the Station. As of the Exchange Closing, Seller will possess good and marketable fee simple title, insurable at standard rates, to all of the Owned Real Property (including the improvements thereon), free and clear of all Liens, foreclosure, condemnation, eminent domain, possession or eviction proceedings, easements, restrictions, encroachments, leases, charges and other claims and encumbrances of any nature whatsoever, and without reservation or exclusion of any mineral, timber, water or other rights or interests, except for Permitted Liens. As of the Exchange Closing, Seller will own, or have a valid right to use, adequate routes of vehicular and pedestrian ingress and egress to, from and over all of the Real Property necessary to operate the Station. To Seller's knowledge, no fact or condition exists which could result in the termination or impairment of the furnishing of utility services to the Real Property. Schedule 1.1(h) lists the street address and legal descriptions of the Owned Real Property. All real estate taxes, assessments and use charges pertaining to the Owned Real Property that have become due have been paid in full.

(ii)   Schedule 1.1(c)(iii) accurately lists the street address and legal descriptions of the leased real property held or used in the operation of the Station (the "Leased Real Property"). Each lease of real property pertaining to any and all Leased Real Property (a "Real Property Lease") is in full force and effect and is binding and enforceable in accordance with its terms. As of the Exchange Closing, Seller will have timely performed its obligations under any Real Property Leases and there will be no default or claim of default or breach against Seller or, to the best of Seller's knowledge, against any other party to any Real Property Lease, or any event or circumstance that, with the passage of time or the giving of notice or both, would result in (i) a default by Seller or (ii) to the best of Seller's knowledge, a default by any other party to any Real Property Lease. No notice of termination, foreclosure, eviction, or possession, condemnation or eminent domain, has been issued with respect to any Real Property Lease. The Real Property Leases are assignable to Buyer on the same terms and conditions as the lessee under such leases now enjoys under such Real Property Leases.

(iii)   The Real Property, any improvements thereon, and the use by Seller or Programmer thereof conform in all respects to all applicable laws, including, but not limited to, zoning requirements. There are no eminent domain proceedings pending, or, to Seller's or Programmer's knowledge, threatened against the Real Property. All improvements on the Real Property (i) have been constructed in a good and workmanlike manner, free, in all respects, from defects in workmanship and material and (ii) have been constructed, occupied, maintained and operated in compliance with all applicable laws, insurance requirements, contracts, leases, permits, licenses, ordinances, restrictions, building set-back lines, covenants, reservations, and easements, and neither Seller nor Programmer has received any notice, written or verbal, claiming any violation of any of the same or requesting or requiring the performance of

- 11 -

any repairs, alterations or other work in order to so comply.  No improvements on any of the Real Property encroach upon any adjacent real property of any other person or entity.

(i)     Personal Property.  Schedule 1.1(b) contains a list of all tangible personal property and assets to be owned or held by Seller upon the Exchange Closing and used or useful in the conduct of the business and operations of the Station.  Except as stated in Schedule 1.1, Seller upon the Exchange Closing will own and possesses good and marketable title to all property referred to in the immediately preceding sentence and none of such property will be subject to any Liens, other than Permitted Liens.  The tangible personal property and fixtures to be owned by Seller as of the Exchange Closing or used by Seller and necessary for the business or operations of the Station will be in good working condition. To Seller's knowledge, the tower upon which the Station's antenna is mounted is structurally sound and is not overstressed. As of the Exchange Closing, Seller shall own all of the tangible personal property listed in Schedule 1.1(b) and this shall include all of the tangible personal property and fixtures necessary to conduct the business of the Station as presently conducted.  The Station Assets to be transferred hereunder constitute all of the assets, rights and properties that are used for the business and operations of the Station and are sufficient to operate the Station in the manner in which it is being operated as of the date of this Agreement and in accordance with the terms of the Station Licenses and applicable law, including, without limitation, the rules and regulations of the FCC.

(j)     Contractual and Other Obligations.  Set forth in Schedule 1.1(c)(iv) is a listing of all contracts, agreements, leases, and arrangements used or useful in the operation of the Station (each, a "Contract").  Neither Seller nor Programmer nor, to the knowledge of Seller or Programmer, any other party thereto is in material default in the performance of any covenant or condition under any Contract and no claim of such a default has been made and no event has occurred which, with the giving of notice or the lapse of time, would constitute such a default under any covenant or condition under any Contract.  Neither Seller nor Programmer is a party to any Contract that would terminate or be materially adversely affected by the consummation of the transactions contemplated by this Agreement.  Originals or true, correct and complete copies of all of the Contracts being assigned to Buyer have been provided to Buyer and true, correct and complete copies of such Contracts being assigned to Buyer are included in Schedule 1.1(c)(iv).

(k)     Liens and Encumbrances.  As of the Exchange Closing, all of the Station Assets, including leases, will be free and clear of all Liens except Permitted Liens.

(l)     Environmental Matters.  Except as set forth in Schedule 6.1(l), :

(i)     the Real Property used in connection with the Station and the business and operations thereon is and has been and with respect to any predecessor or prior owner, operator or lessee (each a "Predecessor") has been, in compliance with all applicable federal, state and local statutes, codes, rules, ordinances or regulations as well as common law decisions relating to the environment, natural resources and public or employee health and safety (collectively, the "Environmental Laws");

(ii)     No judicial or administrative proceedings are pending or, to Seller's knowledge, threatened against Seller or any of the Real Property used in connection with the Station alleging the violation of or seeking to impose liability pursuant to any Environmental

- 12 -

(iii)    For purposes of this Agreement, the terms "Tax" and "Taxes" shall mean all federal, state, local, or foreign income, payroll, Medicare, Medicaid, withholding, unemployment insurance, social security, Federal Insurance Contribution Act, sales, use, service, service use, leasing, leasing use, excise, franchise, gross receipts, value added, alternative or add-on minimum, estimated, occupation, real and personal property, stamp, duty, document, transfer, workers' compensation, severance, windfall profits, environmental, or other tax, charge, fee, levy or assessment of the same or of a similar nature, including any interest, penalty, or addition thereto, whether disputed or not.  The term "Tax Return" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes or any amendment thereto, and including any schedule or attachment thereto.

(n)    <u>Personnel</u>. Schedule 6.1(n) includes a complete and correct list as of the date hereof of the names, positions and locations of all employees of the Seller or Programmer who are employed at the Station and broadcast personnel not employees of the Seller or Programmer (including, without limitation, Seller principals, Programmer, independent contractors, employees of independent contractors or employees of time brokers) performing services for the Station which sets forth the current salaries and any other compensation arrangements of all such personnel and indicates which of those personnel is a party to an employment or consulting or similar contract.

(o)    <u>Employee Benefits</u>.

(i)    Except as set forth on <u>Schedule 6.1(o)(i)</u>, neither Seller, Programmer, nor any person who would be considered a single employer with Seller or Programmer pursuant to Section 414(b), (c), (m) or (o) of the Internal Revenue Code ("Code") (an "ERISA Affiliate"), maintains or contributes to or has any obligation to contribute to, any employment, consulting or deferred compensation agreement, or an executive compensation, bonus, pension, profit-sharing, savings, retirement, stock option or other equity-based compensation, severance pay, life, medical, dental, death benefit, disability or accident insurance plan or any other "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA") (individually, a "Seller Plan", and collectively, the "Seller Plans").

(ii)    Neither Seller, Programmer nor any ERISA Affiliate of Seller or Programmer maintains or contributes to, nor has ever had any obligation to maintain or contribute to, any Seller Plan that is (A) subject to Title IV of ERISA or Section 412 of the Code, (B) a "multiemployer plan" within the meaning of Section 3(37) or 4001(a)(3) of ERISA, (C) a "multiple employer plan" within the meaning of the Code or ERISA, (iv) any "employee benefit plan" (as defined in Section 3(3) of ERISA) which provides welfare benefits to or in respect of former employees, except as may be required pursuant to Section 4980B of the Code and Section 601, <u>et seq.</u> of ERISA ("COBRA") and the cost of which are fully paid by such former employees.

(iii)    With respect to each Seller Plan (A) Seller, Programmer and each ERISA Affiliate of Seller or Programmer, as applicable, has complied with, and each such Seller Plan conforms in form and operation to, all applicable laws and regulations, including, but not limited to, ERISA and the Code, in all material respects; (B) each such Seller Plan that is an

- 14 -

Law. No notice or claim from any Governmental Entity or other person has been given to Seller claiming any violation of or alleging any liability under any Environmental Laws in connection with the Real Property used in connection with the Station or operations thereon;

(iii)      There are no facts, circumstances or conditions on the Real Property or the business or operations thereon used in connection with the Station or the business and operations thereon which are reasonably likely to give rise to an environmental claim or result in Environmental Costs and Liabilities (as defined below);

(iv)      All substances, materials or waste that are regulated by federal, state or local government under the Environmental Laws as hazardous, toxic or a pollutant or contaminant, as well as any petroleum or petroleum derived product, used or generated by Seller in connection with the Real Property and used in connection with the Station (collectively, the "Hazardous Substances"), have been stored, used, treated, and disposed of by such persons or on their behalf in such manner as not to result in any material Environmental Costs or Liabilities. "Environmental Costs and Liabilities" means any losses, including environmental remediation costs, clean up funds, liabilities, obligations, damages, fines, penalties or judgments arising from or under any Environmental Law or order of or agreement with any Governmental Entity or other person.

(v)      There are not now, nor have there been in the past, on, in or under any Real Property used in connection with the Station when owned, leased or operated by Seller, or to Seller's knowledge, when owned, leased or operated by any Predecessor, any of the following: (A) underground storage tanks, above-ground storage tanks, dikes or impoundments, (B) asbestos containing materials, (C) polychlorinated biphenyls or (D) radioactive substances or related compounds (other than those labeled and maintained in accordance with applicable Environmental Laws).

(m)      Taxes.

(i)      All Tax Returns (as defined below) that are required to be filed on or before the execution of this Agreement by Seller or Programmer have been duly filed on a timely basis under the statutes, rules and regulations of each applicable jurisdiction and Seller and Programmer will file or will cause to be duly and timely filed all Tax Returns required to be filed by Seller and Programmer as of the Closing Date and with respect to any taxable period prior to or which includes the Closing Date. All such Tax Returns are (or will be) complete and accurate in all material respects. Except as stated in Schedule 6.1(m), all Taxes, whether or not reflected on the Tax Returns, which are due with respect to Seller or Programmer have been timely paid by Seller or Programmer, as applicable, whether or not such Taxes are disputed.

(ii)      No claim, judgment, Lien, settlement, writ, or order for assessment or collection of Taxes has been asserted against Seller or Programmer. Neither Seller nor Programmer is a party to any pending audit, action, suit, claim, litigation, proceeding or investigation by any Governmental Entity for the assessment or collection of Taxes, nor does either Seller or Programmer have knowledge of any threatened audit, suit, claim, litigation, action, proceeding or investigation.

"employee pension benefit plan" (as defined in Section 3(2) of ERISA) and intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS with respect to such qualification; and (C) there are no actions, suits or claims pending (other than routine claims for benefits) or threatened with respect to any Seller Plan or against the assets of any Seller Plan.

      (iv)    With respect to each Seller Plan listed on <u>Schedule 1.2(g)</u>, Seller or Programmer, as applicable, has delivered to Buyer a current, accurate and complete copy thereof and, to the extent applicable: (A) any related trust agreement or other funding instrument; (B) the most recent IRS determination letter, if applicable; (C) any summary plan description and other written communication by the Seller or Programmer, as applicable, to its employees concerning the benefits provided under the Seller Plan; and for the three most recent years (x) the Form 5500 and attached schedules, (y) audited financial statement and (z) actuarial valuation reports.

      (v)    The consummation of the transactions contemplated by this Agreement will not (A) accelerate the time of the payment or vesting of, or increase the amount of, compensation due to any employee or former employee, (B) reasonably be expected to result in any "excess parachute payment" under Section 280G of the Code, (C) result in any liability to any present or former employee, including, but not limited to, as a result of the Worker Adjustment Retraining and Notification Act or any similar state law, or (D) entitle any employee or former employee to severance pay, unemployment compensation or similar payment.

      (vi)    Neither Seller nor Programmer has announced any plan or legally binding commitment to create any additional Seller Plans or to amend or modify any existing Seller Plan (except as may be required under applicable law).

      (p)    <u>Employment and Labor Matters</u>.

      (i)    Neither Seller nor Programmer is a party to any contract with any labor organization with respect to employees performing services at or for the Station, nor has Seller or Programmer agreed to recognize any union or other collective bargaining unit with respect to employees performing services at or for the Station, nor has any union or other collective bargaining unit been certified as representing any of the Seller's or Programmer's employees. Neither Seller nor Programmer has any knowledge of any organizational effort currently being made or threatened by or on behalf of any labor union with respect to employees performing services at or for the Station. During the last five years, the Station has not experienced any strikes, work stoppages, grievance proceedings, claims of unfair labor practices filed, or other significant labor difficulties.

      (ii)    Neither Seller nor Programmer has violated any provision of federal or state law or any governmental rule or regulation, or any order, decree, judgment arbitration award of any court, arbitrator or any government agency regarding the terms and conditions of employment of employees, former employees or prospective employees or other labor related matters, including, without limitation, laws, rules, regulations, orders, rulings, decrees, judgments and awards relating to discrimination, fair labor standards and occupational health and safety, wrongful discharge or violation of the personal rights of employees, former employees or prospective employees. Without limiting the foregoing, Seller and Programmer

each represents, warrants and covenants that, as of the date of Closing, it will have paid all back wages, vacation pay, sick pay, severance pay and any other benefits owed to any past or present employees of the Seller or Programmer, as applicable.

(q)     Patents, Trademarks, Etc.  Schedule 1.1(d) sets forth all Intellectual Property used in the business and operations of the Station to which Seller, upon the Exchange Closing, will have good and marketable title to all Intellectual Property free and clear of any and all Liens. Upon the Closing, Buyer will have good and marketable title to all Intellectual Property free and clear of any and all Liens. Neither Seller nor Programmer has received any notice of any claimed conflict, notice of cease and desist, suit, complaint, settlement, litigation, judgment, claim, proceeding, action, violation or infringement pertaining to such Intellectual Property rights.  To the knowledge of Seller and Programmer, no material Intellectual Property rights are being infringed by any third party.  To the knowledge of Seller and Programmer, the operation of Seller's and Programmer's businesses do not infringe on the Intellectual Property rights of any other person.

(r)     Broker, Commission or Finder's Fees. Except with respect to a brokerage fee to be charged by Stan Raymond & Associates, Inc., which fee shall be paid by Seller no later than Closing, neither Seller nor any entity acting on behalf of Seller has agreed to pay a broker's commission, finder's fee or similar payment in connection with this Agreement or any matter related hereto.

(s)     Full Disclosure.  No representation or warranty by Seller or Programmer contained in this Agreement (including the schedules) or in any certificate furnished pursuant to this Agreement contains or will contain any untrue statement of a material fact or omits or will omit any material fact necessary to make the statements herein or therein not misleading.

(t)     Seller's and Programmer's Financial Condition.  Except as stated in Schedule 6.1(t), no insolvency proceedings of any character, including, without limitation, bankruptcy, receivership, reorganization, composition or arrangement with creditors, voluntary or involuntary, affecting Seller, Programmer or any of their respective assets or properties are pending, or threatened, and neither Seller nor Programmer has made any assignment for the benefit of creditors, fraudulent conveyances, preferences, or transfers, nor has either Seller or Programmer taken any action with a view to, or which would constitute a basis for, the institution of any such insolvency proceedings.  Seller shall use the proceeds received under this agreement to pay, satisfy, or discharge, or to make appropriate provision for the payment of any and all creditors of Seller prior to making any distribution to its shareholders.

(u)     Books and Records.  The books, records and accounts of Seller and Programmer maintained with respect to the Station accurately and fairly reflect the assets, liabilities and results of operations of Seller and Programmer.

(v)     Barter Arrangements . Schedule 1.1(c)(ii) accurately describes all barter, trade or similar arrangements for the sale of advertising for consideration other than cash relating to the business or operations of the Station which are outstanding as of the date hereof.  With respect to the Station, all such advertising time sold under barter, trade or similar arrangements for consideration other than cash may be preempted by advertising time that is sold for cash.  All

such barter, trade or similar arrangements for the sale of advertising time for consideration other than cash have been entered into in the ordinary course of business consistent with past practices.

(w)     No Third Party Options.  Other than the Exchange Agreement, there are no existing agreements with, options or other rights of purchase granted to, or commitments to any person other than Buyer to acquire any of the Station Assets or any interest therein.

6.2.          No other Representations or Warranties by Seller or Programmer..  Buyer agrees that, except for the representations and warranties (including the schedules with respect thereto) made by the Seller and Programmer and set forth in this Article 6, neither Seller, Programmer nor any representative of Seller or Programmer has made and shall not be construed as having made to the Buyer or to any representative of Buyer, and neither the Buyer nor any representative of Buyer has relied upon, any other representation or warranty of any kind.

## ARTICLE 7
## REPRESENTATIONS AND WARRANTIES OF BUYER

7.1.          Representations and Warranties of Buyer..  Buyer hereby makes the following representations and warranties to Seller, each of which is true and correct as of the date hereof, and shall be true and correct as of the Closing Date, and shall be unaffected by any investigation heretofore or hereafter made by Seller.

(a)     Organization and Standing.  Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now being conducted.

(b)     Authorization and Binding Obligation.  Buyer has all requisite corporate power and authority to enter into and perform this Agreement and the transactions contemplated hereby, and to own or lease the Station Assets and to carry on the business and operations of the Station upon the consummation of the transactions contemplated by this Agreement.  Buyer's execution, delivery and performance of this Agreement and the transactions contemplated hereby have been duly and validly authorized by all necessary corporate action on behalf of Buyer and constitutes the valid and binding obligation of Buyer, enforceable in accordance with its terms.

(c)     Qualification.  Buyer is legally, financially and otherwise qualified to be the licensee of, acquire, own and operate the Station under the Communications Act and the rules, regulations and policies of the FCC.  There are no facts known to Buyer that would disqualify Buyer as an assignee of the FCC Licenses or as the owner and operator of the Station. There is no action, suit or proceeding pending or threatened against Buyer that could materially adversely affect Buyer's ability to perform its obligations hereunder.

(d)     Absence of Conflicting Agreements or Required Consents.  Except for the FCC Consent contemplated in this Agreement, the execution, delivery and performance of this Agreement by Buyer shall not: (i) violate or conflict with any of the terms, conditions or provisions of the certificate of incorporation or bylaws of Buyer; (ii) require the consent of any third party not affiliated with Buyer, other than consents which will be received prior to Closing; (iii) violate any applicable statute, ordinance, law, judgment, settlement, order, injunction,

decree, rule, regulation or ruling of any Governmental Entity applicable to Buyer; and (iv) either alone or with the giving of notice or the passage of time, violate the terms, conditions or provisions of, or constitute a default or breach under, any agreement, instrument, license or permit to which Buyer is now subject.

