UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

Case Number:  05-21772-CIV-MARTINEZ-BANDSTRA

QANTUM COMMUNICATIONS
CORPORATION, a Delaware Corporation,

      Plaintiff,

vs.

STAR BROADCASTING, INC., a Florida
corporation, and RONALD E. HALE, SR.,

      Defendants.

_____/

### ORDER ON NON-JURY PROCEEDING TO DETERMINE DAMAGES INCIDENT TO SPECIFIC PERFORMANCE, ATTORNEY'S FEES AND COSTS, AND DAMAGES PURSUANT TO COUNT II OF THE AMENDED COMPLAINT

THIS CAUSE came before the Court upon a two-day, non-jury proceeding to determine

damages incident to specific performance, reasonable attorney's fees and costs, and damages

pursuant to Count II of the Amended Complaint. The Court has carefully considered all the

parties' filings, and it is otherwise duly advised.[1]  This Court discussed the factual background of

_____

[1]  This Court has considered the entire record in this case, including Plaintiff's Verified
Motion for Attorney's Fees and Costs (D.E. No. 169); Defendants' Written Submission on
Damages (D.E. No. 172); Plaintiff's Initial Submission on Damages Incident to Specific
Performance (D.E. No. 173); Defendants' Response to Plaintiff's Verified Motion for Award of
Attorney's Fees and Costs (D.E. No. 179); Defendants' Response to Plaintiff's Initial Submission
on Damages Incident to Specific Performance (D.E. No. 180); Defendants' Supplement to
Defendants' Response to Plaintiff's Initial Submissions on Damages Incident to Specific
Performance (D.E. No. 184); Defendants' Reply to Plaintiff's Opposition to Defendants' Written
Submission on Damages (D.E. No. 187); Plaintiff's Reply in Support of its Initial Submission on
Damages Incident to Specific Performance (D.E. No. 188); Plaintiff's Reply in Support of it
Motion for Attorney's Fees and Costs (D.E. No. 189); Plaintiff's Proposed Findings of Fact and
Conclusions of Law (D.E. No. 191); the parties' Joint Pretrial Stipulation (D.E. No. 192);
Defendants' Proposed Findings of Fact and Conclusions of Law (D.E. No. 193); all the evidence
admitted at the non-jury proceeding, as well as the testimony of the witnesses; Defendants'
Proposed Final Judgment (D.E. No. 213); Plaintiff's Proposed Final Judgment (D.E. No. 214);
Plaintiff's Supplemental Motion for Attorney's Fees (D.E. No. 215); Plaintiff's Supplemental

this case, which involves a commercial dispute over an agreement to purchased the assets of an

FM radio station, at length in its February 9, 2007 Order Granting Plaintiff's Motion for Summary

Judgment and Granting Plaintiff's Motion for Sanctions at 3-4 (D.E. No. 164) ("Summary

Judgment and Sanctions Order").  That Order found that Plaintiff was entitled to summary

judgment and that Plaintiff was entitled to an award of sanctions, including default judgment and

an award of attorney's fees and costs, pursuant to the inherent power of the Court.  *See generally*

*id*.  This Court first provides a brief procedural and factual background of this case.  It then states

its Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure Federal

52.[2]

## I.  PROCEDURAL BACKGROUND

### A.      The WTKE Purchase Agreement

On September 5, 2003, Qantum and Defendants, Star Broadcasting, Inc. ("Star") and

Ronald E. Hale Sr. ("Hale"), entered into an agreement (the "WTKE Purchase Agreement") in

which Qantum agreed to buy the assets of Ft. Walton Beach radio station WTKE-FM (the

"WTKE Assets") from Defendants for $3 million.  *See generally* Summary Judgment and

Sanctions Order.  This Court has already found that Defendants breached various implied and

express provisions of the WTKE Purchase Agreement, including the No-Shop Provision, which

precluded Defendants from soliciting, entertaining or negotiating with entities other than Qantum

regarding the WTKE Assets while the WTKE Purchase Agreement was in effect.  *Id*. at 15-24.

---

Motion for Bill of Costs (D.E. No. 216); Defendants' Response to Plaintiff's Supplemental
Motions for Attorney's Fees and Costs (D.E. No. 222); and Plaintiff's Reply in Support of
Supplemental Verified Motion for an Award of Attorney's Fees and Costs (D.E. No. 225).

[2] Final judgment in favor of the Plaintiff shall be issued concurrently in a separate
document pursuant to Federal Rules of Civil Procedure 54 and 58.

Qantum filed suit on July 1, 2005.  (D.E. No. 1).  Following an August 3, 2005 hearing before this Court, Qantum's attorneys obtained a Preliminary Injunction preventing Defendants from soliciting, entertaining or negotiating with entities other than Qantum regarding the WTKE Assets (the "Preliminary Injunction Order").  (D.E. Nos. 43, 46).  Defendants appealed this Court's Preliminary Injunction Order in the United States Court of Appeals for the Eleventh Circuit.  (D.E. Nos. 52).  Defendants' appeal was dismissed for lack of prosecution.  (D.E. No. 123).

### B.      The Bankruptcy Court Action

On November 10, 2005, Star filed for Chapter 11 bankruptcy in the Bankruptcy Court for the Northern District of Florida (the "Bankruptcy Court Action").  (*In re Star Broad., Inc.*, No. 05-35012-WSS (Bankr. N.D. Fla.)).  Upon Qantum's Motion to Lift the Automatic Stay, and after a one-day hearing, the Bankruptcy Court held on January 20, 2006 that Star had filed its bankruptcy petition in bad faith to avoid performance in accordance with the WTKE Purchase Agreement and this Court's Preliminary Injunction Order.  (D.E. No. 101).  The Bankruptcy Court lifted the automatic stay, holding that "Qantum may complete the litigation in the United States District Court for the Southern District of Florida . . . ."  *Id*. at 16.