(e)     Litigation; Compliance with Law. There is no litigation, administrative action, suit, claim, arbitration or other proceeding, or petition, complaint or investigation before any court or Governmental Entity pending against Buyer that would adversely affect Buyer's ability to perform its obligations pursuant to this Agreement or the agreements to be executed by Buyer in connection herewith. Buyer has committed no violation of any applicable law, statute, regulation or ordinance or any other requirement of any Governmental Entity or court which would have an adverse effect on Buyer or its ability to perform its obligations pursuant to this Agreement or the agreements to be executed in connection herewith.

(f)     Broker, Commission or Finder's Fees. Neither Buyer nor any entity acting on behalf of Buyer has agreed to pay a broker's commission, finder's fee or similar payment in connection with this Agreement or any matter related hereto.

7.2.     No other Representations or Warranties by Buyer. Seller and Programmer agree that, except for the representations and warranties by Buyer set forth in this Article 7, neither Buyer nor any representative of Buyer has made and shall not be construed as having made to Seller, Programmer or to any representative of Seller or Programmer, and neither Seller, Programmer nor any representative of Seller or Programmer has relied upon, any other representation or warranty of any kind.

## ARTICLE 8
## COVENANTS OF SELLER AND PROGRAMMER

8.1.     Seller's and Programmers' Covenants. Seller and Programmer, as applicable, covenant and agree with Buyer that, pending the Closing and except as otherwise agreed to in writing by Buyer:

(a)     Conduct of Station prior to the Closing Date. From and after the date hereof through the Closing Date,:

(i)     Seller shall expeditiously take those steps reasonably necessary to consummate the transactions contemplated in the Exchange Agreement such that Seller becomes the FCC licensee of the Station;

(ii)     Upon the Exchange Closing, Programmer shall assign all of its right and interest in the Contracts including, without limitation, all Time Sales Agreements and Trade Agreements, to Seller such that Seller will be in a position to assign such Contracts to Buyer at Closing;

(iii)     Seller and Programmer shall use commercially reasonable efforts to maintain their present business organizations, keep available the services of their present employees and independent contractors, preserve their relationships with their customers and

others having business relationships with the Station, and refrain from materially and adversely changing any of their business practices and policies (including, but not limited to, advertising, marketing and promotions (including making substantially the same amount of cash expenditures), marketing, promotion, pricing, purchasing, personnel, sales and budget practices and policies);

(iv)    maintain their books of account and records in the usual and ordinary manner consistent with past practice;

(v)    notify Buyer, as set forth in Section 17.2, if the regular broadcast transmission of the Station is interrupted;

(vi)    operate in the usual and ordinary course of business in accordance with past practices and conduct their business in all material respects in compliance with the terms of the Station Licenses and all applicable laws, rules, and regulations, including, without limitation, the applicable rules and regulations of the FCC;

(vii)    use, repair, and, if necessary, replace, subject to the terms of the Clear Channel LMA, any of the Station's studio and transmission assets in a reasonable manner consistent with historical practice and maintain the Station Assets in substantially their current condition, ordinary wear and tear excepted;

(viii)    maintain insurance in accordance with Section 6.1(f);

(ix)    not lease, sell, convey, transfer, assign, license, encumber, mortgage, pledge, or subject to a Lien, claim, or encumbrance (other than Permitted Liens) any of the Station Assets or sell or transfer any of the Station Assets without replacing such Station Assets with assets of substantially the same value and utility;

(x)    not (A) modify or extend any Station Contract or (B) enter into any new Station Contracts the payments under which exceed One Thousand Dollars ($1,000) per annum individually or Five Thousand Dollars ($5,000) in the aggregate;

(xi)    not, except in the ordinary course of business consistent with past practices, increase the compensation of any employee;

(xii)    not establish or increase the benefits under, or promise to establish, modify or increase the benefits under, any Seller Plan, or to establish, adopt or enter into any collective bargaining agreement; and

(xiii)    pay as and when the same shall become due and payable any amounts owed by Seller or Programmer to its respective employees who have performed services up to the time of Closing, whether fixed or accrued, for wages, vacation pay, sick pay, severance pay, employee benefits, damages and otherwise.

(b)    Access.  Seller and Programmer shall give, or cause the Station to give, Buyer and Buyer's engineers and environmental consultants  reasonable access during normal

business hours to all of Seller's and Programmer's properties and to all real estate, buildings and equipment relating to the Station in order that Buyer may have full opportunity to make such investigation as Buyer deems appropriate, including, but not limited to, environmental assessments and the performance of surveys. The rights of Buyer under this Section shall not be exercised in such a manner as to interfere unreasonably with the business of the Station. Such investigations shall not adversely affect or diminish the effect of any and all representations and warranties made by Seller or Programmer in this Agreement;

(c) Monthly Financial Statements. Within fifteen (15) days of the date of this Agreement, Seller and Programmer shall provide Buyer with monthly financial statements, in a form reasonably acceptable to Buyer, for 2002 and for each month of 2003 through the month immediately preceding the date of this Agreement. During the period from the date of this Agreement through the Closing Date, each calendar month or part thereof, Seller and Programmer shall prepare and promptly deliver (in any event no more than 30 days following the end of the relevant calendar month) to Buyer financial statements, in a form reasonably acceptable to Buyer, relating to the Station's business and operations. The monthly financial statements provided pursuant to this Section 8.1(c) shall fairly and accurately present the financial position and results of the business and operations of the Station as of the dates and for the periods indicated;

(d) Other Consents. Each of Seller and Programmer will use commercially reasonable efforts to obtain all consents, authorizations, or approvals, in each case required pursuant to the Station Contracts or otherwise required for Seller's consummation of the transactions contemplated by this Agreement; and

(e) No Inconsistent Action. Neither Seller nor Programmer shall take any action which is inconsistent with its obligations under this Agreement.

8.2. Updating of Schedules. From time to time prior to the Closing, Seller and Programmer will supplement or amend the schedules delivered in connection with this Agreement with respect to any matter which exists or occurs after the date of this Agreement and which, if existing or occurring at or prior to the date of this Agreement, would have been required to be set forth or described in the schedules or which is necessary to correct any information therein. The provisions of this Section are informational only and Buyer shall not be bound to the terms of any changed schedules unless they are incorporated into this Agreement by a written amendment signed by Buyer and such changes to the schedules shall not have any effect on the validity of the representations made by Seller or Programmer in this Agreement.

8.3. Enforcement of Agreements. During the period prior to Closing, Seller or Programmer, as applicable, shall enforce, if necessary, the terms of any and all Contracts.

8.4. FCC Filings. Prior to the Exchange Closing, Seller shall take steps to ensure that the present licensee of the Station files or causes to be filed, and, subsequent to the Exchange Closing, Seller shall file or cause to be filed, on a current basis until the Closing Date all applications, fees, reports and documents required to be filed with the FCC with respect to the Station. Copies of each such application, fee filing, report and document filed between the date

hereof and the Closing Date with respect to the Station shall be furnished to Buyer promptly after its filing.

8.5.        Notification.  Seller and Programmer shall promptly notify Buyer in writing of (i) any litigation, arbitration or administrative proceeding pending or, to its knowledge, threatened against Seller or Programmer which challenges the transactions contemplated by this Agreement, (ii) the failure of Seller or Programmer, or any employee or agent of Seller or Programmer, to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or be satisfied by it hereunder or (iii) the occurrence, to the knowledge of either Seller or Programmer, of any event that would entitle Buyer to terminate this Agreement pursuant to Section 17.1.

8.6.        Post-Closing Access.  Following Closing, upon reasonable request by Buyer and at Buyer's expense, Seller and Programmer shall make available during normal business hours, for any reasonable purpose and upon reasonable notice, any records, files, documents and correspondence relating to the Station and access to any employee or officer of Seller or Programmer.

8.7.        Taxes.  Seller and Programmer shall pay or cause to be paid when due all property and all other taxes relating to the Station and the Station Assets and employees of the Station required to be paid to city, county, state, federal and other governmental entities through the Closing Date; provided, however, Seller or Programmer, as applicable, may appeal or contest any such tax, it being understood that Seller or Programmer, as applicable, shall indemnify and hold harmless Buyer, its successors and assigns, from any and all liabilities relating to or in respect of taxes (including any interest or penalties assessed in connection therewith) relating to operation of the Station prior to the Closing Date.

8.8.        Continuity.  Seller covenants and agrees that for a period of at least fourteen months following the Closing Date Seller shall maintain its corporate existence and shall retain sufficient assets to ensure that it can meet any liabilities of the Seller, whether actual or contingent, as they arise, including, without limitation, any liability to provide indemnification provided for under this Agreement.

8.9.        Non-Solicitation.  As long as this Agreement is in effect and except as otherwise provided in this Agreement, neither Programmer, Seller nor any of its principals shall directly or indirectly solicit, entertain, negotiate with any person or entity (other than a party hereto) or accept any proposal to acquire Seller, the Station or any of the Station Assets in whole or in part, including without limitation an acquisition of all or substantially all of the assets of Seller, any equity in Seller or any rights to program the Station.

8.10.        Option for Ft. Walton Beach Site. Seller, its principals or its affiliates (including, but not limited to, Star Tower, LLC), as applicable, shall enter into an agreement with Buyer whereby Buyer will hold an option to lease space at the transmitter site to be constructed at the Ft. Walton Beach Site (the "Ft. Walton Beach Site Option"). The Ft. Walton Beach Site Option shall allow Buyer to place the transmission facilities of WWAV(FM) at the Ft. Walton Beach Site and to locate the antenna for WWAV(FM) on the tower at a height to be specified by Buyer. The Ft. Walton Beach Site Option shall specify that (i) the rent under such lease shall be

Two Thousand, Two Hundred Fifty Dollars ($2,250) per month for WWAV(FM); (ii) the initial term of the lease will be ten years; and (iii) Buyer shall have the option to extend the lease for two additional terms of five years each.

8.11.   Lease for Future WTKE(FM) Site

. Seller shall cause the land lease for the future WTKE(FM) transmitter site, namely, the Lease Agreement between Gulf Breeze Media, Inc., as Lessee, and Robert C. Erhart, Trustee of the Colleen Kelly Revocable Trust, as Lessor, dated July 23, 1999 (the "Land Lease") to be assigned to Star Tower, LLC.

## ARTICLE 9
## COVENANTS OF BUYER

9.1.          Buyer Covenants.  Buyer covenants and agrees that, pending the Closing and except as otherwise agreed to in writing by Seller,:

(a)      Notification.  Buyer shall promptly notify Seller in writing of (i) any litigation, arbitration or administrative proceeding pending or, to its knowledge, threatened against Buyer which challenges the transactions contemplated by this Agreement, (ii) the failure of Buyer, or any employee or agent of Buyer to comply with or satisfy in any material respect any covenant, condition or agreement to be complied with or be satisfied by it hereunder or (iii) the occurrence, to its knowledge, of any event that would entitle Seller to terminate this Agreement pursuant to Section 17.1; and

(b)      No Inconsistent Action.  Buyer shall not take any action which is inconsistent with its obligations under this Agreement.

9.2.          Post-Closing Access.  Buyer, for a period of one (1) year following the Closing Date, shall make available during normal business hours for audit and inspection by Seller, Programmer and the representatives of Seller or Programmer, for any reasonable purpose and upon reasonable notice, all records, files, documents and correspondence transferred to it hereunder relating to the pre-closing period.  All information, records, files, documents and correspondence made available or disclosed under this Section 9.2 shall be kept confidential.

9.3.          Other Consents..  Buyer will use commercially reasonable efforts to obtain all necessary consents, authorizations, or approvals, in each case, required for Buyer's consummation of the transactions contemplated by this Agreement.

## ARTICLE 10
## JOINT COVENANTS

10.1.   Joint Covenants.  Seller, Programmer and Buyer (Seller and Programmer being referred to in this Article 10 as the "Seller Party") covenant and agree that, pending the Closing and except as otherwise agreed to in writing, they shall act in accordance with the following:

(a)   Confidentiality.

(i)   Each of the Seller Party and Buyer will hold in confidence, and will cause its respective directors, officers, employees, accountants, counsel, financial advisors and other representatives and affiliates to hold in confidence, all non-public information received from the other party hereto (collectively, "Confidential Information "); provided, however, that the term "Confidential Information" does not include any information that (a) at the time of disclosure or thereafter is generally available to and known by the public (other than as a result of a disclosure directly or indirectly by the party hereto which received such information (the "Recipient")), (b) was available to the Recipient from a source other than the other parties hereto or (c) has been independently acquired or developed by the Recipient without violating any of its obligations under this Agreement. The obligation to keep Confidential Information confidential shall not apply to any information that is required to be disclosed pursuant to any court action or any proceeding before a Governmental Authority. In the event this Agreement is terminated for any reason, either the Seller Party or Buyer, upon the request of the other party hereto, shall promptly return to the requesting party all copies of Confidential Information in its possession and shall destroy all analysis, studies and documents prepared by it which contain any Confidential Information. (ii)

(ii)   Notwithstanding anything to the contrary elsewhere in this Agreement, either the Seller Party or Buyer (and each employee, representative, or other agent of such party) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated by this Agreement, and all materials of any kind (including opinions or other tax analyses) related to such tax treatment and tax structure; provided that this Section 10.1(a)(ii) shall not permit any person to disclose confidential commercial information regarding such transactions.

(b)   Cooperation. Seller, Programmer and Buyer shall cooperate fully with one another in taking any actions, including actions to obtain the required consent of any governmental instrumentality or any third party necessary or helpful to accomplish the transactions contemplated by this Agreement.

10.2.   Control of Station. Prior to Closing, Buyer shall not, directly or indirectly, control or direct the business or operations of the Station.

10.3.   Bulk Sales Laws. Buyer hereby waives compliance by Seller with the provisions of the "bulk sales" or similar laws of any state. Seller shall defend and indemnify Buyer and hold it forever harmless from any and all losses, settlements, judgments, actions, suits, claims, costs, damages and expenses (including, but not limited to, reasonable attorneys' fees at all levels) sustained by Buyer as a result of any failure of Seller to comply with any "bulk sales" or similar laws. The indemnification of Buyer by Seller under this Section 10.3 shall not be subject to the limitations on indemnification set forth elsewhere in this Agreement. This covenant shall survive the Closing Date and the expiration or termination of this Agreement.

10.4.   Public Announcements. Prior to the Closing, none of the parties hereto shall issue any press release or make any public disclosure with respect to the transactions contemplated by this Agreement without the prior written approval of the other party, except (a) Buyer and Seller

may make any disclosure as may be required by applicable law or by obligations pursuant to any listing agreement with any securities exchange or any stock exchange regulations; (b) Buyer, Seller and Programmer may each continue such communications with employees, customers, suppliers, franchises, lenders, lessors, shareholders, and other particular groups as may be legally required or necessary or appropriate and not inconsistent with the best interests of the other parties or the prompt consummation of the transactions contemplated herein and (c) Seller may publish and broadcast such public notices concerning such transactions as are required by the FCC's rules.

10.5. <u>Employee Matters</u>.

(a) Seller and Programmer will use commercially reasonable efforts to retain existing employees and Seller and Programmer shall, prior to the Closing Date, provide Buyer, to the extent permitted by law, with access to their personnel records and any other related information as Buyer may reasonably request with respect to any of the Station personnel. Buyer shall be under no obligation to offer employment to any employee. If Buyer offers employment to any Station employee, the date on which the employment of such Station employee who accepts Buyer's offer of employment or whose employment agreement the Buyer assumes shall become effective shall be the Closing Date (the "Effective Time of Employment"). Each employee who becomes employed by Buyer pursuant to this section shall be considered a "Transitioned Employee" from and after the time of his or her Effective Time of Employment.

(b) Seller and Programmer shall be solely responsible for all liabilities relating to or arising in connection with any actual, constructive or deemed termination of employment (including any COBRA obligation, severance or separation pay or benefits or other similar compensation or benefits under any applicable law, regulation or Seller Plan) to or with respect to any employee whether as a result of (A) the consummation of the transactions contemplated by this Agreement, (B) any event occurring before the Closing Date, or C) any action or failure to act on the part of Seller or Programmer. Except as provided in Section 10.5(a), Buyer shall be solely responsible for all liabilities relating to or arising in connection with any actual, constructive or deemed termination of employment of any Transitioned Employee with the Buyer after such Transitioned Employee's Effective Time of Employment. Anything to the contrary in this Agreement notwithstanding, Seller and Programmer each explicitly agrees and acknowledges that Buyer is not assuming any obligations for severance payments to be made to any employee of the Seller or Programmer under any contract of employment or otherwise.

10.6. <u>Payroll Tax</u>. For purposes of payroll taxes with respect to all employees of the Station that become Transitioned Employees, Seller, Programmer and Buyer shall treat the transactions contemplated herein as a transaction described in Treas. Reg. Sections 31.3121(a)(1)-1(b)(2) and 31.3306(b)(1)-1(b)(2).

10.7. <u>Buyer's Audit</u>. Between the date of this Agreement and the Closing Date, Buyer's accountants shall have the right to audit Seller's and Programmer's financial statements and to review any accountants' work papers in connection with the preparation of such financial statements. Such audit shall be conducted at Buyer's expense. Seller and Programmer will cooperate in the conducting of such audit including, without limitation, by providing such management representation letters as may be requested by the auditors.

## ARTICLE 11
## CONDITIONS OF CLOSING BY BUYER

11.1.   <u>Obligations of Buyer</u>.  The obligations of Buyer hereunder are, at its option (other than with respect to the condition that the FCC Consent shall have been issued, which condition may not be waived), subject to satisfaction at or prior to the Closing Date of all of the following conditions:

(a)    <u>Representations and Warranties</u>.  All representations and warranties of Seller and Programmer made in this Agreement or in any exhibit, schedule or document delivered pursuant hereto, shall be true and complete in all material respects as of the date hereof and on and as of the Closing Date as if made on and as of that date, except for changes expressly permitted or contemplated by the terms of this Agreement;

(b)    <u>Compliance with Agreement</u>.  All of the terms, covenants and conditions to be complied with and performed by Seller or Programmer on or prior to the Closing Date shall have been complied with or performed in all material respects to the satisfaction of the Buyer;

(c)    <u>Third Party Consents and Approvals</u>.  Seller and Programmer shall have obtained all third-party consents and approvals, if any, required for the transfer or continuance, as the case may be, of those Station Contracts on <u>Schedule 1.1(c)(iv)</u> (and contracts that would have been on <u>Schedule 1.1(c)(iv)</u> had they been in existence on the date of this Agreement) that are designated by Buyer as "material contracts" on <u>Schedule 11.1(c)</u>, as that <u>Schedule 11.1(c)</u> may be modified by Buyer to reflect contracts that would have been on <u>Schedule 1.1(c)</u> had they been in existence on the date of this Agreement;

(d)    <u>Closing Certificates</u>.  Buyer shall have received a certificate, dated as of the Closing Date, from the Seller and Programmer, executed by an authorized officer of Seller and by Programmer, certifying, in such detail as Buyer may reasonably request, that the conditions set forth in this Article 11 have been fulfilled;

(e)    <u>Governmental Consents</u>.