The Bankruptcy Court recently denied a creditor's motion to reimpose the automatic stay, confirming that Qantum may complete the litigation of its claims in this Court with the caveat that the automatic stay "remains in effect as to all assets of the bankruptcy estate, including radio station WTKE."  (D.E. No. 195).  Thus, despite Star's pending bankruptcy, this Court has jurisdiction over Qantum's claims against Defendants and has the ability to order Defendants to assume and specifically perform the WTKE Purchase Agreement.

### C.      Summary Judgment and Sanctions Order

In April 2006, Qantum filed a Motion for Partial Summary Judgment and a Motion for

Sanctions.  On February 9, 2007, the Court issued its Summary Judgment and Sanctions Order. (D.E. 164).  Pursuant to this Court's inherent authority to sanction, the Court entered default judgment against Defendants on all claims for lying under oath, withholding key documents and filing the bad-faith bankruptcy petition.  (Summ. J. and Sanctions Order at 35).[3]  The Court's sanctions included an award of Qantum's reasonable attorney's fees and costs.  *Id*.

In the Summary Judgment and Sanctions Order, the Court held an evidentiary hearing  to determine: 1) the amount of Qantum's damages incident to specific performance, 2) Qantum's reasonable attorney's fees and costs, and 3) the amount of damages pursuant to Count II of the Amended Complaint (a breach of contract claim for Defendants' failure to negotiate the tower purchase option pursuant to Section 1.3 of the WTKE Purchase Agreement (the "Tower Purchase Option")).  The parties agreed that these matters should be resolved through a non-jury proceeding.  *See* (D.E. Nos. 165, 166).  That proceeding (the "Hearing") was held on May 8-9, 2007.

## II. FINDINGS OF FACT

### A.    Lost Operating Profits If Defendants Provide a Tower Lease at Closing

On the same day the WTKE Purchase Agreement was executed, Qantum and another Hale-owned entity, Gulf Breeze Media, Inc. ("Gulf Breeze"), entered into an agreement to sell radio station WMMK-FM to Qantum.  (See WMMK Agreement (Defs. Ex. LL)).  Section 4.2 of the WTKE Purchase Agreement (the "LMA Provision") stated that if Qantum and Gulf Breeze closed the WMMK transaction before Qantum and Defendants closed on the WTKE Purchase Agreement, then Qantum could broadcast programming on WTKE starting on the date of the

---

[3]  This Court explained that this finding serves an alternative basis for this Court's judgment as to liability for Count I, Count III, and Count IV of the Amended Complaint.  (D.E. No. 164 at 3 n.5).

WMMK closing:

> [Hale] agrees that, in the event that the parties have not closed on the transactions contemplated by this Agreement by the date that [Qantum] or its permitted assign closes on the purchase of substantially all of the assets of WMMK(FM) (the "WMMK Closing Date"), *[Hale] shall permit [Qantum], effective on the WMMK Closing Date, to broadcast programming over the Station [WTKE] during all broadcast time made available to [Hale] pursuant to the Clear Channel LMA.*  In return for [Hale's] granting to [Qantum] the right to provide substantially all of the programming aired on the Station, [Qantum] shall reimburse [Hale] for those expenses required to be paid by [Hale] under the Clear Channel LMA commencing with the WMMK Closing Date and continuing for as long as [Qantum] provides such programming over the Station pursuant to this Section 4.2.  In addition, [Qantum] shall pay to [Hale] at Closing if the Closing takes place fifty percent (50%) of [Qantum's] broadcast cash flows, if any, directly attributable to the Station during the period that [Qantum] was programming the Station pursuant to this Section 4.2.

*Id.*  (emphasis added).

The WMMK deal closed on December 30, 2004, but Hale refused to provide Qantum with access to broadcast programming over WTKE.  (Am. Compl. at 11).  The Court finds that January 1, 2005 was the first day that Qantum's lost profit damages began to accrue.  The Court further finds, in accordance with the testimony and methodology employed by Qantum's lost operating profits damages expert, William Redpath ("Mr. Redpath"), that Qantum's lost operating profits damages through the hypothetical closing date of July 1, 2007 (the "Closing") are $243,321 (reduced to present value).  (Pls. Ex. 11 at Table 2 (BIA Report)).

Mr. Redpath arrived at his lost profits calculations by comparing projected cash flows between two scenarios.  (May 8 Trial Tr. at 30).  The first scenario accounted for what would have happened had Qantum started programming WTKE under the LMA on January 1, 2005 and closed the WTKE Purchase Agreement on September 1, 2005.  *Id.*  The second scenario accounted for what did happen — the Closing was delayed by Defendants to an assumed closing date on July 1, 2007.  *Id.*  Using research of the average audience and revenue shares for FM radio stations in the Ft. Walton Beach market, Mr. Redpath calculated Qantum's projected gross

and net revenues.  (Pls. Ex. 11 at 3).  Subtracting estimated direct operating expenses (such as sales commissions) and financing expenses, and accounting for research that indicated that new radio stations earn an average of 36.7% of their mature audience share within their first year of operation and reach 100% during their second year of operation, Mr. Redpath arrived at his projections of Qantum's lost operating profits.  *Id*. at 3-4.