(i)    <u>FCC</u>. The FCC Consent shall have been obtained without any conditions that are materially adverse to Buyer, the FCC Consent shall have become a Final Order, and no court or governmental order prohibiting Closing shall be in effect. In its discretion, Buyer may waive the requirement that the FCC Consent shall have become a Final Order and may choose to instead proceed to Closing upon the grant of the FCC Consent by initial decision of the FCC staff;

(ii)    <u>Other Consents</u>.  All other material authorizations, consents, approvals, and clearances of any Governmental Entity required to permit the consummation of the transactions contemplated by this Agreement shall have been obtained;

(f)    <u>Adverse Proceedings</u>.  No injunction, order, stipulation, settlement, writ, decree or judgment of any court, agency or other Governmental Entity shall have been rendered against Seller, Programmer or Buyer which would render it unlawful, as of the Closing Date, to effect the transactions contemplated by this Agreement in accordance with its terms;

(g)     Closing Documents. Seller shall have delivered or caused to be delivered to Seller, on the Closing Date, the Closing documents specified in Section 13.1;

(h)     Environmental Assessment. Buyer shall have received environmental assessments for each parcel of Real Property and such assessments shall be to Buyer's reasonable satisfaction;

(i)     No Material Adverse Change. No material adverse change in the Station Licenses, the Station Assets or the financial condition, business, results of operations, or liabilities of the Station shall have occurred; and

(j)     Ft. Walton Beach Site Option. Seller, its principals, or affiliates, as applicable, and Buyer shall have entered into the Ft. Walton Beach Site Option, as set forth in Section 8.10, above.

(k)     Future WTKE Transmitter Site Lease. Seller shall have assigned the Land Lease to Star Tower, LLC.

# ARTICLE 12
## CONDITIONS OF CLOSING BY SELLER

12.1.   Obligations of Seller. The obligations of Seller hereunder are, at its option (other than with respect to the condition that the FCC Consent shall have been issued, which condition may not be waived), subject to satisfaction at or prior to the Closing Date of all of the following conditions:

(a)     Representations, Warranties and Covenants. All representations and warranties of Buyer made in this Agreement or in any exhibit, schedule or document delivered pursuant hereto, shall be true and complete in all material respects as of the date hereof and on and as of the Closing Date as if made on and as of that date, except for changes expressly permitted or contemplated by the terms of this Agreement and except those given as of a specified date;

(b)     Compliance with Agreement . All the terms, covenants, and conditions to be complied with and performed by Buyer on or prior to the Closing Date shall have been complied with or performed in all material respects;

(c)     Certifications, etc. Seller shall have received a certificate, dated as of the Closing Date, from the Buyer, executed by an authorized officer of Buyer certifying, in such detail as Seller may reasonably request that the conditions set forth in this Article 12 have been fulfilled;

(d)     Governmental Approval.

(i)     FCC. The FCC Consent shall have been obtained and no court or governmental order prohibiting Closing shall be in effect; and

(ii)  Other Consents.  All other material authorizations, consents, approvals, and clearances of any Governmental Entity required to permit the consummation of the transactions contemplated by this Agreement shall have been obtained;

(e)  Adverse Proceedings.  No injunction, order, stipulation, settlement, decree, judgment, or writ of any court, agency or other Governmental Entity shall have been rendered against Seller, Programmer or Buyer which would render it unlawful, as of the Closing Date, to effect the transactions contemplated by this Agreement in accordance with its terms; and

(f)  Closing Documents.  Buyer shall have delivered or caused to be delivered to Seller, on the Closing Date, the Closing documents specified in Section 13.2.

# ARTICLE 13
## DOCUMENTS TO BE DELIVERED AT THE CLOSING

13.1.  Documents to be Delivered by Seller.  At the Closing, Seller will deliver to Buyer the following, at the expense of Seller and in proper form for recording when appropriate:

(a)  Transfer Documents.  Such bills of sale, assignments, warranty deeds and other good and sufficient instruments of transfer as Buyer may reasonably request in order to convey and transfer to Buyer title to the Station Assets, including, without limitation, an "Assignment and Assumption of Station Licenses" evidencing the assignment by Seller to Buyer, and the assumption by Buyer, of the Station Licenses (collectively, the "Transfer Documents");

(b)  Certified Resolutions.  Certified resolutions of Seller approving the execution and delivery of this Agreement and each of the other documents delivered by Seller pursuant thereto and authorizing the consummation of the transactions contemplated hereby and thereby;

(c)  Certificate.  A certificate, dated as of the Closing Date, executed on behalf of Seller and Programmer in the form described in Section 11.1(d);

(d)  Opinions. Written opinions of counsel in substantially the form attached hereto as Exhibit E, dated as of the Closing Date;

(e)  Good Standing Certificates.  Governmental certificates showing that Seller is duly incorporated and in good standing in the State of Florida;

(f)  FIRPTA Affidavits. Seller shall provide an affidavit of an officer of Seller, sworn to under penalty of perjury, setting forth such Seller's name, address and federal tax identification number and stating that such Seller is not a "foreign person" within the meaning of Section 1445 of the Code;

(g)  Estoppel Certificates. Estoppel certificates for each of the Real Property Leases and for the Land Lease;

(h)  Ft. Walton Beach Site Option. The Ft. Walton Beach Site Option, as set forth in Sections 8.10 and 11.1(j), above, in form and substance acceptable to Buyer in its sole discretion; and

(i)  Other Documents. Such additional information and materials as Buyer shall reasonably request.

13.2.  Documents to be Delivered by Buyer. At the Closing, Buyer will deliver to Seller, at the expense of Buyer:

(a)  Purchase Price. Evidence of a wire transfer in immediately available funds of the amount specified in Section 3.3(a), subject to any adjustments;

(b)  Assignment and Assumption of FCC License. A document evidencing the assignment by Seller to Buyer, and the assumption by Buyer, of the Station Licenses;

(c)  Assumption Agreement. An assumption agreement relating to Buyer's assumption of the Assumed Liabilities in form and substance mutually agreeable to the parties hereto;

(d)  Certified Resolutions. Certified resolutions of the Board of Directors or similar body of Buyer approving the execution and delivery of this Agreement and each of the other documents delivered by Buyer pursuant hereto and authorizing the consummation of the transactions contemplated hereby and thereby;

(e)  Officer's Certificate. A certificate, dated the Closing Date, executed on behalf of the Buyer in the form described in Section 12.1(c);

(f)  Opinion. Written opinion of counsel in substantially in the form attached hereto as Exhibit F dated as of the Closing Date;

(g)  Good Standing Certificates. Governmental certificates showing that Buyer is in good standing in the State of Delaware and duly qualified and in good standing in the State of Florida; and

(h)  Other Documents. Such additional information and materials as Seller shall reasonably request.

## ARTICLE 14
## TRANSFER TAXES: FEES AND EXPENSES

14.1.  Expenses. Each party to this Agreement shall be solely responsible for all costs and expenses incurred by it in connection with the negotiation, preparation and performance of and compliance with the terms of this Agreement.

14.2.  Transfer Taxes and Similar Charges. All recordation, transfer and documentary taxes and fees, stamps, and any excise, sales or use taxes, and all similar costs of transferring the Station Assets in accordance with this Agreement, shall be paid by Seller.

14.3.   Governmental Filing or Grant Fees. Any filing or grant fees imposed by any Governmental Entity, the consent of which is required for the consummation of the transactions contemplated hereby, including, but not limited to, the FCC, the Department of Justice and the Federal Trade Commission, shall be borne one half by Buyer and one half by Seller.

## ARTICLE 15
## ACCOUNTS RECEIVABLE

15.1.   Accounts Receivable. All accounts receivable arising prior to the Closing Date in connection with the operation of the Station, including but not limited to accounts receivable for advertising revenues for programs and announcements performed prior to the Closing Date and other broadcast revenues for services performed prior to the Closing Date shall remain the property of Seller (the "Accounts Receivable") and Buyer shall not acquire any right or interest therein. For a period of one hundred twenty (120) days from the Closing Date (the "Collection Period"), Buyer shall collect the Accounts Receivable in the normal and ordinary course of Buyer's business and shall apply all such amounts collected to the debtor's oldest account receivable first, unless the account debtor thereon otherwise directs. Buyer's obligation shall not extend to the institution of litigation, employment of counsel or a collection agency or any other extraordinary means of collection. During the Collection Period, neither Seller nor its agents shall make any direct solicitation of any such account debtor for collection purposes or institute litigation for the collection of amounts due. Any amounts relating to the Accounts Receivable that are paid directly to Seller shall be retained by Seller (and they shall inform Buyer thereof). Within ten (10) calendar days after the end of each month during the Collection Period, Buyer shall make a payment to Seller equal to the amount of all collections of Accounts Receivable during the preceding month. Any accounts remaining uncollected after the Collection Period, shall be reassigned to Seller without recourse and Seller shall be solely responsible for the collection of such remaining Accounts Receivable. Seller and Programmer each represents, warrants and covenants that each of the Accounts Receivable was incurred in the ordinary course of business and has been, and will be, accurately invoiced.

## ARTICLE 16
## SURVIVAL; INDEMNIFICATION

16.1.   Survival. The representations and warranties in this Agreement shall survive Closing for a period of fifteen (15) months from the Closing Date whereupon they shall expire and be of no further force or effect, except (a) those representations and warranties contained in Sections 6.1(a) and (b), and the indemnification obligations with respect to such provisions, which shall survive indefinitely, (b) Sections 6.1(l), (m) and (o), and the indemnification obligations with respect to such provisions, which shall survive until the termination of any applicable statute of limitations, and (c) those claims under this Article 16 that relate to Damages (as defined in Section 16.2) for which written notice is given by the indemnified party to the indemnifying party prior to the expiration, which shall survive until resolved. All covenants and agreements shall survive the Closing indefinitely.

16.2.   Indemnification.

(a)    From and after the Closing, Seller shall defend, indemnify and hold harmless Buyer from and against any and all losses, costs, damages, liabilities and expenses, including reasonable attorneys' fees and expenses ("Damages") incurred by Buyer arising out of or resulting from: (i) any breach of any representation or warranty of the Seller or Programmer hereunder; (ii) any breach or default by Seller or Programmer of any covenant or agreement under this Agreement; or (iii) the Retained Obligations or the business or operation of the Station before Closing.

(b)    From and after the Closing, Buyer shall defend, indemnify and hold harmless Seller from and against any and all Damages incurred by Seller arising out of or resulting from: (i) any breach of any representation or warranty of Buyer hereunder; (ii) any breach or default by Buyer of any covenant or agreement under this Agreement; or (iii) the Assumed Obligations or the business or operation of the Station after Closing.

16.3.   Procedures.  The indemnified party shall give prompt written notice to the indemnifying party of any demand, suit, claim or assertion of liability by third parties or other circumstances that could give rise to an indemnification obligation hereunder against the indemnifying party (a "Claim"), but a failure to give such notice or delaying such notice shall not affect the indemnified party's right to indemnification and the indemnifying party's obligation to indemnify as set forth in this Agreement, except to the extent the indemnifying party's ability to remedy, contest, defend or settle with respect to such Claim is thereby prejudiced.  The obligations and liabilities of the parties with respect to any Claim shall be subject to the following terms and conditions:

(a)    The indemnifying party shall have the right to undertake, by counsel or other representatives of its own choosing, the defense or opposition to such Claim;

(b)    In the event that the indemnifying party shall elect not to undertake such defense or opposition, or, within twenty (20) days after written notice (which shall include description of background information explaining the basis for such Claim) of any such Claim from the indemnified party, the indemnifying party shall fail to undertake to defend or oppose, the indemnified party (upon further written notice to the indemnifying party) shall have the right to undertake the defense, opposition, compromise or settlement of such Claim, by counsel or other representatives of its own choosing, on behalf of and for the account and risk of the indemnifying party (subject to the right of the indemnifying party to assume defense of or opposition to such Claim at any time prior to settlement, compromise or final determination thereof);

(c)    Anything herein to the contrary notwithstanding: (i) the indemnified party shall have the right, at its own cost and expense, to participate in the defense, opposition, compromise or settlement of the Claim; (ii) the indemnifying party shall not, without the indemnified party's written consent, settle or compromise any Claim or consent to entry of any judgment which does not include as an unconditional term thereof the giving by the claimant or the plaintiff to the indemnified party of a release from all liability in respect of such Claim; and (iii) in the event that the indemnifying party undertakes defense of or opposition to any Claim, the indemnified party, by counsel or other representative of its own choosing and at its sole cost and expense, shall have the right to consult with the indemnifying party and its counsel or other

- 30 -

representatives concerning such Claim and the indemnifying party and the indemnified party and their respective counsel or other representatives shall cooperate in good faith with respect to such Claim; and

(d)     All claims not disputed shall be paid by the indemnifying party within thirty (30) days after receiving notice of the Claim. "Disputed Claims" shall mean claims for Damages by an indemnified party which the indemnifying party objects to in writing within thirty (30) days after receiving notice of the Claim. In the event there is a Disputed Claim with respect to any Damages, the indemnifying party shall be required to pay the indemnified party the amount of such Damages for which the indemnifying party has, pursuant to a final determination, been found liable within ten (10) days after there is a final determination with respect to such Disputed Claim. A final determination of a Disputed Claim shall be (i) a judgment of any court determining the validity of a Disputed Claim, if no appeal is pending from such judgment and if the time to appeal therefrom has elapsed; (ii) an award of any arbitration determining the validity of such disputed claim, if there is not pending any motion to set aside such award and if the time within which to move to set aside such award has elapsed; (iii) a written termination of the dispute with respect to such claim signed by the parties thereto or their attorneys; (iv) a written acknowledgment of the indemnifying party that it no longer disputes the validity of such claim; or (v) such other evidence of final determination of a disputed claim as shall be acceptable to the parties. No undertaking of defense or opposition to a Claim shall be construed as an acknowledgment by such party that it is liable to the party claiming indemnification with respect to the Claim at issue or other similar Claims.

## ARTICLE 17
## TERMINATION

17.1.   Termination. This Agreement may be terminated at any time prior to Closing as follows:

(a)     by mutual written consent of Seller and Buyer;

(b)     by written notice of Seller to Buyer, provided that all other conditions to Closing have been met and further provided that Seller is not then in breach of this Agreement, if Buyer (i) does not satisfy the conditions or perform the obligations to be satisfied or performed by it on the Closing Date; or (ii) otherwise breaches in any material respect any of its representations or warranties or defaults in any material respect in the performance of any of its covenants or agreements herein contained and such breach or default is not cured within the Cure Period (defined below);

(c)     by written notice of Buyer to Seller if either Seller or Programmer (i) does not satisfy the conditions or perform the obligations to be satisfied or performed by either of them on or before the Closing Date; or (ii) otherwise breaches in any material respect any of its representations or warranties or defaults in any material respect in the performance of any of its covenants or agreements herein contained and such breach or default is not cured within the Cure Period (defined below);

(d)     by written notice of either party to the other if the FCC denies the FCC Application and the party seeking to terminate the Agreement is not then in breach of this Agreement;

(e)     by written notice of Buyer to Seller if the FCC Consent includes a condition that is materially adverse to Buyer;

(f)     by written notice of Buyer to Seller under the circumstances specified in Section 17.2 dealing with Interruption of Broadcast Transmission or Section 18.2 dealing with Risk of Loss; and

(g)     by written notice of either party to the other if the Closing shall not have been consummated on or before the date eighteen (18) months after the date of this Agreement and the party seeking to terminate this Agreement is not then in breach of this Agreement.

The term "Cure Period" as used herein means a period commencing the date Buyer or Seller receives from the other written notice of breach or default hereunder and continuing for a period of thirty (30) days thereafter; provided, however, that if the breach or default cannot reasonably be cured within such period, but can be cured before the Closing Date, and if diligent efforts to cure promptly commence, then the Cure Period shall continue as long as such diligent efforts to cure continue, but not beyond the Closing Date.

17.2.   Interruption of Broadcast Transmission.  Notwithstanding any other provision of this Agreement, if, prior to Closing, any event occurs which prevents broadcast transmission by the Station with substantially full licensed power and antenna height (as described in the applicable FCC License) and in the manner it has heretofore been operating for periods of time in excess of six (6) hours, Seller shall give prompt written notice thereof to Buyer.  If such Station's facilities are not restored so that operation is resumed with substantially full licensed power within twenty-four (24) hours of such event, or, in the case of more than one event the aggregate number of hours preceding such restoration from all such events is more than thirty-six (36) hours, Buyer shall have the right, in its sole discretion, to terminate this Agreement by giving notice to the Seller.

17.3.   Liquidated Damages.  If this Agreement is terminated by Seller due to Buyer's failure to consummate the Closing on the Closing Date in accordance with Section 17.1(b) of this Agreement, then the Deposit or the proceeds of the Letter of Credit in the amount of One Hundred Fifty Thousand Dollars ($150,000), as applicable, will be disbursed to Seller as set forth in Section 3.2, above, and shall constitute liquidated damages for Buyer's failure. Such liquidated damages shall be Seller's and Programmer's sole and exclusive remedy hereunder for breach by Buyer of its obligation to consummate the Closing in accordance with the terms of this Agreement.  It is understood and agreed that such liquidated damages amount represents the parties' reasonable estimate of actual damages and does not constitute a penalty.

17.4.   Specific Performance. Seller and Programmer each agrees that the Station is unique and cannot be readily obtained on the open market and that Buyer will be irreparably injured if this Agreement is not specifically enforced. Therefore, in the event that Buyer institutes any action specifically to enforce Seller's and Programmer's performance under this Agreement,

- 32 -

Seller and Programmer each agrees to waive the defense that Buyer has an adequate remedy at law and to interpose no opposition, legal or otherwise, as to the propriety of specific performance as a remedy.

## ARTICLE 18
## MISCELLANEOUS PROVISIONS

18.1.   <u>Casualty Loss</u>.  In the event any non-material loss or damage of the Station Assets exists on the Closing Date, the parties shall consummate the Closing and after Closing the parties shall cooperate to repair or replace (as appropriate under the circumstances) the lost or damaged items at Seller's reasonable expense.