Qantum's lost operating profits do not end on the date of Closing.  *Id*. at 5.  Even assuming Qantum obtains WTKE on July 1, 2007 and immediately begins broadcasting, the revenues and operating profits it earns after Closing will be less than they would have been had Qantum taken possession of WTKE in January 2005 and used the next two-and-a-half years to build its revenues and market presence.  *Id*. at 5-6.  It will take another year, to July 1, 2008, for Qantum's revenues to catch up to those it would have earned had Defendants honored the WTKE Purchase Agreement and given Qantum possession of WTKE on January 1, 2005.  *Id*. at 5-6 and Table 2.  Qantum's lost operating profits from July 1, 2007 to July 1, 2008 amount to $424,121 (reduced to present value).  *Id*. at 6 and Table 2.  Qantum's total lost operating profits from January 1, 2005 to July 1, 2008 are therefore $667,443.  *Id*.

**B.     Lost Operating Profits if Defendants Do Not Provide a Tower Lease at Closing**

This Court agrees that Qantum is faced with the possibility that Defendants are unable to provide a tower lease from which Qantum can broadcast WTKE after Closing.  Star has represented to the Bankruptcy Court that it has "lost its lease" with Star Towers of Florida, LLC (the "Tower Lease"), pursuant to which Star broadcasts programming of WTKE.  Star Motion to Dismiss Bankruptcy ¶ 8, No. 05-35012 (Bankr. N.D. Fla. March 26, 2007).

On the second day of the Hearing, Defendants produced a copy of a tower lease that had been sent by Star Tower of Florida to Qantum's FCC counsel that day.  The existence of a lease

offer does not prove with reasonable certainty that an acceptable tower lease will be available at Closing with terms substantially similar to those contained in the lease that was in existence when the WTKE Purchase Agreement was executed (the "Star Tower LLC/Capstar Lease").

If Defendants are unable to cure Star's default of the Tower Lease before Closing on the WTKE Purchase Agreement or otherwise provide a tower lease substantially similar to the Star Tower LLC/Capstar Lease at Closing, then Qantum will be without a tower from which to broadcast, and will incur additional lost operating profits. (Pls. Ex. 11 at 6-9).

This Court finds that Plaintiff has demonstrated that without a broadcast tower, WTKE will go off the air as soon as the deal closes. *Id.* It would take a minimum of two years, from July 1, 2007 through June 30, 2009, for Qantum to build a new tower on which to place WTKE's antenna. *Id.* at 6; (May 8 Trial Tr. at 81). Additionally, it would take another year for WTKE's revenues to catch up to levels that Qantum would have earned had Defendants honored the WTKE Purchase Agreement and provided a Tower lease at Closing. (Pls. Ex. 11 at 6-7). In total, should Defendants fail to provide a Tower lease at Closing, Qantum's lost operating profits would increase from $978,748, to $1,646,191. *Id.* at 6-8 and Tables 3-4.

Defendants' failure to provide a Tower lease also would require Qantum to build its own tower from which to transmit the WTKE signal. *Id.* at 8-9; (May 8 Trial Tr. at 81). The Court finds that it would cost $813,804 to buy land and build a tower. Pls. Ex. 11 at 8-9. Because Qantum would save $488,218 on future lease payments by owning such a tower, its total damages related to building a tower would be $325,586. *Id.* at 9; (May 8 Trial Tr. at 83). Added to the $1,646,191 in lost operating profits described above, Qantum's total damages arising from Defendants' failure to provide a tower lease amount to $1,971,777. (Pls. Ex. 11 at 10).

If Defendants provide a tower lease at closing that is not substantially the same as the Star Tower LLC/Capstar Lease in existence at the time the WTKE Purchase Agreement was executed,

Defendants would be liable to Qantum for damages arising out of any dissimilar terms contained in the tower lease provided.

### C.   Damages Relating to the Tower Purchase Option

Section 1.3 of the WTKE Purchase Agreement required Defendants to negotiate in good faith an option to purchase the Tower (the "Tower Purchase Option"). (Am. Compl. at 14-16). Defendants failed to provide the Tower Purchase Option. *Id*. Ownership of the Tower would have provided Qantum with rental income and a location for the WTKE antenna. (Pls. Ex. 12, March 30, 2007 Expert Report of Bruce Bingham at 5-6). This Court finds that had Defendants negotiated in good faith and provided Qantum with a Tower Purchase Option, Qantum would have attracted three additional cellular tenants to the Tower, garnering additional lost profits in the amount of $326,939. (May 8 Trial Tr. at 92-95). This Court agrees that Mr. Bingham's model regarding three additional cellular tenants is a conservative estimate. *See id*. at 92-93.

### D.   The Missing Assets

Schedule 1.1(b) of the WTKE Purchase Agreement lists the WTKE Assets that Defendants are required to provide to Qantum at Closing. (See WTKE Purchase Agreement Schedule 1.1(b)). Defendants failed to acquire and/or no longer possess many of the WTKE Assets listed in Schedule 1.1(b). (Pls. Ex. 15, Bankruptcy Petition Schedule B). Approximately $455,000 of these missing assets (the "Missing Assets") were retained by Clear Channel Communications, Inc. ("Clear Channel"), the company that sold WTKE to Defendants. (May 9 Trial Tr. at 55-56). Another $42,000 in assets were either sold or discarded by Defendants. *Id*. at 56.

### E.   Attorney's Fees and Costs

Defendants stipulated that the number of hours spent by Qantum's attorneys on this case is reasonable. (May 8 Trial Tr. at 12). Defendants also stipulated that the hourly rates charged by

Qantum's attorneys on this case are reasonable.  *Id*.  Qantum incurred $780,866.97 in attorney's fees and $33,327.77 in taxable costs (total: $814,194.74) from June 1, 2005 through January 31, 2007.  (Pls. Ex. 13, Josefsberg Expert Report).  From February 1, 2005 through May 9, 2007, the last day of the Hearing, Qantum incurred an additional $329,006 in attorney's fees and $9,292 in taxable costs.  In total, therefore, Qantum has incurred $1,152,493 in attorney's fees, expenses and taxable costs.