18.2.   <u>Risk of Loss</u>.  The risk of loss or damage to the Station Assets shall be upon Seller at all times prior to Closing.  In the event of such loss or damage, Seller will promptly notify Buyer and may repair, replace or restore the Station Assets to their former condition. If material damage has occurred that precludes the operation of the Station within the terms of its license and the Station Assets have not been repaired or restored prior to the Closing Date, Buyer may, at its option:

(a)   elect to consummate the Closing and accept the Station "as is," in which event Seller will pay over to Buyer any proceeds of insurance received by Seller and attributable to damage to the Station or the Station Assets, in which case Seller will have no further obligation to repair, replace or restore the damaged property; or

(b)   elect to postpone the Closing Date for a period of up to ninety (90) days, with prior consent of the Commission if necessary, to permit Seller, at its option, to make such repairs, replacements, or restoration as are required to restore the property to the equivalent of its former condition. If after the expiration of the extension period the property has not been repaired, replaced or restored in a manner sufficient to permit the Station to resume operation within the terms of its license, Buyer may terminate this Agreement. If the parties disagree whether the property has been adequately repaired, replaced or restored, the matter will be referred to a mutually acceptable qualified consulting communications engineer, who shall be a member of the Association of Federal Communications Consulting Engineers, whose decision will be final, and whose fees and expenses will be split equally by the parties.

18.3.   <u>Further Assurances</u>.  After the Closing, each party shall from time to time, at the request of and without further cost or expense to the other, execute and deliver such other instruments and take such other actions as may reasonably be requested in order to more effectively consummate the transactions contemplated hereby to exchange assets and assume obligations as contemplated by this Agreement.

18.4.   <u>Assignment</u>.  Neither party may assign this Agreement without the prior written consent of the other party hereto, provided that Buyer may assign its right to acquire the Station to an affiliate of Buyer if such assignment does not delay the governmental consents contemplated by Article 5 (or otherwise delay Closing), the representations made by Buyer under this Agreement are true with respect to the assignee, and Buyer gives Seller prior written notice

thereof. No such assignment shall relieve Buyer of any obligation or liability under this Agreement. With respect to any permitted assignment, the parties shall take all such actions as are reasonably necessary to effectuate such assignment, including but not limited to cooperating in any appropriate filings with the FCC or other governmental authorities. All covenants, agreements, statements, representations, warranties and indemnities in this Agreement by and on behalf of any of the parties hereto shall bind and inure to the benefit of the respective successors and permitted assigns of the parties hereto.

18.5.   Amendments.  No amendment, waiver of compliance with any provision or condition hereof or consent pursuant to this Agreement shall be effective unless evidenced by an instrument in writing signed by the party against whom enforcement of any waiver, amendment, change, extension or discharge is sought.

18.6.   Headings.  The headings set forth in this Agreement are for convenience only and will not control or affect the meaning or construction of the provisions of this Agreement.

18.7.   Governing Law and Venue.  The construction and performance of this Agreement shall be governed by the laws of the State of Florida without giving effect to the choice of law provisions thereof. Seller and Buyer hereby submit to the nonexclusive jurisdiction of the courts of the State of Florida and the federal courts of the United States of America located in such state solely in respect of the interpretation and enforcement of the provisions hereof and of the documents referred to herein, and hereby waive, and agree not to assert, as a defense in any action, suit or proceeding for the interpretation or enforcement hereof or of any such document, that they are not subject thereto or that such action, suit or proceeding may not be brought or is not maintainable in said courts or that this Agreement or any of such documents may not be enforced in or by said courts, that the suit, action or proceeding is brought in an inconvenient forum, or that the venue of the suit, action or proceeding is improper.

18.8.   Notices.  Any notice, demand or request required or permitted to be given under the provisions of this Agreement shall be in writing, including by facsimile, and shall be deemed to have been received on the date of personal delivery, on the third day after deposit in the U.S. mail if mailed by registered or certified mail, postage prepaid and return receipt requested, on the day after delivery to a nationally recognized overnight courier service if sent by an overnight delivery service for next morning delivery or when delivered by facsimile transmission (provided that any notice given by facsimile is also given by one of the other means of notice provided for in this Section 18.8), and shall be addressed as follows (or to such other address as any party may request by written notice):

> If to Buyer:   Qantum Communications Corporation
> 3 Stamford Landing, Suite 210
> 46 Southfield Avenue
> Stamford, Connecticut 06902
> Attn: Michael F. Mangan
> Facsimile:  (203) 388-0054

with a copy (which shall not constitute notice) to:

John M. Pelkey, Esq.
Garvey Schubert Barer,
5th Floor
1000 Potomac Street, NW
Washington, DC 20007
Facsimile: (202) 965-1729

If to Seller or Programmer:
Gulf Breeze Media, Inc.
21 Miracle Strip Parkway
Fort Walton Beach, Florida 32548
Attn: Ronald E. Hale, Sr.
Facsimile: (850) 243-1471

with a copy (which shall not constitute notice) to:

Walton E. Williams III, Esq.
801 Noble Street, 8th Floor Suite 30
Anniston, AL 36201
Facsimile: (509) 471-3808

18.9.  Counterparts.  This Agreement may be executed in one or more counterparts, each of which will be deemed an original and all of which together will constitute one and the same instrument. Signatures on this Agreement transmitted by facsimile shall be deemed to be original signatures for all purposes of this Agreement.

18.10.  No Third Party Beneficiaries.  Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any person or entity other than the parties hereto and their successors or permitted assigns, any rights or remedies under or by reason of this Agreement.

18.11.  Severability.  The parties agree that if one or more provisions contained in this Agreement shall be deemed or held to be invalid, illegal or unenforceable in any respect under any applicable law, this Agreement shall be construed with the invalid, illegal or unenforceable provision deleted, and the validity, legality and enforceability of the remaining provisions contained herein shall not be affected or impaired thereby.

18.12.  Entire Agreement.  This Agreement, including its Schedules and Exhibits, embody the entire agreement and understanding of the parties hereto and thereto and supersede any and all prior agreements, arrangements and understandings relating to the matters provided for herein.

18.13.  Interpretation. In this Agreement, the singular includes the plural and the plural the singular; the word "it" shall include all pronouns connoting other genders, as the context requires; the words "including," "includes" and "include" shall be deemed to be followed by the words "without limitation;" references to Sections or Exhibits are to those of this Agreement unless otherwise indicated; references to laws and regulations, unless otherwise specified, shall

be deemed to include all corresponding provisions of subsequent or superseding laws and regulations affecting the same; references to agreements and other contractual instruments, unless otherwise specified, shall be deemed to include all subsequent amendments and other modifications to such instruments in accordance with the terms thereof; the phrase "and/or" shall be deemed to mean the words both preceding and following such phrase, or either of them; and "days" refers to calendar days unless otherwise indicated.

[Remainder of Page Intentionally Left Blank]

**IN WITNESS WHEREOF**, each of the parties has caused this Asset Purchase Agreement to be duly executed and delivered as of the date first above written.

STAR BROADCASTING, INC.

By _____

RONALD E. HALE, SR. Jr Pres.

_____

QANTUM COMMUNICATIONS CORPORATION

By: _____

IN WITNESS WHEREOF, each of the parties has caused this Asset Purchase Agreement to be duly executed and delivered as of the date first above written.

STAR BROADCASTING, INC.

By: _____

RONALD E. HALE, SR.

_____

QANTUM COMMUNICATIONS CORPORATION

By: _____
      MICHAEL F. MANGAN
      CFO

# Exhibit 2

QANTUM VS. STAR

RONALD E. HALE SR., 7/21/05

---

SHEET 6   PAGE 21

**21**

```
1              THE WITNESS:  Yeah, but I don't.  You guys
2     don't give it to me.
3              MR. O'SULLIVAN:  Okay.
4         Q    (By Mr. O'Sullivan)  Okay.  I'm going to ask
5     you, Mr. Hale, about the e-mail at the top.  It's a March
6     3rd, 2005 e-mail from Tim Brady to Richard Denning.  Take a
7     look on the second page, if you would.  This is actually a
8     string of e-mails, and I'll be specific when I get to it.
9     I'm not actually asking you about the March 2, 2005 e-mail
10    that starts at the bottom of page 1 of Exhibit 5.  It's to
11    Lew and Richard from Tim Brady, copy to you.  I'm going to
12    ask you about the paragraph that says, 'We have not resolved
13    how the additional funds...'  You can read that to yourself.
14    It's the first full paragraph.
15        A    Is that not the same thing I just read?
16        Q    Well, it may be a different paragraph in the
17    same e-mail, but that paragraph that, 'We have not
18    resolved.'  Do you see where I'm at?
19        A    Okay.  Yes.
20        Q    Okay.  It says there that, 'There was
21    discussion of the assignment of WBAU-AM for the 400K needed
22    by Star to complete closing on both deals.'
23             What was that discussion?
24             MR. SEAVEY:  Objection, form.
25        Q    (By Mr. O'Sullivan)  I'll rephrase.  Mr. Hale,
```

---

PAGE 22

**22**

```
1     did you have a discussion with anybody from Cumulus about
2     the possibility of the assignment of WBAU-AM for the 400K
3     needed by Star to complete closing on both deals?
4         A    The only thing I remember is a comment to
5     Mr. Dickey that that could be used for collateral.
6         Q    And meaning that the WBAU, the AM station,
7     could be used to give Cumulus collateral --
8         A    Correct.
9         Q    -- for monies that they would loan you in
10    connection with the deal?
11        A    That's correct.
12        Q    And then going back to the very top e-mail on
13    the first page where you were, they're asking you about, I
14    assume, because this is collateral, they're asking you who
15    owns it, who owns WBAU, and your lawyer here is saying it's
16    owned by Phillips.  Who is Phillips?
17        A    The name of the company is Yesterday's Radio
18    Network, and the managing member is Rupert Phillips.
19        Q    Okay.  And your lawyers are -- Star's lawyer
20    here is saying Star has an agreement to acquire BAU; is that
21    correct?
22        A    That's correct.
23        Q    And then it says, 'They were planning on
24    filing with the FCC,' presumably on the BAU deal, 'after
25    they determine what they're going to do with WTKE.'
```

---

PAGE 23

**23**

```
1              What's the connection between those two sets
2     of transactions?
3         A    Would you ask that question again.
4         Q    Yeah.
5         A    You need to be a little more specific.
6         Q    Okay.
7         A    It's a little broad.
8         Q    Let me ask a different question.
9         A    All right.
10        Q    The reference here is to doing something with
11    the FCC about the AM station, quote, 'after they determine
12    what they're going to do with WTKE.'  On March 3rd of 2005,
13    was there any doubt in your mind about what you were going
14    to do with WTKE?
15             MR. SEAVEY:  Objection, form.
16             THE WITNESS:  Well, obviously, we had that
17        contract -- no decision had been made at that point
18        in time.  Just what it says, we're going to
19        have to determine how all that is going to fall in
20        place.
21        Q    (By Mr. O'Sullivan)  Okay.  But on March 3rd,
22    2005, you considered one possibility would be to sell WTKE
23    to somebody other than Qantum; that's one of the options you
24    were considering?
25             MR. SEAVEY:  Objection, form.
```

---

PAGE 24

**24**

```
1         Q    (By Mr. O'Sullivan)  You can answer.
2         A    Okay.  We knew that the contract was going to
3     run out on the 5th, yes.  But there had been no, you know,
4     no decision.
5         Q    Right.  But you were -- these are discussions
6     between Star and Cumulus about a WTKE deal, right?  That's
7     what these are?
8              MR. SEAVEY:  Objection, form.
9              THE WITNESS:  Actually, no.  These are
10        discussions between Star and Cumulus about providing
11        the funds for us to be able to close WTKE with Clear
12        Channel.
13        Q    (By Mr. O'Sullivan)  Okay.  Let's do some
14    more -- we'll go to the next one, Exhibit 6.  Did you think
15    back at the time of these e-mails, March 3rd, 2005, that you
16    would need litigation funding for a Qantum lawsuit just
17    because you closed on WTKE?
18             MR. SEAVEY:  Are you asking him to read these
19        documents first before answering your question?
20             MR. O'SULLIVAN:  It's not relating to the
21        document.
22        Q    (By Mr. O'Sullivan)  Prior to March 3rd, 2005,
23    had you had any discussions with anybody from Cumulus about
24    the possibility of Cumulus acquiring WTKE from you?
25        A    Any discussions with Cumulus at that point in
```

25

```
 1   time were simply that we needed funds to close it with Clear
 2   Channel.  After the contract ended is when we started
 3   talking about the possibility of selling TKE to them.  We
 4   were selling WPGG to them and using WPGG as leverage to
 5   borrow additional funds to close WYKE with Clear Channel.
 6   And we were already in -- we already needed legal -- needed
 7   money for legal fees to fight what Qantum was doing at the
 8   time.
 9        Q    Can you be more specific.  What was Qantum
10   doing at the time back in March of 2005?
11        A    Qantum had filed a petition to deny on our
12   move, the relocation move of WPGG from Evergreen, Alabama,
13   to Shalimar.  They had sent a January 11th -- 12th letter of
14   notice of breach, which we had to spend a great deal of
15   time, effort and resources to answer, and we needed funds
16   for those things.  Coming up was the answer on the WPGG move
17   from the commission, and we knew that there would be
18   additional filings because they promised us they would do
19   that.
20        Q    Okay.  I'm actually going to skip Exhibit 6
21   and go to Exhibit 7.
22        MR. SEAVEY:  It's very nice of you to premark
23   These.  Thank you.
24        Q    (By Mr. O'Sullivan)  Okay.  I'm going to
25   direct your attention to the top e-mail.  It's from
```

26

```
 1   Mr. Brady to Mr. Denning, and ask you to read to yourself
 2   paragraph 4 of that e-mail.
 3        A    Okay.
 4        Q    Okay.  Your lawyer is saying here, Star's
 5   lawyer is saying, 'It has always been my opinion that Qantum
 6   will file suit.  Ron and apparently Lew believe that if
 7   Cumulus' involvement is made known soon enough after the
 8   termination of the Qantum deal, say through the filing of a
 9   314, then Qantum will not pursue the matter further.'
10        Why did you think Qantum would not pursue the
11   matter further if Cumulus' participation was made known?
12        A    The 18 months, the contract had expired.  It
13   was over.
14        Q    We'll talk about that in a minute.  You're
15   saying here that if Cumulus' involvement is made known,
16   maybe Qantum wouldn't fight.  Is there something special
17   about Cumulus as the new purchaser?
18        A    I'm not sure that I agree with that -- the
19   paragraph.  I'm not sure that this is correct from what I
20   felt.  Now, Lew may have felt something different.  But I
21   don't remember --
22        Q    You see the last line says, 'I did get the
23   impression from Lew in one of our conference calls that he
24   agreed with Ron on this.'
25        A    Yes.
```

27

```
 1        Q    Sounds like it's your idea.
 2        MR. SEAVEY:  Objection, form.
 3        Q    (By Mr. O'Sullivan)  Was it your idea?
 4        A    I don't think so.  But, honestly, you know, my
 5   personal opinion was that the contract time had run; the
 6   contract was over, and we had answered and taken care of
 7   their breach letter of January the 12th, and I thought it
 8   would just be over.
 9        Q    Okay.  Take a look at the next e-mail below
10   that.  This is to Tim from Richard Denning, Tim Brady.
11        A    Okay.
12        Q    No. 1 there says, 'I will talk with Lew about
13   the timing of the PGG close and the TKE termination.'
14        What conversations had you had with the
15   Cumulus people about a TKE termination?
16        A    Well, they knew that the contract ended on
17   March 5th.  I had told them that.
18        Q    So when he asks about the timing of the TKE
19   termination, what is that?
20        A    Well, this is only a couple of days
21   afterwards.  I presume that's what they were going to talk
22   about.  Our focus at this point was totally on PGG.
23        Q    Well, you're talking about the timing of the
24   TKE termination, correct?
25        A    Which was two days earlier or three days
```

28

```
 1   earlier.
 2        Q    Okay.  At this point, had you shown anybody
 3   from Cumulus a copy of your Qantum/TKE agreement?
 4        A    No...
 5        Q    Okay.  Let's take a quick look, Mr. Hale, back
 6   at Exhibit 3, the big document.
 7        A    Exhibit 3.
 8        MR. SEAVEY:  It's the thick one.
 9        THE WITNESS:  Okay.
10        Q    (By Mr. O'Sullivan)  And I'm going to ask you
11   to turn to page 31.
12        A    Okay.
13        Q    And you see there in sort of the middle of the
14   page under the section headed Termination, it says,
15   'Termination.  This agreement may be terminated at any time
16   prior to closing as follows.'  And you see there are some
17   provisions below that about how you can do it?
18        A    Correct.
19        Q    And (g) says one can terminate, 'by written
20   notice of either party to the other if the closing shall not
21   have been consummated on or before the date 18 months after
22   the date of this agreement and the party seeking to
23   terminate this agreement is not then in broach of this
24   agreement.'
25        See that?
```

QANTUM VS. STAR

RONALD E. HALE SR., 7/21/05

57

```
 1   close with Clear Channel.
 2       Q    I understand that.  This very specific term,
 3   you're going to need $650,000 from them to buy TKE, right?
 4       A    From?
 5       Q    From Clear Channel?
 6       A    From Clear Channel.
 7       Q    Right.  So that you can sell it to Cumulus,
 8   right?  That's what we're talking about here?
 9       A    Yeah, absolutely.
10       Q    That's what that says.  When did you tell
11   Cumulus that the amount you needed in cash, just as a matter
12   of getting the closing done, was 650?
13       A    As part of the WPGG negotiations.  And there
14   is prior e-mails to support that.
15       Q    There are prior e-mails to support a lot of
16   things.  Help me.  Why would the amount of cash you would
17   need to close on TKE be relevant to the PGG deal?
18       A    Because that's what we asked for.  That was
19   our reason.  Part of the reason for doing that deal to begin
20   with was to get enough cash to close WTKE with Clear
21   Channel.
22       Q    But why would Cumulus give you cash if it
23   wasn't for them to get TKE?
24           MR. SEAVEY:  Objection, form.
25           THE WITNESS:  You're missing that WPGG's
```

58

```
 1   negotiation included the cash because we had to have
 2   the cash to close with Clear Channel, or we wouldn't
 3   have had anything to close with Qantum or with
 4   Cumulus.
 5       Q    (By Mr. O'Sullivan)  But would Cumulus ever
 6   have given you -- strike that.
 7           We're done?  Okay.
 8           (A recess was taken.)
 9       Q    (By Mr. O'Sullivan)  Mr. Hale, staying for a
10   moment with Exhibit 22 and the matters in area B, did you
11   have face-to-face meetings with any of the principals of
12   Cumulus before this term sheet was generated --
13       A    No.
14       Q    -- on March 7th?  Had you ever met them?
15       A    No.
16       Q    Did anybody other than you and your attorneys
17   negotiate with Cumulus in connection with any of these
18   deals?
19       A    No.
20           MR. SEAVEY:  Objection to form.
21       Q    (By Mr. O'Sullivan)  Okay.  How much time had
22   you spent in -- strike that.
23           Who were your contact people at Cumulus for
24   these negotiations?
25       A    Lew Dickey.
```