Any of the previous factual finding which may represent conclusions of law are adopted as conclusions of law.  *Miller v. Fenton*, 474 U.S. 104, 114-15 (1985).

### III.  CONCLUSIONS OF LAW

### A.     Qantum Has Proven Lost Profits With Reasonable Certainty

Qantum has met its burden of proving lost profits incurred incident to specific performance.  To prove lost profits, Qantum must show "that 1) the defendant's action caused the damage and 2) there is some standard by which the amount of damages may be adequately determined."  *Nebula Glass Int'l, Inc. v. Reichhold, Inc.*, 454 F.3d 1203, 1214 (11th Cir. 2006) (citing *W.W. Gay Mech. Contractor, Inc. v. Wharfside Two, Ltd.*, 545 So. 2d 1348, 1351 (Fla. 1989); *Twyman v. Roell*, 166 So. 215, 218 (Fla. 1936)).  This Court already has held that Defendants' failure to perform the WTKE Purchase Agreement caused damage to Qantum. (Summ. J. and Sanctions Order at 50).

At the Hearing on damages, and in his expert report, Mr. Redpath presented an acceptable standard by which Qantum's lost operating profits can be adequately determined.  Analyzing the average shares and revenues of the FM radio stations in Ft. Walton Beach, Mr. Redpath determined that Qantum's lost operating profits would be $667,443 if Defendants provide a tower lease at Closing or $1,646,191 if Defendants fail to provide a tower lease at Closing.  (Pls. Ex. 11 at Tables 2, 4).  This Court adopts Mr. Redpath's analysis.

Defendants argued in their filings and at the Hearing that Qantum's failure to choose a programming format for WTKE rendered Qantum's lost profits analysis speculative.  (May 8 Trial Tr. at 133).  But Mr. Redpath testified credibly regarding the fact that an economic damages evaluation need not take into account a station's format, and format analyses typically are conducted by programming experts after a station is purchased.  (May 9 Trial Tr. at 117).  In his September 29, 2006 deposition, Qantum's Chief Financial Officer, Michael Mangan ("Mr. Mangan"), testified that Qantum relies on its consultants when it comes to station formatting, and that it did not change the format of WMMK (now WFFY) until three months after closing.  (Mangan Depo. Tr. at 50-53). Moreover, Defendants' expert, Mr. Holt, acknowledged that a radio station's value can be analyzed without regard to format.  *Id*. at 20-23.

Defendants also argue that Qantum's estimation of a 245% increase in revenues over the first year is "enthusiastic."  (Pls. Ex. B).  Defendants' own estimate of Qantum's lost profits damages, calculated by Mr. Holt, has Qantum earning little more than $27,000 in lost operating profits over two-and-a-half years.  (May 9 Trial Tr. at 44).  Mr. Holt's estimate is not credible on its face, especially in light of Mr. Holt's opinion that WTKE has appreciated in value by $1.75 million in less than three years.  Indeed, the notion that Qantum would spend significant time and money fighting for assets that generate such insubstantial revenues defies common sense.  As Mr. Redpath testified at the Hearing, there is a disconnect between Mr. Holt's opinion that Qantum would earn few operating profits from a radio station that Mr. Holt believes appreciated more than $1.75 million in less than three years.  *Id*. at 120-21.

This Court finds that the performance estimates testified to by Plaintiff's experts may reasonably be expected from Qantum, which is ranked first or second in key listenership demographics in each of the five Arbitron-rated markets in which it operates.  *Id*. at 101-02. Qantum regularly competes for market share with competitors in those markets, including its main

competitor in the Ft. Walton Beach market, Cumulus Media Inc. ("Cumulus"). *Id*. at 104-05.

Moreover, Mr. Mangan testified that the revenues of the other station it purchased from Hale,

WMMK (now WFFY), were $102,000 in Hale's last year of operating it. After Qantum

purchased WFFY and changed its format in April 2005, WFFY earned $320,000 in revenues the

first 12 months following the format change and more than $550,000 in the second year. *Id*. at

104-05. Although Qantum calculates that WTKE's revenues will increase to more than $800,000,

Holt acknowledged that WTKE is a better technical facility than WFFY and has "substantial

potential." (May 8 Trial Tr. at 144; May 9 Trial Tr. at 24). WTKE is a 100,000-watt class C1

station, whereas WFFY is a 25,000-watt class C3 station. (May 9 Trial Tr. at 111).

Defendants also argued that it would take Qantum longer than a year to reach its revenue

projections because of a reporting lag in the Arbitron ratings system, which is the ratings

information provider consulted by advertising agencies. (May 9 Trial Tr. at 69). This Court

notes that if Qantum had estimated a longer "ramp up" time to reach revenue estimates, its lost

profits damages would have increased. Defendants therefore benefit from a shorter ramp up

period. Regardless, Qantum's performance with WFFY, which experienced rapid revenue growth

of about 200% in the first year, belies Defendants' argument. And Mr. Mangan testified that more

than half of its advertising revenues in Ft. Walton Beach are derived not from advertising agencies

but directly from local advertisers. *Id*. at 105.

Defendants also argue that it is premature for this Court to determine the amount of

Qantum's damages should Defendants fail to provide a tower lease at Closing, as a Closing has

not yet occurred. On the second day of the Hearing, Defendants introduced as evidence a

proposed tower lease submitted to Qantum that day by the Tower's landlord, Star Towers of

Florida LLC. *Id*. at 99. This Court agrees with Mr. Mangan, who testified that although Qantum

hopes that a tower lease can be entered into, that there are no assurances that a viable tower lease

will be available at Closing. *Id*. at 101. In the absence of any reasonable assurances on the record, this Court is justified in making a determination of an alternative damages amount to be used should Defendants fail to provide a tower lease. As determined above, in the absence of a tower lease, Qantum would have to build its own tower. It would reasonably take two years for Qantum to build a tower and an additional year for Qantum to meets its projected revenues, resulting in additional damages of $1,646,191 in lost operating profits and $325,586 in damages relating to the construction of a tower.