59

```
 1       Q    Only him?
 2       A    Only Lew Dickey.
 3       Q    Okay.  And he was the president of the
 4   company?
 5       A    I think he's CFO or CEO.
 6       Q    Okay.
 7       A    He may be president and CEO.
 8       Q    Okay.  And prior to the time that this Exhibit
 9   22 was created, how many times had you spoken with him ever?
10       A    Well, of course, I talked to him back in 2002
11   several times.
12       Q    Okay.
13       A    So it would be difficult to give you a number.
14       Q    Okay.  Leaving those aside.
15       A    Okay.
16       Q    The time after you signed up with Qantum, how
17   many times did you speak with Dickey prior to this Exhibit
18   22 being generated?
19       A    Probably three or four times.
20       Q    Okay.  And of those three or four
21   conversations, what was the earliest one?  What was the
22   first time you talked to him about any of this stuff, either
23   PGG or TKE?
24       A    I would think in January.
25       Q    Okay.  January of '05?
```

60

```
 1       A    Yes.
 2       Q    And in either that discussion or any ensuing
 3   discussions leading up to this term sheet, when was the
 4   first time the two of you discussed the possibility that
 5   Cumulus might get WTKE?
 6       A    We had discussions about I needed cash to
 7   close TKE, and if he wanted WPGG, then we would need to
 8   float a loan to close WTKE.  As far as --
 9       Q    Let me just ask to follow up on that because
10   this is important, I think.  I want to make sure I get it.
11   Why should Cumulus care what you did with the cash they gave
12   you if they weren't getting TKE?
13       A    They were wanting WPGG.
14       Q    Right.  But why couldn't they just pay you for
15   that, you buy it, give it to them, end of story?
16       A    Because I didn't want to do that.  I needed
17   money to close WTKE with Clear Channel.
18       Q    I understand.  But what you choose to do with
19   the money, why is it of Cumulus' concern?
20       A    There was no profit in the PGG deal, none
21   whatsoever.
22       Q    So the whole premise of you doing it was to do
23   it to get the TKE profit, right?
24       A    Absolutely, to get the cash to be able to
25   close with Clear Channel.
```

QANTUM VS. STAR

RONALD E. HALE SR., 7/21/05

SHEET 20   PAGE 77

77

1  be able to move it to Fort Walton Beach, and their dollars
2  would be in jeopardy.
3      Q   But they don't say a problem; they just say a
4  notice of breach, right?
5      A   It says no breach for the lease, so the PGG
6  lease had to be in place, or you couldn't move PGG from
7  Evergreen to Fort Walton Beach, TKE tower.
8      Q   Right.  But if you read the rest of the
9  sentence, it says noticed.
10      A   Oh, okay, okay.  Well, I'm not an attorney.
11  Go ahead.
12      Q   Well, as a layman, do you understand that your
13  situation in business may be affected by the fact that
14  you're the recipient of a notice of breach?
15      A   Yes.
16      Q   Let's look quickly at Exhibit 9.  Just a quick
17  point on this.  The last line of the Lew Paper e-mail says,
18  'I'll also be preparing the WTKE agreement based on attached
19  draft,' and that's March 8th.  My question is, is it fair to
20  say by March 8th you had gotten far enough that you were
21  going to be drafting a TKE agreement as well as a PGG
22  agreement?
23      A   I would read that message that way, yes.
24      Q   And in your mind, is that where you were; once
25  you'd exchanged these term sheets, it was time to draft?  By

PAGE 78

78

1  these term sheets, I mean 22 and 23.
2      A   I presume, yes.
3      Q   Okay.  I know I've spent a lot of time in this
4  area, but I want to make sure I just close it out.  Give me
5  your best testimony as to the first moment, the first date
6  that your discussions with Cumulus evolved into ones that
7  included Cumulus getting TKE.
8          MR. SEAVEY:  Objection, form.  You can answer.
9          THE WITNESS:  You're talking about during the
10  September the 5th, 2003 --
11      Q   (By Mr. O'Sullivan)  Forward.
12      A   -- to March the 5th.  I notified Cumulus on
13  the morning of the 7th that the 5th had happened and the
14  contract was over.
15      Q   Okay.  Did you notify Qantum on the morning of
16  the 5th?
17      A   No.
18      Q   Just to move things along, that was not an
19  answer to my question.
20      A   I'm sorry.
21      Q   I need an answer to my question.  When is the
22  first -- you told me when you first talked to Cumulus.
23      A   Right.
24      Q   You talked about PGG, right?
25      A   That's correct.

PAGE 79

79

1      Q   And that at least at that time, TKE wasn't
2  directly going to go to Cumulus in the deal under
3  consideration, right, or is that not right?
4      A   That is correct.
5      Q   Okay.  There was a time when Cumulus -- you
6  were going to do a deal with Cumulus, but Cumulus was not
7  going to get TKE in that deal, right?
8      A   That's correct.
9      Q   And when is the first time the deal, at least
10  the deal in discussion, changed into one that Cumulus might
11  get TKE?
12      A   That would have been on the morning of the 7th
13  when I notified them.
14      Q   Okay.  So the first time --
15      A   That's best of my recollection.
16      Q   The first time you said, either directly or
17  indirectly through your lawyer to anyone from Cumulus, that
18  they might get their hands on WTKE was the morning of March
19  7th?
20          MR. SEAVEY:  Objection, form.
21      Q   (By Mr. O'Sullivan)  You can answer.
22      A   That's correct.
23      Q   Okay.  Were they surprised?
24      A   No.
25      Q   Had they ever mentioned it before then to you?

PAGE 80

80

1      A   No, not to my recollection.
2      Q   And you never told them that there was
3  something magic about March 5th in terms of talking about
4  TKE?
5      A   I presume that Cumulus, being the company that
6  it is, went to the FCC database and pulled up the contract,
7  and they knew that.
8      Q   Well, beyond presume, do you know that?
9      A   I don't know that, no.
10      Q   You never gave Cumulus a copy of your contract
11  with Qantum?
12      A   I never gave Cumulus a copy of the contract.
13      Q   Do you know whether your lawyer did?
14      A   I do not know that.
15      Q   Okay.  I take it that certainly by March --
16  that anytime after March 5th, in your mind, you were
17  perfectly free to negotiate --
18      A   Absolutely.
19      Q   -- or solicit or sell TKE to Cumulus?
20      A   Yes.
21      Q   Okay.  Let's quickly look back at the big
22  contract, and I'm going to ask you to go to page 21.
23      A   Page what now?
24      Q   21, and direct your attention to Section 8.9,
25  Nonsolicitation.  And it says, 'As long as this agreement is

QANTUM VS. STAR

RONALD E. HALE SR., 7/21/05

113

1  fax that the APA is terminated."
2          Now, you understand the APA there to mean your
3  deal with Qantum, right?  See there in the first line?
4          MR. SEAVEY:  Let him read the whole e-mail.
5          MR. O'SULLIVAN:  Okay.
6          THE WITNESS:  All right.  Ask the question.
7      Q    (By Mr. O'Sullivan)  Okay.  It says here at
8  the top, "Star gave written notice --" Star is informing,
9  through its lawyer, Cumulus, "Star gave written notice to
10 Qantum today by fax that the APA is terminated."
11     A    That's the official, the formality, yeah.
12     Q    And the APA is the Qantum deal, right?
13     A    Correct.
14     Q    Why did you do that?
15     A    It's the, you know, it's the notification.  I
16 mean, you know.
17     Q    It's the termination?
18     A    No, not in the way you're saying it.  But it
19 is the notice by which we gave to Qantum that we didn't
20 intend to close, that the contract was already over.
21     Q    All right.  In your mind what effect did the
22 notice have?
23     A    I guess it was kind of like a notification we,
24 you know, we didn't want to accept any more offers from
25 them.

114

1      Q    Well, you had a deal with them?
2      A    No.  The deal was over March 5th.
3      Q    So, then, why did you send a notice of
4  termination of the deal?
5      A    Didn't.  I think that letter basically, that
6  termination letter you're talking about right now is just
7  kind of like a notice.
8      Q    It says that the contract is hereby
9  terminated.
10     A    Right.  Okay.  But the contract expired on the
11 5th.
12     Q    So, again, is there a reason you would send a
13 notice of termination if the contract is already over?
14     A    I presume --
15          MR. SEAVEY:  Objection to form.
16          THE WITNESS:  It's an official notice.
17     Q    (By Mr. O'Sullivan)  But it has no meaning; it
18 doesn't change your rights or their rights?
19          MR. SEAVEY:  Objection to form.
20          THE WITNESS:  I don't think so.  That contract
21 expired March 5th.
22     Q    (By Mr. O'Sullivan)  Okay.
23     A    And that's the official notice that we're not
24 moving forward.
25     Q    Okay.  Let's look at the next paragraph in

115

1  this e-mail.
2      A    Oh, I'm sorry.
3      Q    21.
4      A    21.  Okay.
5      Q    This is your lawyer, Star's lawyer writing to
6  the other side.  "Since one could interpret the APA," which
7  is the Qantum APA, "such that the effective date of
8  termination is the day the copies of the notice are
9  received, i.e., Friday, would it be possible to have the
10 documents dated Saturday, 4/16/05, instead of Friday?"  You
11 see that?
12     A    Okay.
13     Q    Did you talk about that with your lawyer
14 before you sent this out?
15     A    I don't think so.
16          MR. SEAVEY:  Objection.  Well, okay.  Next
17 question.  Again, wait for him to finish the
18 question.
19          THE WITNESS:  I'm sorry.
20          MR. SEAVEY:  Wait for me to get time to make
21 an objection.  And I caution the witness again not
22 to reveal the substance of conversations he had with
23 counsel.
24     Q    (By Mr. O'Sullivan)  Okay.  Do you have any
25 idea why your lawyer is concerned here that under the APA

116

1  with Qantum, the effective date of the termination would be
2  the date that the notice is received?
3          MR. SEAVEY:  Objection to form.
4          THE WITNESS:  No.
5      Q    (By Mr. O'Sullivan)  You don't know why that
6  would matter?
7      A    No.
8      Q    And you weren't involved in any conversations
9  with anyone about backdating documents or postdating
10 documents to get around the termination date?
11     A    No.
12          MR. SEAVEY:  Objection to form.
13     Q    (By Mr. O'Sullivan)  Okay.  And you weren't
14 involved in any discussion where the idea of terminating and
15 making sure the closing was at least a day after was the
16 point?
17          MR. SEAVEY:  Objection, form.
18     Q    (By Mr. O'Sullivan)  Start with a yes or no to
19 that.
20     A    No.
21     Q    You were never involved in a discussion where
22 the topic was the need to make sure the closing on TKE was
23 post the effective date of the notice of termination?
24     A    I don't remember it.
25     Q    Never talked about that with anybody?

WIERZBICKI & STEPHENSON COURT REPORTERS

# Exhibit 3

Page 118

1  cash boot – strike that.
2       Cash boot is how much cash Hale's going to
3  take away from it?
4    A.  How much additional cash consideration
5  over and above the assets they'll be conveyed.
6    Q.  Okay.  So, during the period October of
7  2004 up through March 3 of 2005, isn't it true that
8  Hale and Star on one hand and Cumulus on the other
9  exchanged differing proposals as to how much cash
10  Hale and Star would receive in a swap that involved
11  WTKE and WPGG?
12    A.  I believe I have answered that already.
13    Q.  The answer is yes, right?
14    A.  Yes.
15    Q.  You talked about how much cash would be
16  part of the deal?
17    A.  We've reviewed that today.
18    Q.  I am just trying to move along.  Lawyers
19  fight over small words, and I am happy to do that,
20  but if the truth is you negotiated over the cash
21  consideration as part of the deal, just tell me that,
22  we can move along.
23       So I'll do it in small bites.  Isn't it
24  true, Mr. Dickey, that early in your discussions or
25  communications with Mr. Hale his proposal to Cumulus

Page 119

1  was a swap involving TKE and PGG, in which the cash
2  to Hale and Star would be approximately 4.5 million
3  dollars?
4    A.  Yes.
5    Q.  Okay.  And isn't it true that subsequent
6  to Star and Hale communicating that proposal to
7  Cumulus, you on behalf of Cumulus suggested that you
8  would only be interested in paying at most 3 million
9  dollars in the transaction that involved WTKE and
10  PGG?
11    A.  Yes.
12    Q.  And subsequent to your advancing the 3
13  million dollar number, isn't it true that Mr. Hale on
14  behalf of Star came back and said that he would want
15  you to try to come up to 3.75 million dollars as the
16  cash component in the deal?
17    A.  I believe so.
18    Q.  Okay.  And subsequent to that, isn't it
19  true that after you did not respond to Mr. Hale on
20  the 3.75 million dollar number, he came back to you
21  and said he'd gone to his shareholders and convinced
22  them to accept 3.0 million in a deal that involved
23  both TKE and PGG?
24    A.  What's the first part of your question
25  again?

Page 120

1    Q.  Isn't it true that in the time period
2  after Mr. Hale had responded to your 3.0 million
3  dollar figure with a request to split the difference
4  at 3.75, he effectively bid against himself and came
5  back and said I have gone to my shareholders and
6  we'll actually take the 3 million you've offered?
7       MR. ROMAN:  Objection to the form of the
8  question.
9       THE WITNESS:  Yeah, I don't know whether
10  he – you make it sound like that was a final –
11       MR. O'SULLIVAN:  Let me rephrase, strike
12  the last question.
13       THE WITNESS:  That's just one element of
14  the deal.
15    Q.  (By Mr. O'Sullivan) I understand.  Isn't
16  it true, Mr. Dickey, that in the period after
17  Mr. Hale proposed that the parties split the
18  difference on the cash feature of the deal and get
19  3.75 million dollars to Star and Hale he came back to
20  you and said he discussed it with his shareholders
21  and that Star and Hale were willing to go forward in
22  a deal where the cash component would be at the 3.0
23  million dollar level you'd suggested?
24       MR. ROMAN:  Objection to the form of the
25  question.

Page 121

1       MR. O'SULLIVAN:  What's the objection?
2       MR. ROMAN:  It's compound.  It's also very
3  hard to follow.
4       MR. O'SULLIVAN:  I'll stand with the
5  question.
6    Q.  (By Mr. O'Sullivan) And you're a highly
7  experienced businessman, Mr. Dickey.  This process
8  we've just gone through where Mr. Hale starts out
9  with 4.5 million dollars, you respond at 3, he comes
10  back and tries to do 3.75 and you hold fast at 3 and
11  then he says 3, isn't that what people call
12  negotiation?
13    A.  It's semantics.  We can call it whatever
14  we want.
15    Q.  Are you willing to describe that process
16  as negotiation?
17    A.  I didn't deem myself to be negotiating.
18    Q.  What were you doing?
19    A.  I knew what – in my mind what the value
20  was worth and that's all I was prepared to pay.
21  That's not negotiating.  That implies a give and
22  take.
23    Q.  Does it?
24    A.  Like I said, it's semantics.
25    Q.  Well, I mean, what's the big mystery?

# Exhibit 4

.. Case No. 05-35012-WSS
For ID. __47__ In Evidence
Debtor __Star Broadcasting, Inc.__
This 3rd day of January, 2006
WILLIAM S. SHULMAN, BANKRUPTCY JUDGE

**Richard Denning**

-----Original Message-----
From: tkbrady@bellsouth.net [mailto:tkbrady@bellsouth.net]
Sent: Monday, June 20, 2005 6:48 PM
To: Paper, Lew
Subject: Re: Qantum Petition to Deny

Lew:

Here is my rewrite of the Background section
of your Opposition.

I have highlighted my revisions and comments in bold.

My intent was to keep the account accurate while reducing
the amount of new information you were providing Qantum.
My only concern with the attached is whether it might
be possible to reduce that disclosure further.

The FCC is not interested in when various discussions
took place. Qantum is very interested. They know that
logically we had to be discussing the transactions
before we entered into the agreements, but they have
no idea when those discussions took place or whether they
were before or after March 5th. We do not want to tell them that, as
having that fact might increase the chance they will file some action
against Star and/or Cumulus.

While Cumulus might get some mileage out of Section 3.3 vis-a-vis Star,
that representation is not going to
help Cumulus vis-a-vis Qantum, once Qantum learns that
Cumulus had as much information about that issue as
did Star (including copies of the Qantum APA, Pelkey's
breach letter and Star's response).

Thus, I think it is important to Cumulus as well as Star to avoid giving
aid to Qantum.

Paper, Lew wrote:
>
> Hi Tim.  I look forward to hearing from you after you have had a
> chance to talk with Ron about any disagreements with the factual
> recitations in the Cumulus opposition.
>

PLAINTIFF'S
EXHIBIT

127

--------------------------------------------------------
This e-mail message and any attached files are confidential and are intended solely for
the use of the addressee(s) named above. This communication may contain material protected
by attorney-client, work product, or other privileges. If you are not the intended
recipient or person responsible for delivering this confidential communication to the
intended recipient, you have received this communication in error, and any review, use,
dissemination, forwarding, printing, copying, or other distribution of this e-mail message
and any attached files is strictly prohibited. Dickstein Shapiro reserves the right to
monitor any communication that is created, received, or sent on its network.  If you have
received this confidential communication in error, please notify the sender immediately by
reply e-mail message and permanently delete the original message.

To reply to our email administrator directly, send an email to postmaster@dsmo.com

Dickstein Shapiro Morin & Oshinsky LLP
http://www.DicksteinShapiro.com
========================================================================================

## I. Background Facts

On August 27, 2003, Star entered into an Asset Purchase Agreement (the "Gulf Coast Agreement") with Gulf Coast Broadcasting, Inc. ("Gulf Coast") to acquire WPGG and WIJK(AM), both in Evergreen, Alabama, for $2,750,000. Section 10.1 of the Gulf Coast Agreement entitled each party to terminate the agreement if the closing had not occurred by August 27, 2004.



By early 2005, the Gulf Coast Agreement had not been consummated and was subject to termination by Gulf Coast. At that point, Star contacted Cumulus to determine whether Cumulus might be interested in acquiring WPGG from Star after if it was able to consummate the Gulf Coast Agreement. Those discussions included an inquiry whether Cumulus might loan money to Star to consummate its acquisition of WPGG.