At the Hearing, Holt testified that Qantum could mitigate its damages by quickly locating an alternative tower for its antenna. (May 8 Trial Tr. at 138). However, there are no assurances that Qantum can obtain space on a tower that would allow Qantum to broadcast WTKE at full power, or at the height in which WTKE currently broadcasts on the Ft. Walton Beach Tower. (May 9 Trial Tr. at 42-43). Furthermore, Holt was not able to identify any specific alternatives. *Id*. at 41-42. In addition, Plaintiff recently filed a copy of a document filed in the Bankruptcy Court Action, more specifically Debtor's Response in Opposition to the Motion or the Appointment of a Receiver or In the Alternative, to Convert (D.E. No. 219-2), which clearly represents that Star has "lost its lease" with the tower landlord. *Id*. at ¶ 6.[4] This filing provides further support for this Court's conclusions that it is not premature for this Court to determine the amount of Qantum's damages should Defendants fail to provide a tower lease at Closing and that Qantum is entitled to damages.

**B.     Qantum Is Entitled to Damages Relating to the Tower Purchase Option**

This Court entered a default judgment against Defendants as a sanction for lying under

---

[4] That Bankruptcy Court filing states: "The debtor [Star] has also lost its lease with Phillips Properties, Inc. and/or Star Towers LLC an it is without resources to secure a lease elsewhere or to obtain FCC approval for a transfer of the asset to another tower." *Id*.

oath, withholding key documents and filing the bad-faith bankruptcy petition.  Qantum's

allegations against Defendants are thereby deemed admitted by Defendants.  *See Nishimatsu*

*Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1205-06 (5th Cir. 1975); *see also Buchanan*

*v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987).  At the Hearing, Defendants proffered evidence

in an attempt to prove that it negotiated in good faith with Qantum to provide the Tower

Purchase Option pursuant to Section 1.3 of the WTKE Purchase Agreement.  However, this

evidence is irrelevant given the allegations made by Qantum in its Amended Complaint that

Defendants failed to negotiate in good faith.  (Am. Compl. at 14-16).  In light of the default

judgment sanction, those allegations are deemed admitted and cannot be re-litigated.

    As to the amount of Qantum's damages, Defendants' expert, Mr. Holt, testified that

Qantum would be able to find only one additional tenant for the Tower, resulting in damages of

$109,218 rather than $326,939.  (May 8 Trial Tr. at 146).  Defendants testified that a nearby

tower already leased antenna space to six cellular tenants, representing most of the cellular

providers in the area.  (May 9 Trial Tr. at 72).  However, Mr. Holt acknowledged that he did not

know who those tenants were, when those tenants leased space on the nearby tower or whether,

had Defendants timely provided the Tower Purchase Option, Qantum could have competed for

and obtained leasees from those tenants.  *Id*. at 37.  This Court finds more credible the testimony

of Qantum's expert Bruce Bingham, who testified that Qantum would have been able to find three

additional tenants for the Tower.  (May 8 Trial Tr. at 95).

## C.    Qantum Is Entitled to a $497,600 Reduction in the Purchase Price Relating to the Missing Assets

    Qantum is entitled to a reduction in the purchase price commensurate to the $497,600 in

Missing Assets.  Defendants' argument that the Missing Assets are not "used or useful" to the

operation of WTKE is without merit.  The WTKE Purchase Agreement expressly states that the

assets listed in Schedule 1.1(b) are to be considered among the used or useful assets that must be

conveyed at Closing:

> [T]he Station Assets will include, without limitation, . . . all equipment, electrical devices, antennas, towers, cables, tools, hardware, office furniture and fixtures, computer equipment and printers, office materials and supplies, inventory, motor vehicles, spare parts and other tangible personal property of every kind and description *which are used or useful in the operation of the Station, including, without limitation, those listed or described on Schedule 1.1(b)*, except any retirements or dispositions thereof made between the date hereof and the Closing Date in the ordinary course of business and consistent with past practices of Seller or with the written consent of Buyer . . . .

WTKE Purchase Agreement § 1.1(b) (emphasis added).

Defendants argue that the Missing Assets fall under Section 1.1(b)'s exception for

"retirements or dispositions" made in the ordinary course of business.  In actuality, however,

Defendants never obtained the Missing Assets from Clear Channel, which used them to set off a

debt owed by Defendants for their failure to make required payments pursuant to the Clear

Channel LMA Agreement.  (May 9 Trial Tr. at 90).  However, whether Defendants actually used

the Missing Assets is irrelevant.  Those Assets would be useful to Qantum.  *Id*. at 106.  For

example, one of the missing assets is a 1096-foot-tall transmission tower that Defendants valued

at $374,382.  (*See* WTKE Purchase Agreement Schedule 1.1(b)).  Although Qantum sought to

purchase that tower as a backup facility, the tower could have been used by Qantum as the

primary tower for broadcasting WTKE in the event Defendants failed to provide the Tower Lease

or Tower Purchase Option at Closing.  *Id*.  Many of the other assets listed in Schedule 1.1(b),

including the transmission line, fence, and wood building, were related to this tower and added to

its value.  *Id*.  Even if Qantum could not have used these assets, it could have sold them for cash.

*Id*.