**As the result of those discussions, Cumulus and Star on April 18, 2005, entered into an Asset Exchange Agreement (the "WPGG Agreement"), pursuant to which Cumulus agreed (1) to loan Star $1,500,000 to be used in the acquisition of WPGG by Star and (2) to acquire WPGG, subject to Commission approval, in exchange for WNCV and payment of $1,500,000.00.**

[Deleted first sentence]  Star had entered into a separate Asset Purchase Agreement (the "Qantum Agreement") on September 5, 2003 with Qantum Communications Corporation (Qantum's parent) with respect to the sale of WTKE, and that sale had been approved by the Commission. File No. BALH-20030922AFA. However, consummation of the Qantum Agreement was conditioned on consummation of a separate agreement which Star had with Capstar TX Limited Partnership ("Capstar") to acquire WTKE. File No. BALH-200212124ACX. The Capstar agreement, in turn, was conditioned on a simultaneous consummation of the sale of WQYZ(FM) in Ocean Springs, Mississippi, to Capstar. **The application for approval of the assignment of WQYZ to Capstar was embroiled in litigation before the Commission. File No. BRH-20040202AHI.** As a result of the foregoing daisy-chain sequence of applications, Qantum and Star were not in a position [deletion] to consummate the sale of WTKE to Qantum and, more importantly, there did not appear to be any specific date by which the Qantum Agreement could be consummated. [1]  **The Qantum Agreement provided that either party could terminate the Qantum Agreement after 18 months, if no closing has been consummated by that date, which date in this case fell on March 5, 2005.**



**In the course of its negotiations with Cumulus regarding the WPGG acquisition, Star related the foregoing facts concerning the WTKE transaction, as well as the fact that Star intended to terminate the Qantum Agreement.  Star gave written notice to Qantum of the termination of the Qantum Agreement on April 14, 2005.  Subsequently, on April 18, 2005, Star and Cumulus entered into an Asset Exchange Agreement (the "WTKE Agreement"), pursuant to which Cumulus agreed (1) to loan Star funds to close its acquisition of WTKE and (2) to acquire WTKE in exchange for WYZB and payment of $1,500,000.00.**

Section 3.3 of the WTKE Agreement includes a representation by Star to Cumulus that the execution, delivery and performance of the WTKE Agreement would not "conflict with or violate or result in any breach or any default under . . . any contract or any agreement to which [Star] is a party or by which it is bound or by which WTKE or any of the WTKE Assets may be affected (including but not limited to that certain Asset Purchase

Agreement (the 'Qantum Agreement'), dated as of September 5, 2003, by and among [Star], Ronald E. Hale, Sr., and Qantum Communications Corporation, which has been terminated) . . ." Cumulus relied on that representation in moving forward with the execution of the WTKE Agreement and the filing of the above-referenced Application to acquire WTKE.

**[OBVIOUSLY, WE WOULD PREFER YOU DELETE THE ABOVE PARAGRAPH, AS WE THINK IT IS IRRELEVANT IN THIS CONTEXT]**

In the meantime, Gulf Coast had filed a Petition for Rulemaking to change the community of license for WPGG from Evergreen Alabama, to Shalimar, Florida, which is in the Fort Walton Beach Arbitron Metro. Qantum filed comments in opposition to that proposed move. On March 25, 2005, the Media Bureau released a Report and Order granting Gulf Coast's petition and authorizing the relocation of WPGG from Evergreen, Alabama, to Shalimar, Florida. *Evergreen, Alabama, and Shalimar, Florida*, DA 05-763 (MB March 25, 2005) ("*WPGG Report and Order*"). On June 3, 2005, the Commission accepted Star's application for a construction permit to relocate WPGG from Evergreen, Alabama, to Shalimar, Florida. File No. BPH-20050513ACW.

That application has not been granted, the new facilities have not been constructed, and WPGG is not currently operating in Shalimar, Florida.

**[TO MAKE THIS COMPLETE YOU MIGHT ADD THAT QANTUM HAS FILED A PETITION FOR RECON.]**

# Exhibit 5

RECEIVED AS EXHIBIT NO.
Bank. Case No. 05-35012-WSS
For ID. ____18____ In Evidence
Debtor  Star Broadcasting, Inc.
This 3rd day of January, 2006
WILLIAM S. SHULMAN, BANKRUPTCY JUDGE

**Lew Dickey**

| | |
|---|---|
| From: | Ron Hale [ronhalesr@hotmail.com] |
| Sent: | Wednesday, October 13, 2004 3:02 PM |
| To: | Lew Dickey |
| Subject: | Ft. Walton Beach Swap |

Lew....The Stations are WTKE-FM 100kw at 500 Ft....WWRK-FM 25kw 92.1....and WPGG-FM 100kw now that moves to Ft. Walton Beach at 50kw....We would need to put 3Mil in the Bankruptcy by Friday this would keep WWRK-FM away from Qantum (Osborn)....for that you would receive WTKE-FM when the contract expires with Qantum and ...and Star would receive your 6kw.....WPGG-Fm could then be swapped for your 25kw with some cash....I would need to close WPGG qickly as well we are ready to close it now....In the end you would increase your cluster in Ft Walton Beach to (2) 100kw stations and (2) 50kw and prevent Qantum from becoming competetive...Star would then have 3 stations 2 25kws adn 1 6kw....Please get back with me soon...ronhalesr@hotmailm.com...

Express yourself instantly with MSN Messenger! Download today - it's FREE!
http://messenger.msn.click-url.com/go/onm00200471ave/direct/01/

1



RECEIVED AS EXHIBIT NO.
Bank. Case No. 05-35012-WSS
For ID. 19  In Evidence
Debtor Star Broadcasting, Inc.
This 3rd day of January, 2006
WILLIAM S. SHULMAN, BANKRUPTCY JUDGE

**Lew Dickey**

| | |
|---|---|
| From: | Ron Hale [ronhalesr@hotmail.com] |
| Sent: | Thursday, October 14, 2004 8:36 AM |
| To: | Lew Dickey |
| Subject: | WWRK-FM |

Lew....I couldn't tell if you got the E'mail yesterday....So I thought I would summarize...

#1. WWRK-FM was sold to Qantum (Osborn)...Qantum Breached the contract so we put WWRK 92 (Gulf Breeze Media) into Chapter 11....We had a contract for 3Mil as part of our reorganization from Carl Parmer (Media Partners) .... Qantum threatened litigation and the Buyer decided to get out...If We replace the 3Mil dollar contract with a Loan to distribute to the Creditors we can have the Qantum contract rejected... We could then do our original swap of WTKE-FM which is owned by Star Broadcasting whose contract for sale runs out on March 7th 2005....So Cumulus would provide 3Mil for the Bankruptcy and would receive WTKE-FM after the March 7th date when we would be able to complete the swap of your 6kw (100.3) and the 3Mil for WTKE-FM (100kw @ 98.1)....

#2 WPGG-FM is ready to close and we need to close it....We filed in August of 2003 to move it to Shalamar Fl...Part of the Ft. Walton Beach Market....It's time is running...the sale price is 2.75Mil and I inteded to use part of the Sale proceeds of WTKE-FM to pay it off...We can swap WPGG-FM for your 25kw (105.5) if you want but would need the money to close WPGG-FM now....WPGG becomes a 50kw at 500ft in FT. Walton Beach...These are great opportunities but I need to move quickly....Please Advise.....ronhalesr@hotmail.com

Express yourself instantly with MSN Messenger! Download today - it's FREE!
hthttp://messenger.msn.click-url.com/go/onm00200471ave/direct/01/

PLAINTIFF'S
EXHIBIT

# 57

1

RECEIVED AS EXHIBIT NO. _____
Bank. Case No. _05-35012-WSS_
For ID. ___20___ In Evidence
Debtor _Star Broadcasting, Inc._
This 3rd day of January, 2006
WILLIAM S. SHULMAN, BANKRUPTCY JUDGE

**Lew Dickey**

**From:**      Ron Hale [ronhalesr@hotmail.com]
**Sent:**      Friday, October 15, 2004 4:44 PM
**To:**        Lew Dickey
**Subject:**   WTKE-FM/WPGG-FM

Lew....We were at 2Mil in the swap for WTKE-FM in last years discussions and I couldn't get it closed on this end....so I think we should try to get into the 4.5 range for the two....2.5 for WTKE-FM and 2M for WPGG-FM....1.5Mil could be Cumulus Stock....I would need to move quickly on closing WPGG and could continue to run it until the commission lets us move it.... WTKE won't happen til spring....and Lew, thanks for the consideration....:Ron

FREE pop-up blocking with the new MSN Toolbar – get it now!
http://toolbar.msn.click-url.com/go/onm00200415ave/direct/01/

1

PLAINTIFF'S
EXHIBIT

#58

RECEIVED AS EXHIBIT NO.
Bank. Case No. 05-35012-WSS
For ID.    21    In Evidence
Debtor  Star Broadcasting, Inc.
This 3rd day of January, 2006
WILLIAM S. SHULMAN, BANKRUPTCY JUDGE

**Lew Dickey**

From:        Lew Dickey
Sent:        Monday, October 18, 2004 8:42 AM
To:          'Ron Hale'
Subject:     RE: WTKE/WPGG

Ron,

First, it sounds like we are apart on price. Assuming that we can agree on value, I would be interested in proceeding with WTKE once the Quantum APA expires. I'm not sure what you are proposing on WPGG. We cannot own it, but can only swap for it. I have heard conflicting accounts of it's proposed signal and need to clarify the coverage before proceeding. Please send the transmitter site, antenna height and ERP so I can diligence the signal.

Thanks,

Lew

-----Original Message-----
From: Ron Hale [mailto:ronhalesr@hotmail.com]
Sent: Monday, October 18, 2004 8:35 AM
To: Lew Dickey
Subject: WTKE/WPGG

Lew...There is no litigation on either the WTKE-FM contract or WPGG's....The litigation with Qantum is Specific Performance on NWRK-FM which I put into Chapter 11...Qantum will probably end up with WWRK, unless I come up with something.....What Qantum is doing is that they are trying to negeotiate on WPGG-FM since we have not been able to close due to Clear Channel's delays on closing WQYZ-FM (The Exchange Station in Ocean Springs), we need to come to an agreement and close WPGG quickly, or we could loose it.....I see our time frame as comming to an agreement quickly on WPGG-FM and closing under Star Broadcasting's contract using WPGG-FM as the collaterial for a Loan from Cumulus....WTKE-FM has a contract with Qantum that runs out March 7th
2005 which we think they have already breached....The best path for the two of us is to allow the time to run out and simply file a new contract at that time....Please Advise....Thanks....Ron Hale

Express yourself instantly with MSN Messenger! Download today - it's FREE!
http://messenger.msn.click-url.com/go/onm00200471ave/direct/01/

1

PLAINTIFF'S
EXHIBIT

#159

## Lew Dickey

**From:**      Ron Hale [ronhalesr@hotmail.com]
**Sent:**      Thursday, October 21, 2004 12:55 PM
**To:**        Lew Dickey
**Subject:**   WPGG

Lew...I had Vic Bosinger send to you the co-ordinates and center of radiation and spacing of WPGG-FM... have your guys had time to give it a look? and what did they  think about it? ...Please Advise....Ron

On the road to retirement? Check out MSN Life Events for advice on how to get there!
http://lifeevents.msn.com/category.aspx?cid=Retirement

1



## Lew Dickey

**From:** Ron Hale [ronhalesr@hotmail.com]
**Sent:** Tuesday, October 19, 2004 8:39 AM
**To:** Lew Dickey
**Subject:** WPGG-FM

Lew....I hope you received the E'mail from Vic Bosinger...If we want to do a swap on WPGG-FM for either your 6kw or your 25kw the deal will have to be done quickly or we will loose our opportunity....As you see we only have a 3.7k shortspacing that would only require a small reduction in power...it would still be one of the best signals in the market....Please Advise....Ron Hale

Express yourself instantly with MSN Messenger! Download today - it's FREE!
http://messenger.msn.click-url.com/go/onm00200471ave/direct/01/

1

**Lew Dickey**

| | |
|---|---|
| From: | Ron Hale [ronhalesr@hotmail.com] |
| Sent: | Monday, October 18, 2004 8:56 AM |
| To: | Lew Dickey |
| Subject: | RE: WTKE/WPGG |

Lew...I am confident we can find some agreement on Price....We have filed to move WPGG to Shaimar which is part of the Ft Walton beach Market...It will move on the newly constructed tower on Hollywood Blvd...it would have an identical signal at 50kw at 500ft as your station 99.5 WKSM...We were able to negeotiate with the tower owner for a Broad Band Antenna for both WPGG-FM and WTKE-FM....the proposal would be to swap either your 6kw or your 25kw for it....I will send you what ever you need, just let me know what that is...and do I send it by E'mail?....Thanks,...Ron

>From: "Lew Dickey" <lew.dickey@cumulus.com>
>To: "Ron Hale" <ronhalesr@hotmail.com>
>Subject: RE: WTKE/WPGG
>Date: Mon, 18 Oct 2004 08:42:12 -0400
>
>Ron,
>
>First, it sounds like we are apart on price.  Assuming that we can
>agree on value, I would be interested in proceeding with WTKE once the
>Quantum APA expires.  I'm not sure what you are proposing on WPGG.  We
>cannot own it, but can only swap for it.  I have heard conflicting
>accounts of it's proposed signal and need to clarify the coverage
>before proceeding.  Please send the transmitter site, antenna height
>and ERP so I can diligence the signal.
>
>Thanks,
>
>Lew
>
>-----Original Message-----
>From: Ron Hale [mailto:ronhalesr@hotmail.com]
>Sent: Monday, October 18, 2004 8:35 AM
>To: Lew Dickey
>Subject: WTKE/WPGG
>
>Lew...There is no litigation on either the WTKE-FM contract or
>WPGG's....The litigation with Qantum is Specific Performance on WWRK-FM
>which I put into Chapter 11...Qantum will probably end up with WWRK,
>unless I come up with something.....What Qantum is doing is that they
>are trying to negeotiate on WPGG-FM since we have not been able to
>close due to Clear Channel's delays on closing WQYZ-FM (The Exchange
>Station in Ocean Springs), we need to come to an agreement and close
>WPGG quickly, or we could loose it.....I see our time frame as comming
>to an agreement quickly on WPGG-FM and closing under Star
>Broadcasting's contract using WPGG-FM as the collaterial for a Loan
>from Cumulus....WTKE-FM has a contract with Qantum that runs out March
>7th
>2005 which we think they have already breached....The best path for the
>two of us is to allow the time to run out and simply file a new
>contract at that time.....Please Advise....Thanks....Ron Hale
>
>
>Express yourself instantly with MSN Messenger! Download today - it's FREE!
>http://messenger.msn.click-url.com/go/onm00200471ave/direct/01/
>
>

Get ready for school! Find articles, homework help and more in the Back to School Guide!

http://special.msn.com/network/04backtoschool.armx

## Lew Dickey

| | |
|---|---|
| **From:** | Ron Hale [ronhalesr@hotmail.com] |
| **Sent:** | Tuesday, October 26, 2004 5:44 PM |
| **To:** | Lew Dickey |
| **Subject:** | WTKE/WPGG |

Lew...I had Vic Bosiger to send to you an email outlinging the WPGG technical information....while there is a small reduction of power WPGG at 50kw at 500ft will be the fourth best signal behind WTKE and your Z96 and
99.5 WKSM and then WPGG...the rest of the market isn't even close....I have had meetings with all the shareholders and gotten them to agree to meet you half way on the price....Can you move up to 3.75M and Swap WTKE-FM (1.75Mil) and WPGG-FM(2Mil) for your 6KW and 25KW?....We will need to move quickly on WPGG-FM we already have consent to transfer...The best guess is that the Commission will act on the change of the Table of Allocation before the end of the year....A construction permit would be next about 60+ days....I have already worked out a new broad based antenna for WTKE and WPGG on the new 500ft tower on Hollywood included in thier leases and WTKE is already broadcasting on it....I think you might want to consider keeping WTKE's Sports format...it covers both markets and is extremely popular....Max Howell who I think worked for you in Atlanta is doing a morning Sports Show that is also on Cox Cable in Both Pensacola and Ft. Walton Beach....I think you might look at syndacation of the show since it is so popular among the male demo....You could probably make more money than you do on your AC format and be able to pick up the Pensacola market....without the power of WTKE I won't be able to cover Pensacola....Please Advise....Ron Hale

FREE pop-up blocking with the new MSN Toolbar - get it now!
http://toolbar.msn.click-url.com/go/onm00200415ave/direct/01/

1



PLAINTIFF'S EXHIBIT
#61

RECEIVED AS EXHIBIT NO.
Bank. Case No. 05-35012-WSS
For ID.    23    In Evidence
Debtor Star Broadcasting, Inc.
This 3rd day of January, 2006
WILLIAM S. SHULMAN, BANKRUPTCY JUDGE

**Lew Dickey**

| | |
|---|---|
| **From:** | Ron Hale [ronhalesr@hotmail.com] |
| **Sent:** | Thursday, October 28, 2004 4:46 PM |
| **To:** | Lew Dickey |
| **Subject:** | Running out of Time |

Lew...If you still have an interest in a swap for WPGG-FM for one of your low power
stations in Ft. Walton Beach we need to come to an agreement quickly....While I did exten
our Consent to Transfer at the Commission until December, I was notified today that I
needed to step forward with an agreement showing how we were going to be able to close
without waiting on the WTKE-FM deal to close, to hold off another possible LOI from
another buyer (I think Qantum)...I want to move forward with WPGG-FM swap if you do....Al
I need from you is an LOI so we can get the seller to understand when we might
close....Please Advise....Ron Hale...Phone 1-850-244-1400

On the road to retirement? Check out MSN Life Events for advice on how to get there!
http://lifeevents.msn.com/category.aspx?cid=Retirement

PLAINTIFF'S
EXHIBIT

#63

# Exhibit 6

IVED AS EXHIBIT NO.
Bank. Case No. 05-35012-WSS
For ID.   33   In Evidence
Debtor   Star Broadcasting, Inc.
This 3rd day of January, 2006
WILLIAM S. SHULMAN, BANKRUPTCY JUDGE

**Richard Denning**

| | |
|---|---|
| **From:** | Ron Hale [ronhalesr@hotmail.com] |
| **Sent:** | Tuesday, February 15, 2005 12:29 PM |
| **To:** | Richard Denning |
| **Subject:** | Overview with attachment |



Overview
Cumulus.doc (22 KE

    Richard...sorry I forgot the attachment...Take a look and call me...Thanks....Ron

PLAINTIFF'S
EXHIBIT

86

# Overview Ft. Walton Beach

The total price is 3Million for WPGG-FM and WTKE-FM and the swap of WNCV-FM and WYZB-FM in Ft. Walton Beach...Cumulus ends up with WTKE-FM a 100,000 Watt station in Ft. Walton Beach and WPGG-FM a 50,000 Watt station which, after the City of License change to Shalimar Fl. Will locate on the tower located at 122 Hollywood Blvd....Star ends up with WYZB-FM a 25KW station and WNCV-FM a 6KW station....

1. WPGG-FM needs to close as quickly as possible...Lee Hagan needs to satisfy the Bank to get Dick Shively's estate off the guarantee on the Note on that station and he needs some cash....If we don't move quickly he will sell to Qantum or the first comparable offer that gets him where he needs to be....Our strength is that Star has been approved and Star could close tomorrow if we can work out the money.....The Price is 2.75 Million....all cash.... even though he would accept $900,000.00 and hold some paper for a short period of time or would be open to accept some Cumulus stock....