Hale testified that the Missing Assets are not worth $497,600, the value they are given in

Schedule 1.1(b) of the WTKE Purchase Agreement.  *Id*. at 83.  However, in an attempt to avoid

the WTKE Purchase Agreement in the Bankruptcy Court Action, Hale represented to the

Bankruptcy Court at the January 3, 2006 Bankruptcy Court hearing that certain of the Missing

Assets were withheld by Clear Channel and had a value of $455,000 — the same total value for

those assets as listed in Schedule 1.1(b).  The Bankruptcy Court Order reflected that at the

bankruptcy hearing Hale "stated that Star Broadcasting could not fulfill its obligations under the

Qantum APA because Star Broadcasting did not get all of the assets it expected to get from Clear

Channel.  The asset value of the deal was reduced by approximately $455,000."  (D.E. 101 at

8-9).  Moreover, Defendants used the value of the assets listed in Schedule 1.1(b) in its

Bankruptcy Petition when valuing those assets that it did obtain from Clear Channel.  *Id*. at 91.

Having used Schedule 1.1(b)'s asset values in the Bankruptcy Court, Defendants cannot now

disavow them in an attempt to avoid a purchase price reduction before this Court.

> **D.    Qantum Is Entitled to All of Its Reasonable Attorney's Fees and Costs in This Case**

This Court finds that Qantum is entitled to its reasonable attorney's fees, expenses, and

costs of $1,152,493 through May 9, 2007, and it will consider any supplementary attorney's fee

petition submitted by Qantum regarding fees and costs incurred post-judgment.

Defendants have argued that Qantum is not entitled to attorney's fees unrelated to their

sanctionable conduct.  However, it is within a court's discretion to vindicate itself and compensate

a victimized party by invoking the court's inherent power to sanction and requiring the bad-faith

actor to pay for all of the victim's attorney's fees.  *See Chambers v. NASCO, Inc.*, 501 U.S. 32,

56-57 (1991) (affirming the district court's award of more than $996,000 in attorney's fees).

Defendants have engaged in a pattern of misconduct that has endured throughout the course of

the litigation.  (Summ. J. and Sanctions Order at 35).  At the beginning of the case, Defendants

deliberately gave false testimony and failed to produce documents regarding the linchpin issue in

this case. *Id*. at 35-42.  Defendants then filed a bad-faith bankruptcy petition to avoid this Court's Injunction Order.  *Id*. at 42-44.  Later, they proffered outrageous and untenable positions in defense of Qantum's summary judgment motion.  *Id*. at 47.  Defendants' actions in this case warrant no less than an award of Qantum's entire reasonable attorney's fees and costs.

Defendants also argued that Qantum is not entitled to fees and costs incurred in the Bankruptcy Court Action.  However, when considering sanctions, a district court may consider all the circumstances surrounding the alleged violations, including a party's misconduct in related cases. *See Atkins v. Fischer*, 232 F.R.D. 116, 129-131 (D.C. Cir. 2005).  Defendants' conduct related to the bankruptcy filing, including the Bankruptcy Court's finding that Star filed bankruptcy to avoid this litigation and the WTKE Agreement, constitutes bad faith and evidences Defendants' lack of respect for courts and the judicial process.  (Summ. J. and Sanctions Order at 44).  All reasonable fees and costs incurred by Qantum in pursuing Defendants into the Bankruptcy Court Action therefore will be a part of the overall fee award.

Moreover, Qantum is entitled to its fees incurred in the Bankruptcy Court Action because the lifting of the automatic stay was essential to the resolution of Qantum's claims before this Court. *See Yurman Designs, Inc. v. PAJ, Inc.*, 125 F. Supp. 2d 54, 56 (S.D.N.Y. 2000) (awarding fees and costs arising in related Texas action where jurisdictional issues resolved there were "essential to the resolution of the claims" before the Southern District of New York), *aff'd*, 29 Fed. Appx. 46 (2002).  The award of bankruptcy-related fees is especially warranted in light of the fact that Defendants themselves needlessly caused those fees to be incurred by filing a bad-faith bankruptcy petition in the first place. *See Stathos v. Bowden*, 728 F.2d 15, 22 (1st Cir. 1984) (awarding fees and costs arising in related state court action that the plaintiffs were "forced to defend" and was "a necessary part" of the federal court case).  Moreover, one of the "products" of the Bankruptcy Court Action — the Bankruptcy Court's holding that Star filed bankruptcy in

bad faith to avoid this Court — was a basis for sanctions, further warranting the recoupment of bankruptcy-related fees. *See Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 414, 420 (3d Cir. 1993) (holding that "[I]f the plaintiff can prove that the fees and expenses incurred in the other litigation resulted in work product that was actually utilized in the instant litigation, that the time spent on other litigation was 'inextricably linked' to the issues raised in the present litigation, and that plaintiff has not previously been compensated for those fees and expenses, then the district court may include those fees and expenses in its fee award.").

This Court has taken into account Defendants' ability to pay the sanctions and will assign liability jointly and severally among Star and Hale. *See Martin v. Autombili Lamborghini Exclusive, Inc.*, 307 F.3d 1332, 1337 (11th Cir. 2002). During the Hearing, Defendants did not argue that Star cannot pay any fee and cost related sanctions imposed by this Court. Such fees and costs may be recouped from the WTKE Purchase Agreement's $3 million purchase price. At the Hearing, Hale testified that he cannot pay Qantum's attorney's fees and costs. (May 9 at 76-80). However, Hale provided no credible evidence to support his testimony. He provided no bank account statements, tax returns, credit reports or any other evidence to support his position that he cannot pay the attorney's fees sanction awarded by this Court. Having observed Mr. Hale as a witness, this Court finds that his testimony is not credible. The Court also notes that Hale acknowledged that at the time he refused to perform under the WTKE Purchase Agreement, he understood that "a lot of money in legal fees were going to be spent trying to deal with the issue." *Id*. at 93. This Court therefore awards Qantum its attorney's fees jointly and severally against Defendants.