2. WTKE-FM after the drop dead date of March 7th Star should be in a position to sell the station to Cumulus...Star has an obligation to pay at closing $650,000.00 cash and star would start paying on a $900,000.00 note to be paid to WQYZ owners...Star intends to use 2.75M of the 3Million paid by Cumulus to pay for WPGG-FM and the $250,000.00 left over to pay part of the $650,000.00 and work out with Cumulus the additional $400,000.00 needed by using WBAU an AM Star owns...

3. Clear Channel would like to close by eliminating the Exchange agreement and closing WTKE-FM before we close WQYZ-FM...If that occurred after the Qantum drop dead date it might be helpful to us in giving Qantum less of a legal position..The Qantum contract is 3.5Million, if, for some reason WTKE-FM could not be closed with Cumulus then Star would be willing to assign the appropriate amount to protect Cumulus....There is 2.85Million left of the purchase price after paying the $650,000.00 at closing for WQYZ-FM....

Definitions....

WQYZ-FM Ocean Springs, Ms. Is being purchased by Star Broadcasting to be used as the Exchange station for WTKE.....the Purchase Price 1.550 Million

WTKE-FM Holt, Fl. Is currently owned by Clear Channel but is being sold by Clear Channel to Star....(Exchange Agreement) and APA...

CUML-000500

Pg 2

WBAU-AM 1400...Can be used as collateral...it is owned by Star but hasn't been filed at the commission...

WZYB-FM is the Swap Station for WTKE-FM and is currently owned by Cumulus in Ft. Walton Beach....

WNCV-FM is the Swap Station for WPGG-FM and is currently owned by Cumulus in Ft. Walton Beach....

CUML-000501

**Richard Denning**

RECEIVED AS EXHIBIT NO.
Bank. Case No. 05-35012-WSS
For ID. 37 In Evidence
Debtor Star Broadcasting, Inc.
This 3rd day of January, 2006
WILLIAM S. SHULMAN, BANKRUPTCY JUDGE

| | |
|---|---|
| **From:** | tkbrady@bellsouth.net |
| **Sent:** | Wednesday, March 02, 2005 7:05 PM |
| **To:** | Richard Denning; Lew Dickey |
| **Cc:** | ronhalesr@hotmail.com |
| **Subject:** | Outline of Star/Cumulus Deal |



Outline_Cumulus_A
greement.rtf ...

Lew and Richard:

Attached is an outline of the proposed deal between Star and Cumulus as I understand it.

We need to make sure we are all on the same page so that Lew Paper and I will know what documents we need and when.

We have not resolved how the additional funds are to be handled. There was discussion of the assignment of WBAU-AM (1400 kHz) for the $400k needed by Star to complete closing on both deals.  I have determined that Star may well need an additional $200k to cover other expenses related to getting the deal done, including moving WPGG, paying certain adjustments on the Clear Channel LMA and related engineering and legal fees, including possible defense of legal action by Qantum.

These funds could either be rolled into a sale of the AM or handled as a loan. Unless Cumulus really wants the AM, however, it would probably work best to handle additional funds as a line of credit to be secured by the AM and the FMs, especially since Star may not need the full $200k.

Give Ron or me your comments on this as soon as possible as we need to get a clear road map in place that Lew Paper and I can work from.

-- Timothy K. Brady
770-252-2620

```
PLAINTIFF'S
EXHIBIT

98
```

A. __WPGG-FM Exchange Agreement between Cumulus and Star Broadcasting Inc.__

    1.  Cumulus will Pay $1.5M and WNCV-FM for WPGG.

    2.  The acquisition of WPGG by Star will be closed under Star Broadcasting's contract prior to termination of Star's agreement with Qantum.

    3.  Star will require $1.5 million loan to close WPGG.  Lee Hagan will carry the remaining $1.25 as a note from Star until closing of WTKE-FM.

    4.  Star will provide Cumulus with a first position in WPGG to secure the loan and a second position in the same assets to Lee Hagan to secure his note.

    5.  The closing of the Exchange Agreement with Cumulus will be contingent upon WPGG be reallocated as proposed to Shalimar, FL and the filing of an application for license for the station at the new site.

    6.  Upon closing of the Exchange Agreement between Star and Cumulus, the loan will be forgiven in lieu of the payment of $1.5M.

B. __WTKE-FM Exchange Agreement between Cumulus and Star Broadcasting Inc.__

    1.  Cumulus will Pay $1.5M and WYZB-FM for WTKE-FM...

    2.  Under the current closing scenario, Star will require a total of  $650,000.00 to close the acquisition of  WTKE-FM by Star, the balance of $900,000.00 being represented by a note from Star to the current licensee. It is anticipated that Star will close simultaneously with Cumulus.

    3.  Alternatively, there could be an early closing on Star's acquisition of WTKE-FM in which case Star may be required to place the $650,000.00 cash portion of the consideration in escrow.

C. __Additional Funds Needed__.

    1.  Star will require an additional $400,000.00 at the time of the closing of WTKE beyond the consideration paid for WPGG and WTKE to complete its obligations with respect to discharging the note to Lee Hagen.

    2.  Starr will also require additional funds to relocate WPGG, for adjustments relating to the Clear Channel LMA and for other engineering and legal fees, including possible defense of legal action by Qantum.  Star estimates the additional funds needed at approximately $ 200,000.00.

3.  The funding can be in the form of a $600,000.00 line of credit secured by WBAU-AM (1400 kHz) and the FM stations (although a first position in one of the FM's will have to be given to the holder of the WTKE note) or in the form of a purchase of WBAU-AM with a repurchase option on the part of Star to be exercised as soon as Star can secure alternate financing.

D.  Other Considerations.

Star will need the proceeds of the loan to close on WPGG by March 8, 2005, so it can close that transaction before terminating its agreement with Qantum.

The WTKE Exchange Agreement needs to be signed and ready to file with the FCC along with FCC Form 314 on or as soon as possible after March 8, 2005 to serve as a deterrent to any inclination Qantum may have to fight the termination of their purchase agreement for WTKE.

# Exhibit 8

R   VED AS EXHIBIT NO.
Ba   . Case No. 05-35012-WSS
For ID.   39   In Evidence
Debtor  Star Broadcasting, Inc.
This 3rd day of January, 2006
WILLIAM S. SHULMAN, BANKRUPTCY JUDGE



**Richard Denning**

| | |
|---|---|
| **From:** | Richard Denning |
| **Sent:** | Monday, March 07, 2005 6:08 PM |
| **To:** | 'Ron Hale'; 'tkbrady@bellsouth.net' |
| **Cc:** | 'Paper, Lew'; Lew Dickey |
| **Subject:** | RE: Contracts |

Star-Cumulus
Termsheet v.3.rtf...

Ron:  Here is the term sheet I drafted last week.  Lew has not had a chance to review
this, so I have to reserve on his comments.

I think the most significant change is the need to better collateralize the loans.  Also,
I don't think that the PGG purchase should be linked to TKE.

Thanks, Richard.

-----Original Message-----
From: Ron Hale [mailto:ronhalesr@hotmail.com]
Sent: Monday, March 07, 2005 3:08 PM
To: Lew Dickey; Lew Dickey; Richard Denning
Subject: Contracts

Lew...Today is the 7th and the date we have been waiting for....I sent Richard an e'mail
and we're waiting on contracts....His reply last friday about some elements of the
Overview prepaired by Tim Brady  puzzled me...he said some of the elements were new and I
don't know if he wasn't in on all of our conversations...Please call so we can get
moving....Ron



PLAINTIFF'S
EXHIBIT

105

A.  **WPGG-FM Exchange Agreement between Cumulus Broadcasting LLC ("Cumulus")
and Star Broadcasting Inc. ("Star")**

1.  Cumulus will negotiate the terms and conditions of an Exchange Agreement
whereby at the closing of the transaction Cumulus will pay Star $1.5M and deliver to Star
WNCV-FM; in exchange, Star will simultaneously deliver to Cumulus WPGG at the
closing.

2.  Star intends to terminate the Quantum Agreement immediately following the
execution of the TKE/WNCV exchange agreement.

3.  Star will require $900,000 loan from Cumulus to close WPGG.  Lee Hagan
will carry the remaining $1.85 Million as a note from Star until closing of the PGG
exchange with Cumulus.  The Cumulus note shall bear an interest rate of prime and shall
have a maturity date of one (1) year.

4.  Star will provide Cumulus with a first position in WPGG, TKE, WIJK, WFXX
and WBAU-AM to secure the loan.  The loan will also be personally guaranteed by Ron
Hale, Jr.  The owners of Star will also pledge their ownership interests in Star, which
shall be a first position security in such interests.

5.  Among other things, the closing of the Exchange Agreement with Cumulus
will be contingent upon WPGG being reallocated as proposed to Shalimar, FL and the
filing of an application for license for the station at the new site.  The costs of building
out the CP and the move to the new site will be borne solely by Star.  At the time of
closing there shall be no breach of the lease for the new site by Star.  The closing of this
transaction will occur soon after final FCC approval is obtained for the purchase (or
earlier if finality is waived by Cumulus), provided the conditions to closing are met.

6.  Upon closing of the Exchange Agreement between Star and Cumulus, the loan
will be forgiven and Cumulus will pay to Star an additional $600,000.

B.  **WTKE-FM Exchange Agreement between Cumulus and Star**

1.  Cumulus will negotiate the terms and conditions of an Exchange Agreement
whereby at the closing of the transaction Cumulus will pay Star $1.5M and deliver to Star
WYZB-FM; in exchange, Star will simultaneously deliver to Cumulus WTKE-FM at the
closing.

2.        Star will require a total of $650,000.00 to close the acquisition of WTKE-
FM by Star, the balance of $900,000.00 being represented by a note from Star to the
current licensee, D. Sanford.  Star will immediately close on WTKE, in which case Star
will place the $650,000.00 cash portion of the consideration of the station in escrow.

CUML-000653

4.      If Quantum sues under its existing agreement to purchase WTKE, Cumulus will have the option of terminating the Exchange Agreement.

5.      Star will require a $650,000 loan from Cumulus to close WTKE, consisting of $262,800 to be paid to Rainey and $387,200 to be paid to the owners of WTKE. D. Sanford, the current licensee of WTKE, will carry the remaining $900,000 of the purchase price as a note from Star until closing of the WTKE exchange with Cumulus. The Cumulus note shall bear an interest rate of prime and shall have a maturity date of one (1) year.

6. Star will provide Cumulus with a first position in WTKE, WPGG, WIJK, WFXX and WBAU-AM, subject only to D. Sanford's lien on the WTKE assets, to secure the Cumulus note. The loan will also be personally guaranteed by Ron Hale, Jr. The owners of Star will also pledge their ownership interests in Star, which shall be a first position security on such interests.

7. Among other things, the closing of the Exchange Agreement with Cumulus will be contingent upon there being no breach of the lease for the TKE tower site in Ft. Walton beach noticed. The closing of this transaction will occur soon after final FCC approval is obtained for the purchase, or earlier if finality is waived by Cumulus) provided that the conditions to closing are met.

8. Upon closing of the Exchange Agreement between Star and Cumulus, the loan will be forgiven and Cumulus will pay to Star an additional $850,000.

C. Additional Funds Needed.

1. Star will require an additional $400,000.00 at the time of the closing of WTKE beyond the consideration paid for WPGG and WTKE to complete its obligations with respect to discharging the note to Lee Hagen. Cumulus will loan the $400,000 with the Cumulus note bearing an interest rate of prime and shall have a maturity date of one (1) year. Star will provide Cumulus with a first position in WTKE, WPGG, WIJK, WFXX and WBAU-AM subject only to D. Sanford's lien on the WTKE assets, to secure the Cumulus note. The loan will also be personally guaranteed by Ron Hale, Jr. The owners of Star will also pledge their ownership interests in Star, which shall be a first position security in such interests. Star will be obligated to close on WBAU-AM immediately after FCC approval of the transaction. Star will also grant Cumulus an option to purchase WBAU-AM for $400,000.

2. [Additional $200,000 requires more discussion.]

# Exhibit 10

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

IN RE:                                          *

STAR BROADCASTING, INC.,                        *

     Debtor.                                  *                    Case Number 05-35012-11

                                 *

## ORDER ON QANTUM COMMUNICATION'S MOTION FOR RELIEF FROM AUTOMATIC STAY AND MOTION TO DISMISS

     David E. Bailey, Jr., Counsel for the Debtor
     Yancey Langston, Counsel for Qantum Communications Corporation
     John F. O'Sullivan, Counsel for Qantum Communications Corporation
     Henry A. Callaway and Louis C. Norvell, Counsel for Gulf Coast Broadcasting
     John Lucian, U.S. Trustee

     This matter came on for hearing on Qantum Communication Corporation's motion for relief from automatic stay and motion to dismiss the Debtor's case. Appearances were as noted in the record. The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Order of Reference of the District Court. This matter is a core proceeding pursuant to 28 U.S.C. §157(b)(2). After due consideration of the pleadings, briefs, evidence, testimony and arguments of counsel, the Court makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

     The Debtor-in-possession, Star Broadcasting Inc. ("Star Broadcasting" or "Debtor"), owns and operates commercial radio stations in Florida and Alabama. Ronald E. Hale, Sr. ("Hale") is the General Manager of Star Broadcasting. Hale's wife and children own the company; however, Hale is in charge of the day-to-day operations and handles all business transactions related to Star Broadcasting. The Hales also own Gulf Breeze Media, Inc. ("Gulf

Breeze") which owned and operated another radio station; Hale also served as the General

Manager of Gulf Breeze. Hale has worked in the commercial radio industry since 1984, and has

considerable experience with brokering deals to acquire and sell radio stations and their holdings.

In 2003, Hale began negotiating the sale of two radio stations to Qantum

Communications Corporation ("Qantum"): WTKE, to be acquired by Star Broadcasting, and

WMMK, from Gulf Breeze. The two stations were a "strategically essential part of [Qantum's]

business plan to enter the Ft. Walton Beach market." Movant's Ex. 8, p. 2. On or about

September 5, 2003, Qantum and Star Broadcasting signed an Asset Purchase Agreement ("the

APA") for Qantum to purchase WTKE and its holdings for $3 million. At approximately the

same time, Qantum signed a purchase agreement to buy WMMK from Gulf Breeze. Star

Broadcasting did not own WTKE at the time of the APA, but was trying to obtain it through a

station swap with Clear Channel Communications, Inc. ("Clear Channel"), which required FCC

approval. At the time of the APA with Qantum, there was some concern that the station swap

between Star Broadcasting and Clear Channel would not be approved by the FCC.

The APA provided that either party could terminate the agreement with written notice

starting eighteen months from the date of execution, i.e., by March 5, 2005. However, the party

seeking to terminate the agreement must not be in breach when the termination notice is sent.

See Movant's Exhibit 1, Section 17.1(g). The APA also contained a provision that prevented Star

Broadcasting from attempting to sell WTKE to any other entity or encumber the station and/or its

assets during the term of the agreement. See Movant's Exhibit 1, Section 8.9.

The evidence shows that Hale began negotiating with Lewis Dickey ("Dickey"), CEO of

Cumulus Licensing L.L.C. ("Cumulus"), for the sale of WTKE in a series of e-mails dating from

2

October 14, 2004. See Movant's Exhibits 18-23. Hale offered to sell WTKE to Cumulus after

the APA with Qantum terminated on March 5, 2005. "Cumulus would provide 3Mil for the

Bankruptcy and would receive WTKE-FM after the March 7th date". Movant's Exhibit 19; see

also Movant's Exhibit 18. Dickey expressed interest in WTKE, but did not want to pay $3

million and wanted to know about the "Qantum litigation". Movant's Exhibit 21. Hale sent

copies of the APA between Star Broadcasting and Qantum to Dickey to be reviewed by

Cumulus's general counsel. Movant's Exhibits 24-26. Over the following months, Hale worked

with Dickey and his attorneys to execute a contract for Cumulus to acquire WTKE. The e-mails

between the various parties contain references to the Star Broadcasting/Qantum APA and how to

avoid completing the deal with Qantum. See Movant's Exhibits 21, 23, 28, 30, 33, 36 and 44.

Star Broadcasting issued a notice of termination to Qantum on April 14, 2005, and entered into a

contract to transfer WTKE to Cumulus on April 18, 2005. Movant's Exhibit 11. Cumulus

loaned Star Broadcasting the funds to purchase WTKE, and was given a lien on the WTKE

assets. Qantum issued two notices of breach to Star Broadcasting outlining breaches of the

original APA in January and May 2005.

    In addition to the violation of the non-solicitation provision, Qantum alleges that Star

Broadcasting also breached the APA by failing to provide a Local Marketing Agreement

("LMA") as required by Section 4.2. An e-mail dated December 16, 2004 from Hale to Richard

Denning, Cumulus's general counsel, states:

> [W]e've been looking at several sections of the Qantum/Star contract that bother
> us . . . . Section 4.1, 4.2 and 17.1 Termination says that we would need to give
> them an LMA or be in breach if they buy WWRK (WMMK) so what can we do to
> not LMA it or have you come up with a way for Lew [Dickey of Cumulus] to
> slide into our position . . . . so how can we get around that . . . . I wonder if we

need to blow up the WWRK deal by putting it into Chapter 7 . . . .

Movant's Exhibit 27.

According to Qantum, Star Broadcasting also failed to negotiate in good faith for an option for Qantum to purchase a tower under Section 1.3 of the APA. Hale's wife owned a 50% interest in the tower at the time that the APA was signed. The other 50% owner wanted to sell his interest; he sold the 50% interest to a third party. Subsequently, Hale's wife sold her 50% interest to the same third party, without attempting to obtain an option for Qantum to buy the tower.

On July 1, 2005, Qantum filed an action against Star Broadcasting in the United States District Court in Miami, Florida, (Case No. 05-21772) asking for declaratory relief, an injunction against Star Broadcasting transferring WTKE and its assets to Cumulus and specific performance under the APA.  In preparation for the injunction hearing, Qantum deposed Hale, who testified that he had not negotiated with Cumulus for the sale of WTKE prior to March 5, 2005. Movant's Exhibit 3, pp. 55, 78-80. In contrast, Lewis Dickey of Cumulus testified during his deposition that he began talking with Hale about acquiring WTKE in October 2004. Movant's Exhibit 4, pp. 21-22. The e-mails between Hale and Dickey mentioned above also came to light during this phase of the litigation.

After a hearing on Qantum's motion for temporary restraining order and preliminary injunction, the district court found that Qantum was likely to succeed on the merits of its claim that Star Broadcasting and Hale were in breach of the APA and that Star Broadcasting's attempt to terminate the APA was invalid due to the breach. The court also found that Qantum was likely to succeed in proving that Star Broadcasting and Hale breached the non-solicitation provision

4

under Section 8.9 of the APA.  Movant's Exhibit 8.  The court then set discovery deadlines and a trial date in early February 2006.