**E.     Defendants Are Not Entitled to a Reduction in Damages Based on Any Appreciation of the WTKE Assets**

Defendants proffered a valuation report by Mr. Holt stating that WTKE has appreciated in

value from $3 million to $4.75 million.  (Defs. Ex. A).  Defendants argue that they are entitled to deduct the $1.75 million in appreciation from Qantum's total damages award.  However, Qantum is entitled to receive the full benefit of any appreciation in the value of the WTKE Assets that has accrued over the two years that Defendants failed to perform the WTKE Purchase Agreement. Defendants have provided no authority to the contrary.

In addition, this Court does not find Mr. Holt's valuation credible.  His valuation was premised largely on the assumption that the Ft. Walton Beach market, rated the 226th-largest radio market, can be considered in combination with the Pensacola market, rated 153rd, to form the 83rd-largest radio market in the country.  Qantum's expert Mr. Redpath testified that in actuality there is little overlap between the two markets.  (May 9 Trial Tr. at 118).  Mr. Holt's methodology therefore produces a body of comparable sales in the 50th to 150th market range that inflates his valuation of WTKE.  Moreover, Mr. Holt only considered comparable sales of between $3 million and $9 million (Defs. Ex. A at 4).  This limited range of comparables further inflates Mr. Holt's valuation.

### F.    Defendants Are Not Entitled to a Reduction in Damages Based on the WMMK Asset Purchase Agreement's Conditional Payment Provision

Defendants argue that they are entitled to a reduction in Qantum's damages award equal to $500,000 pursuant to paragraph 3.6 of the WMMK Agreement, which states that if, within 24 months of closing the WMMK deal, the parties have completed the WTKE deal and Qantum commences broadcasting from the Tower, then Qantum is to pay Gulf Breeze $500,000:

> Conditional Payment.  *In the event that, within twenty-four (24) months of Closing, WTKE(FM) commences operation of its transmission facilities from the proposed new tower in Ft. Walton Beach* located at 30° 24' 38" N Latitude; 86° 37' 22 " W Longitude (NAD27) (the "Ft. Walton Beach Site") *and Buyer or any subsidiary of Buyer is at that time the licensee of WTKE(FM)*, Buyer shall pay to Seller an additional sum of Five Hundred Thousand Dollars ($500,000) . . . .

(WMMK Asset Purchase Agreement § 3.6) (emphasis added).

A plain reading of Section 3.6 indicates that Defendants are not entitled to a $500,000 reduction.  The WMMK Purchase Agreement and WTKE Purchase Agreement are separate agreements involving different sellers.  Thus, even assuming that conditions precedent in Section 3.6 were met, then Gulf Breeze, not Star, would receive the $500,000.  Star should not benefit from a payment that was supposed to go to a completely separate entity.

More importantly, the conditions precedent set forth in Section 3.6 were not met.  The WMMK deal closed more than 24 months ago, in December 2004.  And the WMMK Asset Purchase Agreement closed prior to Qantum obtaining the license to WTKE.  Although Defendants argue that this Court should consider September 1, 2005 the closing date as was considered in Qantum's lost profits analysis, the WTKE Purchase Agreement did not close within 24 months, and that Qantum did not obtain the license to WTKE prior to the WMMK closing.  Defendants were largely, if not completely, responsible for delaying the WTKE closing, and should not benefit from that delay now.

### G.    Defendants Are Not Entitled to Interest on the Purchase Price

Defendants argue that they are entitled to a $540,000 offset for interest on the WTKE Purchase Agreement's $3 million purchase price from July 1, 2005 through July 1, 2007.  Although in specific performance cases a seller generally is entitled to interest on the purchase price from the original closing date, an exception exists where the seller caused the delay and interest would exceed the purchaser's lost profits.  *See Shelter Corp. of Canada Ltd. v. Bozin*, 468 So. 2d 1094, 1097 (Fla. 2d DCA 1985).  Here, Qantum seeks lost operating profits from July 1, 2005 through July 1, 2007 of $243,321, which is much less than the $540,000 in interest sought by Defendants.  (Pls. Ex. 11 at Table 2).  Defendants are thus left with the considerable rents and

-19-

profits they earned while operating WTKE from July 1, 2005 through July 1, 2007.

Furthermore, Qantum's economic damages analysis accounted for considerable amounts of interest Qantum would have had to pay to finance the purchase of WTKE.  (Pls. Ex. 11 at 4). This "interest expense" amounted to $53,294.50 in the second half of 2005, $348,360 in 2006, and $87,322.50 in the first half of 2007, for a total of $498,977.  *Id*. at Table 2.  Having received the benefit of this interest expense relating to Qantum's financing of the WTKE purchase price, Defendants are not entitled to a further offset for interest on the purchase price.

### H.   The WTKE Purchase Agreement's $3 Million Purchase Price Shall Be Reduced Commensurate to Qantum's Damages, Attorney's Fees and Costs

Under Florida law, "[d]amages awarded in specific performance are a way of compensation to adjust the equities between the parties to place them in a position that they would have occupied had the contract been timely performed . . . . The court is really requiring an accounting in its attempt to adjust the equities between both parties in order to return them to their relative position at the time of closing."  *Wiborg v. Eisenberg*, 671 So. 2d 832, 835 (Fla. 4th DCA 1996) (internal citations omitted); *Walker v. Benton*, 407 So. 2d 305, 307 (Fla. 4th DCA 1981).

This Court finds that the WTKE Purchase Agreement's $3 million purchase price shall be reduced commensurate to Qantum's damages, attorney's fees, and costs incurred incident to Defendants' failure to specifically perform.  *Boca Palm Invs., Inc. v. Jerdon Inc.*, 568 So. 2d 505, 506-07 (Fla. 4th DCA 1990) (citing *Am. Realequities, Ltd. v. Alm Inv. Corp.*, 406 So. 2d 507, 508-09 (Fla. 3d DCA 1981)).