Star Broadcasting appealed the decision to the Eleventh Circuit Court of Appeals. Shortly after the appeal, counsel for Star Broadcasting, the law firm of Zuckerman Spaeder, moved to withdraw from the case.  The court granted the motion and gave Star Broadcasting until November 11, 2005 to find replacement counsel.  Star Broadcasting's appeal was also in danger of being dismissed because an initial brief had not been filed.  Star Broadcasting filed its chapter 11 bankruptcy on November 10, 2005.

Star Broadcasting's summary of schedules lists $9.9 million in assets and $4.8 million in debt.  The company has six unsecured creditors with claims of $356,968.18 of which Zuckerman-Spaeder is listed as being owed the disputed amount of approximately $236,000.  At Star Broadcasting's §341 meeting on December 22, 2005, Hale, as the representative of Star Broadcasting, was asked why the company filed a chapter 11 petition.  Counsel for Star Broadcasting answered that the November 11, 2005 deadline for finding new counsel for the district court action "was the basis for filing and the timing", and Hale agreed with this statement.  Movant's Exhibit 53, p. 51.  When asked by the U.S. Trustee if there were other reasons for the filing, "other than this contractual dispute", Hale replied, "Absolutely not." Movant's Exhibit 53, p. 51.  Star Broadcasting filed a motion to reject the APA with Qantum on November 30, 2005.

Star Broadcasting is not the first company managed by Hale to file a chapter 11 petition. As noted above, Gulf Breeze Media also entered an agreement with Qantum to sell the radio station, WMMK, in 2003.  When a dispute arose over Gulf Breeze Media's obligations under the

5

contract, Qantum filed an action against Gulf Breeze for specific performance. On May 7, 2004, Gulf Breeze filed a chapter 11 petition in this court, Case Number 04-31172, and sought to reject the Qantum contract. Gulf Breeze solicited another offer to buy WMMK and signed a contract to sell the station as part of its initial chapter 11 plan. Qantum objected to the second offer, and eventually the new buyer withdrew it. Gulf Breeze then amended its chapter 11 plan and assumed Qantum's contract to purchase WMMK.

Star Broadcasting maintains that the negotiations with Cumulus were a back-up agreement in case the Qantum deal did not work out. To get WTKE, Star Broadcasting had to buy WQYZ in Ocean Springs, Mississippi and exchange it for WTKE. Both acquisitions were subject to FCC approval. A Clear Channel competitor in Ocean Springs contested the WQYZ deal; therefore, FCC approval was suspended until the dispute was settled. Hale testified that he knew early on that the Qantum deal could not be completed by the March 5, 2005 deadline because the WQYZ deal would not be approved by the FCC. Qantum produced a February 15, 2005 e-mail from Hale to Richard Denning, Cumulus's general counsel, that indicated "Clear Channel would like to close by eliminating the Exchange agreement and closing WTKE-FM before we close WQYZ-FM ... If that occurred after the Qantum drop dead date it might be helpful to us in giving Qantum less of a legal position ..." Movant's Exhibit 33, p. 2. At the trial of this matter, Hale testified that he did not know about the non-solicitation provision in the APA, until Qantum sent the May 2005 letter notifying Star Broadcasting that they had breached the section.

Hale also stated that Star Broadcasting could not fulfill its obligations under the Qantum APA because Star Broadcasting did not get all of the assets it expected to get from Clear

Channel.  The asset value of the deal was reduced by approximately $455,000.  Qantum maintains that Star Broadcasting did not get all of the assets from the Clear Channel deal because Star Broadcasting withheld funds due under the Local Market Agreement with Clear Channel, and had to agree to pay back the funds at closing by taking less than all of the WTKE assets.

Star Broadcasting also alleges that Qantum breached the APA by failing to give notice that a $150,000 deposit, due when the APA was signed, had been paid.  However, Star Broadcasting never raised the issue prior to the hearing on this matter.  Qantum produced an e-mail form the escrow agent to Hale informing him that the money had been received.  Movant's Exhibit 54.


## CONCLUSIONS OF LAW

Qantum argues that this Chapter 11 petition should be dismissed as a bad faith filing.  Alternatively, Qantum filed a motion for relief from the automatic stay seeking an order terminating the automatic stay to permit Qantum to complete the pending litigation in the United States District Court and the Eleventh Circuit Court of Appeals.  The motion for relief from the automatic stay is premised on the allegation that the Chapter 11 case was filed in bad faith and that Qantum lacks adequate protection.

11 U.S.C. § 1112(b) provides authority to dismiss a case for cause.  It provides in part that:

> (b)(1) Except as provided in paragraph (2) of this subsection, subsection (c) of this section, and section 1104(a)(3), on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court

> shall convert a case under this chapter to a case under chapter 7 or dismiss
> a case under this chapter, whichever is in the best interests of creditors and
> the estate, if the movant establishes cause.

11 U.S.C. § 1112(b)(1) (2005).

Section 1112(b)(4) of the Code contains a list of non-exclusive grounds for dismissal.

The list is not exhaustive and the Eleventh Circuit has held that "a debtor's lack of 'good faith'

may constitute cause for dismissal of a petition." *Albany Partners, Ltd. v. Westbrook (In re*

*Albany Partners, Ltd.*), 749 F.2d 670, 674 (11th Cir. 1984); *In re Natural Land Corp.*, 825 F.2d

296 (11th Cir. 1987).

The automatic stay may be terminated for "cause" pursuant to §362(d)(1) of the

Bankruptcy Code.  It provides that:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant
> relief from the stay provided under subsection (a) of this section, such as by terminating,
> annulling, modifying, or conditioning such stay-
>> (1) for cause, including the lack of adequate protection of an interest in
>> property of such party in interest.  11 U.S.C. §362(d)(1).

"Further, a petition filed in bad faith also justifies relief from a stay." *In re Dixie*

*Broadcasting Inc.*, 871 F.2d 1023, 1026 (11th Cir. 1989),  citing  *In re Natural Land Corp.*, 825

F.2d 296 (11th Cir. 1987). *Dixie Broadcasting Inc.* is very similar to the facts in the instant case.

In *Dixie*, the Debtor entered into an agreement to sell a radio station.  Despite signing a purchase

and sale agreement, the Debtor continued to entertain other offers to purchase the station.  When

another corporation offered to buy the station for a higher price, the Debtor refused to

consummate the sale.  The Debtor granted a lien on its assets and agreed that it would not

transfer the assets without approval of the lienholder.  The purchaser then sued the Debtor in

state court for specific performance.  The court stated that "[a]lthough there is no precise test for

8

determining bad faith, courts have recognized factors which show an 'intent to abuse the judicial process and the purposes of the reorganization provisions'." *Dixie,* 871 F.2d at 1027; quoting *Natural Land,* 825 F.2d at 298; *see In re The Bal Harbour Club, Inc.,* 316 F.3d 1192, 1194 (11th Cir. 2003); *In re Moog,* 159 B.R. 357, 360 (Bankr. S.D. Fla. 1993). The court went on to list those factors which include the timing of the filing of the petition, whether the debtor is financially distressed, whether the petition was filed strictly to circumvent pending litigation, and whether the petition was filed solely to reject an unprofitable contract. *Dixie Broadcasting Inc.,* 871 F.2d at 1027.

Applying the law to the facts here, the actions of the Debtor demonstrate bad faith. This Chapter 11 is Mr. Hale's second attempt to avoid selling a radio station to Qantum. The first attempt was the Gulf Breeze Media, Inc. Chapter 11, in which the Debtor sought to reject the contract to sell the station to Qantum in order to make more profit by selling the station to another purchaser. After much litigation, Gulf Breeze eventually sold the station to Qantum through a confirmed plan. Now Mr. Hale has placed Star Broadcasting into a Chapter 11 with the same idea of rejecting the contract with Qantum in order to sell to another purchaser for more money. The petition in this case was filed merely as a litigation tactic after the United States District Court in Miami, Florida entered an order and a preliminary injunction in favor of Qantum and against Star Broadcasting. Star Broadcasting appealed the decision to the Eleventh Circuit Court of Appeals and was in danger of the appeal being dismissed because of failure to file its initial brief due to the withdrawal of its law firm, Zuckerman, Spaeder. The Debtor was faced with a February 2006 trial date in the United States District Court and was under an order to find new counsel. Instead, Star Broadcasting filed its petition in bankruptcy.

9

In the district court action, considerable discovery was taken in the form of depositions and production of voluminous documents. The district court held a hearing on the temporary restraining order and preliminary injunction and entered an order concluding that Qantum was likely to succeed on the merits of its claim, that the Debtor and Hale were in breach of the agreement and that the attempted termination of the asset purchase agreement by Hale was invalid. The district court also concluded that the evidence produced by both parties including the depositions of Hale and Dickey showed that Qantum was likely to succeed in proving that the Debtor and Hale breached Section 8.9 of the APA by soliciting Cumulus since October 2004.

The evidence in the instant case reveals that Mr. Hale swore falsely in the district court action. In his deposition in the district court litigation, Hale testified there had been no negotiations with Cumulus prior to March 2005. Qantum later discovered documentary evidence and testimony from Mr. Dickey, CEO of Cumulus, that directly contradicted Hale's testimony under oath and revealed that negotiations had been ongoing for months prior to the date Hale gave.

During the hearing on the motions to dismiss and for relief from the stay, Hale testified that Qantum had not paid an escrow deposit of $150,000 under Section 3.2 of the APA dealing with the purchase price. Approximately one week before the bankruptcy hearing was the first time the issue was raised, implying that Qantum was in default of the APA by failing to post the escrow money as part of the purchase price. The facts showed that the escrow had been paid and that Hale had been notified of payments in September 2003. Such posturing by the witness indicated a very selective memory on an issue he raised as a defense to the motions to dismiss and relief from the stay. This Court has observed Hale as a witness and his demeanor on the

10

stand and concludes that his responses to certain questions have been evasive, contradictory and not credible. In particular, his testimony regarding the breach of the non-solicitation provision under Section 8.9 of the APA is contradicted by the overwhelming weight of the evidence. This lack of credibility is further compounded by the testimony of Timothy Brady, a communications attorney who acted as the FCC attorney for Star Broadcasting. He worked on the deal to sell the WTKE station to Cumulus and to obtain the FCC approval to change the broadcasting license in October 2004. He maintained that he did not discover the non-solicitation provision of the APA (Section 8.9) until early March 2005, when he received a letter. Brady testified that he reviewed only parts of the APA and did not read Section 8.9, although he reviewed Section 8.10 of the APA, which is juxtaposed 1¾ inches below the bold print of Section 8.9 "Non-Solicitation" on the same page. The evidence indicates that not only Hale was aware of the non-solicitation provision, but Mr. Brady was also aware, and that Star Broadcasting was making a clear effort to sell the WTKE station despite the contractual provisions to the contrary.

If Star Broadcasting was in breach of the APA, then it was not in a position to terminate the APA under the terms of the agreement. This inconvenience did not deter the Debtor from negotiating a more profitable deal with Cumulus, which prompted the district court litigation. Other breaches are alleged to have occurred , such as regarding the LMA (local marketing agreement),  the option to purchase a tower, and placing a lien on its assets, but for purposes of this decision, the Court does not have to reach the ultimate issue of whether the breaches occurred.

The evidence shows that prior to the district court litigation, Star Broadcasting and Hale carefully crafted a scheme to hide information from Qantum regarding contractual breaches. The

11

emails show a concerted effort to make sure the Qantum contract would not be consummated which would enable Star Broadcasting and Hale to enter into a more profitable deal with Cumulus.

The Debtor's strategy in this case was simple. The Debtor would file its motion to reject the contract, halt the district court litigation and the Eleventh Circuit appeal by virtue of the automatic stay and seek to have the bankruptcy court ultimately approve this through a plan of reorganization. At the first meeting of creditors the Debtor clearly stated that the sole reason for filing a Chapter 11 was to avoid the contract. From the Debtor's schedules, it appears that it has over $9.9 million in assets with existing liabilities of $4.8 million. The Court concludes that based on the timing of the filing of the petition, the Debtor's own schedules showing an equity position of over $5 million in assets over liabilities, the attempt to circumvent pending litigation and the attempt to reject what the Debtor perceived as an unprofitable contract constitutes bad faith in this case and that "cause" exists under §362(d)(1) to lift the automatic stay.

In this case, certain creditors of the Debtor have requested that the Court deny Qantum's motion to dismiss and motion for relief from the automatic stay. The Court notes that the Debtor does have assets in addition to those that were sold under the WTKE sale, and if the case were dismissed, creditors other than Qantum may incur even greater losses.

With respect to the motion for relief from the automatic stay, the Court must not only consider "cause", but determine whether Qantum has any adequate protection of its interest in property. 11 U.S.C. §362d(1). Qantum has an interest in property of the bankruptcy estate because of its right to buy the WTKE radio station assets under the APA. The district court pointed out in pages 6 and 7 of its order that in the APA, both parties agreed to a provision in the

12

agreement that the WTKE assets "are unique and cannot be readily obtained in the open market."

Therefore, the district court concluded that Qantum was entitled to the injunction to stop the sale

to another party.

WTKE is a unique property due to its relative position in the local and national markets,

its location, its licensing and frequency, its assets and its strategic importance in Qantum's

overall business plan.  Section 17.4 of the WTKE purchase agreement which was referred to by

the district court states:

> [Star Broadcasting] and [Hale] each agrees that [WTKE] is unique and cannot be readily
> obtained on the open market and that [Qantum] will be irreparably injured if this
> Agreement is not specifically enforced.  Therefore, in the event that [Qantum] institutes
> any action specifically to enforce [Star Broadcasting] and [Hale's] performance under this
> Agreement, [Star Broadcasting] and [Hale] each agrees to waive the defense that
> [Qantum] has an adequate remedy at law and to interpose no opposition, legal or
> otherwise, as to the propriety of specific performance as a remedy.

Qantum's arrangement with the Debtor and Gulf Breeze Media, Inc., both owned by

Hale's wife and children, and both managed by Hale, was a package deal to acquire two Fort

Walton Beach radio stations.  The two agreements signed on September 5, 2003 were intended to

confer upon Qantum the economic benefits of two additional stations in the Fort Walton Beach

Market and also to enhance the value of Qantum's existing stations in that market.  Qantum

obtained the radio station from Gulf Breeze Media only after much litigation in the Gulf Breeze

Chapter 11.  Qantum maintains that it is operating under a business plan that depends in part on

the acquisition of the WTKE assets, especially after having consummated the associated

acquisition in the same market of the Gulf Breeze station.

Just as in the *Dixie* case where the court stated "the Bankruptcy Court found that

WBHP's (the buyers) interest was inadequately protected given the unique character of an FCC

13

license...",  Qantum's interest as a buyer of the assets including an FCC license cannot be

adequately protected unless it is allowed to proceed with the district court litigation and seek

specific performance.  This Court finds that there is a lack of adequate protection under

§362(d)(1).  The district judge is well equipped to dispose of the litigation since he has already

had one hearing, has scheduled the matter for a final hearing in February 2006 and is familiar

with the facts of the case and the evidence.  Therefore, this Court concludes that the motion for

relief from the automatic stay is due to be granted.  The Court finds that Qantum cannot be

furnished adequate protection and that cause exists due to the bad faith filing of the Debtor.  The

Court further finds that because the Debtor has substantial assets other than those involved in the

district court litigation, it is not in the best interests of the creditors and the estate to dismiss the

case at this time.   It is hereby

ORDERED that Qantum's motion for relief from the automatic stay is GRANTED, and

Qantum may complete the litigation in the United States District Court for the Southern District

of Florida and the pending appeal in the Eleventh Circuit Court of Appeals; and it is further

ORDERED that this order shall be effective immediately upon entry pursuant to

Bankruptcy Rule 4001(a)(3) and the stay shall remain terminated in the event the case is

converted to another Chapter under Title 11 of the United States Code or if the case is

subsequently dismissed and re-filed; and it is further

ORDERED that Qantum's motion to dismiss the case is DENIED.

Dated:    January 20, 2006

WILLIAM S. SHULMAN
U.S. BANKRUPTCY JUDGE

14

# Exhibit 11

Bar   Case No. 05-35012-WSS
For ID.   27   In Evidence
Debtor  Star Broadcasting, Inc.
This 3rd day of January, 2006
WILLIAM S. SHULMAN, BANKRUPTCY JUDGE

**ichard Denning**

| | |
|---|---|
| **rom:** | Richard Denning |
| **Sent:** | Thursday, December 23, 2004 11:59 AM |
| **To:** | 'Ron Hale' |
| **Subject:** | RE: Sections to look at... |

Ron:  Lew asked me to touch base with you before the holiday.  We are still parsing through the information you sent --  the end of the year crunch has overtaken us!  Perhaps we can have a call early next week if you are available.  Let me know what your schedule looks like.

Have a great holiday.

Best regards, Richard.

-----Original Message-----
From: Ron Hale [mailto:ronhalesr@hotmail.com]
Sent: Thursday, December 16, 2004 5:04 PM
To: Richard Denning
Subject: Sections to look at...

Richard...we've been looking at several sections of the Qantum/Star contract that bother us....Section 4.1, 4.2 and 17.1 Termination  says that we would need to give them an LMA or be in breach if they buy WWRK (WMMK) so what can we do to not LMA it or have you come up with a way for Lew to slide into our position....so how can we get arround that....I wonder if we need to blow up the WWRK deal by putting it into Chapter 7....David Bailey My Bankruptcy Attorney says the only way we could do that is to have the money 3Mil on hand to buy....Can you think of anyway to get arround that?....This is too good a deal for both of us to loose it by getting ourselves in a corner...The LMA with Capstar is
 ssignable....While we were trying to wait until Monday to talk I think we might want to
 pend a little time on the phone Friday,maybe just you and I, if Lew's not available.....Ron

PLAINTIFF'S
EXHIBIT

71

CUML-000017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

# ATTACHMENT(S) NOT SCANNED

# PLEASE REFER TO COURT FILE MAINTAINED IN THE OFFICE WHERE THE JUDGE IS CHAMBERED

## CASE NO. 05-21772-CIV-MARTINEZ/BANDSTRA
## DE #117

☐ **DUE TO POOR QUALITY, THE ATTACHED DOCUMENT IS NOT SCANNED**

---

☐ VOLUMINOUS (exceeds 999 pages = 4 inches)
   consisting of (boxes, notebooks, etc.)_____

☐ BOUND EXTRADITION PAPERS

☐ ADMINISTRATIVE RECORD (Social Security)

☐ ORIGINAL BANKRUPTCY TRANSCRIPT

☐ STATE COURT RECORD (Habeas Cases)

☑ SOUTHERN DISTRICT TRANSCRIPTS

☐ LEGAL SIZE

☐ DOUBLE SIDED

☐ PHOTOGRAPHS

☐ POOR QUALITY (e.g. light print, dark print, etc.)

☐ SURETY BOND (original or letter of undertaking)

☐ CD's, DVD's, VHS Tapes, Cassette Tapes

☐ OTHER = _____