Qantum's total damages are $2,644,475 if Defendants provide a Tower Lease at Closing, resulting in a reduction in the purchase price to $355,525.  If Defendants do not provide the

Tower Lease at Closing, Qantum's total damages are $3,948,809, completely offsetting the purchase price and resulting in a remaining debt to Qantum of $948,809.

Any of the previous conclusions of law which may represent findings of fact are adopted as findings of fact. See *Miller*, 474 U.S. at 114-15.

For these reasons, it is hereby:

**ORDERED** and **ADJUDGED** that

1. The following pending motions are resolved as follows: Plaintiff's Verified Motion for Attorney's Fees and Costs **(D.E. No. 169)** is **GRANTED**, consistent with the findings of this Order; Plaintiff's Initial Submission on Damages Incident to Specific Performance **(D.E. No. 173)** is **GRANTED**, consistent with the findings of this Order; Defendants' Response to Plaintiff's Verified Motion for Award of Attorney's Fees and Costs Plaintiff's Supplemental Motion for Attorney's Fees **(D.E. No. 215)** is **GRANTED**, consistent with the findings of this Order; Plaintiff's Supplemental Motion for Bill of Costs **(D.E. No. 216)** is **GRANTED**, consistent with the findings of this Order; Defendants' Request for Oral Argument **(D.E. No. 223)** is **DENIED**.

2. The WTKE Purchase Agreement remains in effect and fully enforceable according to its terms. Defendants' purported April 14, 2005 termination of the WTKE Purchase Agreement is invalid. Defendants shall assume and specifically perform the WTKE Purchase Agreement, cure all of Defendants' defaults thereunder, compensate Qantum for its pecuniary losses arising from such uncured defaults and convey the WTKE Assets free and clear of all liens and encumbrances.

3. Defendants, and each of their agents, employees, including without limitation Ronald E. Hale Jr. and Jennifer F. Hale, and all persons acting in concert or conspiracy with them or under their control or on their behalf, are permanently enjoined, for such time as the WTKE

Purchase Agreement remains in effect, from directly or indirectly:

<ol type="a">
<li>Soliciting, entertaining, or negotiating with entities other than Qantum with regard to the transfer or sale of the WTKE Assets;</li>
<li>Consummating the transaction contemplated in the Cumulus Agreement or otherwise conveying the WTKE Assets to Cumulus;</li>
<li>Soliciting, entertaining or negotiating with entities other than Qantum with regard to the transfer or sale of the Tower; and</li>
<li>Engaging in further violations of the No-Shop Provision in the WTKE Purchase Agreement.</li>
</ol>

4. Defendants shall compensate Qantum for its pecuniary losses arising from Defendants' defaults in failing to timely perform the WTKE Purchase Agreement:

<ol type="a">
<li>**$667,443** in lost operating profits;</li>
<li>if Defendants are unable to provide Qantum with a tower lease at Closing containing terms substantially similar if not identical to those terms set forth in the April 8, 2002 tower lease between Star Tower LLC and Capstar Radio Operating Company, an additional **$978,748** in lost operating profits;</li>
<li>if Defendants are unable to provide Qantum with a tower lease at Closing containing terms substantially similar if not identical to those terms set forth in the April 8, 2002 tower lease between Star Tower LLC and Capstar Radio Operating Company, an additional **$325,586** for the cost to construct a new tower;</li>
<li>if Defendants provide Qantum with a tower lease at Closing containing</li>
</ol>

terms that are not substantially similar to those terms set forth in the April 8, 2002 tower lease between Star Tower LLC and Capstar Radio Operating Company, then Qantum will be entitled to damages arising out of any dissimilar terms contained in the tower lease provided;

e)     **$497,600** for those Missing Assets listed on Schedule 1.1(b) of the WTKE Purchase Agreement;

f)     **$326,939** in damages associated with Defendants' failure to negotiate in good faith the Tower Purchase Option pursuant to Section 1.3 of the WTKE Purchase Agreement; and

g)     **$1,152,493** in reasonable attorney's fees and costs incurred by Qantum through May 9, 2007.

5.  This Court will consider any supplementary Petition for Attorney's Fees and Costs that Qantum submits detailing its post-judgment reasonable attorney's fees and costs.

6.  Each of the damages listed above shall be recovered by Qantum through a commensurate reduction in the WTKE Purchase Agreement's $3 million purchase price.

7.  Defendants shall be jointly and severally liable for all damages exceeding the $3 million purchase price.

8.  The Court's damages are based on a July 1, 2007 closing date.  To the extent reasonably practicable, a closing shall be scheduled on or before that date.  Any delays in closing beyond July 1, 2007 will result in additional damages to Qantum.  Similarly, in the event that the closing occurs earlier than July 1, 2007, the damages will be less than the current estimates.  In the event that the closing occurs sooner or later than July 1, 2007, the parties shall endeavor to amicably reduce or increase the lost profits and other damages values that are affected by the

closing date.  In the event that the parties are unable to reach agreement as to the reduction or

increase in damages values, both Plaintiff and Defendants shall file a memorandum that does not

exceed five pages, excluding any relevant affidavits.

9.  Execution shall issue on the date of closing as set by the Bankruptcy Court.

10. This Clerk is **DIRECTED** to mark this case as **CLOSED**.  The Court retains

jurisdiction to address all post-judgment motions and enforce the terms of this Final Judgment.

DONE AND ORDERED in Chambers at Miami, Florida, June 8, 2007.

_____
JOSE E. MARTINEZ
UNITED STATES DISTRICT JUDGE

Copies provided to:
Magistrate Judge Bandstra
All Counsel of Record